UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 2 0 2010 ★

BROOKLYN OFFICE

UNITED STATES OF AMERICA,

v.

PETER POLOUIZZI,

              Defendant.

)
)
)
)
)
)
)
)
)

No. 06-CR-22 (JBW)

MEMORANDUM AND ORDER
GRANTING NEW TRIAL
(*POLOUIZZI V*)

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.    Introduction ..................................................................................................................4

II.   Facts and Procedural History.......................................................................................5

   A.   Defendant and the Crime......................................................................................5

      1.   Childhood Sexual Abuse in Sicily.................................................................7

      2.   Resulting Psychological Trauma ...................................................................9

   B.   Arrest and Indictment .........................................................................................10

      1.   Execution of Warrant...................................................................................11

      2.   Twenty-Three Count Indictment .................................................................13

   C.   Trial Proceedings................................................................................................14

      1.   Images..........................................................................................................14

      2.   Testimony ....................................................................................................15

         a)   Polizzi's Testimony ...........................................................................16

         b)   Dr. Lisa Cohen...................................................................................19

         c)   Dr. Eric Goldsmith ............................................................................21

     d)     Dr. Naftali Garcia Berrill ................................................................ 24

   3.    Jury Charge ........................................................................................... 28

     a)     Written Charge Sheet ........................................................................ 28

     b)     Insanity Defense ................................................................................ 31

     c)     Mandatory Minimum Sentence ........................................................ 31

D.   Jury Verdict and Colloquy ............................................................................ 32

   1.    Jury Verdict ........................................................................................... 32

   2.    Jurors Opposed To Incarceration ...................................................... 32

E.   Post-Trial Proceedings ................................................................................. 36

   1.    First Grant of New Trial Based on Trial Court's Perception of Error ......................... 36

   2.    Sentencing on Counts Fourteen through Twenty-Four .................... 37

F.   Appeal ............................................................................................................ 38

G.   Proceedings on Remand ............................................................................. 39

III.   Second Grant of New Trial ............................................................................... 41

A.   Standard ......................................................................................................... 41

B.   Preliminary Issue ........................................................................................... 43

C.   Overindictment ............................................................................................. 44

   1.    No Prejudice From Evidence Admitted ............................................ 45

   2.    Prejudice From Overbreadth of Charges Tried .............................. 45

D.   Timeliness ...................................................................................................... 52

   1.    "Seven-Day" Rule ................................................................................ 52

   2.    Excusable Neglect ............................................................................... 54

   3.    Supplemental Order ............................................................................ 57

IV.  Informing New Jury of Mandatory Minimum Sentence......................................................58

   A.  The Sixth Amendment – History and Context.............................................................59

      1.  American Practice *Circa* 1791 ...........................................................................66

      2.  British Practice *Circa* 1791 ...............................................................................72

         a)  Ryder Papers ...........................................................................................72

         b)  Old Bailey Session Papers .....................................................................79

   B.  Caselaw ......................................................................................................................82

      1.  Jury's Historic Sentencing Role...........................................................................83

      2.  Keeping Jury in the Dark Incompatible with Historic Jury Role..........................86

      3.  Jury's Power to Moderate Harsh Effects of Law.................................................90

   C.  Attempts to Restrict Sixth Amendment Jury Discretion.............................................93

      1.  Eighteenth and Nineteenth Century .....................................................................93

      2.  Contemporary ...................................................................................................101

   D.  Second Circuit Court of Appeals: Jury Knowledge.................................................104

      1.  *Thomas* and *Pabon-Cruz* Premises ...................................................................104

         a)  *Thomas* ..................................................................................................104

         b)  *Pabon-Cruz* ..........................................................................................109

         c)  Post-*Booker*, *Pabon-Cruz*, *Thomas* and *Shannon* Require Reinterpretation ........112

         d)  *Pabon-Cruz* Applied to Polizzi ............................................................112

      2.  *Gilliam*'s Language Represents Current General Role of Informed Jury as Representative of Community Mores........................................................................114

      3.  In Instant Case, Informing the Jury of the Applicable Penalty Was Necessary Because of the Defendant's Unusual Background and the Unknown Punishment .................117

    E.    Variability of Results Depending Upon Informed & Non-Informed Jurors .................. 117

    F.    Summary: Informing Jury in Present Case .................................................... 121

    G.    Special Circumstances ......................................................................... 122

V.    Conclusion ............................................................................................... 125

## I.    Introduction

The defendant—a successful, middle-aged business and family man with no criminal record—was tried and convicted of twelve counts of receiving and eleven counts of possessing child pornography in the privacy of his locked garage. *See* 18 U.S.C. §§ 2252(a)(2) (receipt); 2252(a)(4)(B) (possession). *See also United States v. Polizzi* (*Polouizzi I*), 549 F. Supp. 2d 308, 319 (E.D.N.Y. 2008). The only defense proffered was insanity, predicated largely on repeated rapes by a relative, a friend of the family, the police, and other sexual abuse Polizzi suffered as a preteen boy in rural Sicily. *See* 18 U.S.C. § 17. The jury found him guilty on all counts.

A new trial was granted by the trial court on the receipt counts, on the ground that the judge had erred in failing to recognize, and to exercise, his discretion to inform the jury of the mandatory five-year minimum sentence required by the receipt counts, *see* 18 U.S.C. § 2252(b)(1), depriving the defendant of his Sixth Amendment right, when some jurors believed that medical treatment rather than long incarceration was required, and that it would be permitted on a finding of guilt. *See Polouizzi I*, 549 F. Supp. 2d at 443-50.

The Court of Appeals for the Second Circuit reversed. *United States v. Polouizzi* (*Polouizzi II*), 564 F.3d 142 (2d. Cir. 2009). It sharply reduced the number of crimes that could be charged in the indictment, from twenty-three to five, and remanded the case for further action by the trial court in accordance with the appellate opinion. *Id.* at 153-59.

Defendant moved for a new trial. The government opposed.

To expedite an appeal, this court promptly issued two preliminary memoranda, indicating that this more extensive memorandum, *Polouzzi V*, would follow. *See United States v. Polizzi* (*Polouizzi III*), 257 F.R.D. 33 (E.D.N.Y. 2009) (Mem. on Post-Appellate Proceedings); *United States v. Polizzi* (*Polouizzi IV*), No. 06-CR-22, 2009 WL 3163520 (E.D.N.Y. Sept. 29, 2009) (Abbreviated Mem. & Order Granting New Trial). In view of the decision of the Court of Appeals for the Second Circuit in *Polouizzi II*, sharply reducing the scope of the indictment, the trial court in *Polouizzi III* declared that a new trial would be required. 257 F.R.D. at 36-38. In *Polouizzi IV*, the trial court noted that it would exercise its discretion on retrial to inform the jury of the five-year mandatory minimum sentence of incarceration required by a conviction for receipt of child pornography through the Internet. *Polouizzi IV*, 2009 WL 3163520, at * 2.

The reduction in charges by *Polouizzi II* has substantially changed the dynamics of a jury's approach to the defendant's insanity defense. "[L]etting the guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).


II.     **Facts and Procedural History**

     A.     **Defendant and the Crime**

The defendant's background is detailed in the district court's prior order. *See Polouizzi I*, 549 F. Supp. 2d at 320, 323-26. For the convenience of the reader, much of the material in *Polouizzi I, II, III,* and *IV* is incorporated in the present comprehensive document, *Polouizzi V.*

The defendant, Peter Polizzi, is fifty-six years old. He was brought to this country when he was a young teenager after suffering serious sexual abuse as a child in rural Sicily. Without funds, and with only a few years of schooling, he worked assiduously at a pizzeria in Queens,

ultimately buying it and turning it into what he and his family now operate as a valuable and well-known restaurant. Trial Tr. 169. He taught himself to play the guitar, became leader of a band, met and married his present wife, with whom he had five successful and lawfully engaged sons, who are close to him. *Id.* at 165, 169, 1018, 1366. He bought and lives in a fine home. A religious man, he attends church regularly and is much respected in his religious and secular communities. *Id.* at 907. He had never before been charged with a crime. So far as is known, he has never molested a person, sexually or otherwise.

The defendant had a double-locked room in the attic of his detached garage. There he collected and viewed child pornography through the Internet. Eventually he possessed over 5,000 pictures, the majority of which were of young girls. *Id.* at 355, 859. Polizzi never sent photos to anyone, nor did he enter teenage chat rooms or attempt online solicitation. *Id.* at 534-38, 1366; *see id.* at 1058. Beyond his present conviction for receipt and possession of child pornography, no allegations of improper conduct have ever been made. *See id.* at 165.

Polizzi claimed he came across child pornography accidentally through a "pop-up" advertisement while looking for adult pornography, and was "shocked" by what he saw. *Id.* at 1046. He thought such "filthy" photos should be outlawed, but did not realize they were illegal; if they were forbidden, he asked himself, why were they freely available on the Internet? *Id.* at 1047, 1105 ("Now, I know it's wrong, but back then I didn't—I didn't know it was wrong. You say it was illegal, to me something that is there you see is not illegal, because if it's illegal what to stop, what is there is illegal [sic]?").

He testified that his goal was to turn his collection over to law enforcement. *Id.* at 1047, 1070; *see id.* at 782. The images, he said, reminded him of his of being sexually abused multiple times as a child in Sicily, and he said he wanted to help those children he now saw suffering the

6

same fate. *Id.* at 1046; *see* Part II.C.2.a, *infra.* With what he testified was fear of law enforcement based upon the sexual abuse he suffered at the hands of Italian police officers, and hesitant to reveal his own sexual abuse of which his family knew nothing, he never notified any authorities. Trial Tr. 1047, 1048, 1071 ("Always, when I see the police I get anxiety attack, even now.").

1.      Childhood Sexual Abuse in Sicily

Before arriving in the United States from Sicily with his family, Polizzi lived in rural Sicily, where he suffered serious sexual abuse. As a preteenager, he was repeatedly molested and raped by his uncle, sodomized at knife-point by a family friend, and raped by Italian police officers—one of whom sodomized him with a gun.

In Sicily, Polizzi and his family lived in a small rural village, working as sharecroppers. Trial Tr. 941. Dr. Jane Schneider, a cultural anthropologist specializing in 1950s and 1960s Western Sicily, testified as to the general poverty, living arrangements, and economic structure of the region, lending general background support to Polizzi's account. *Id.* at 166, 721-37. She confirmed that Burgetto, Polizzi's village, was then a "very poor," "socially stratified" "rural town" of about 6,500 people, a peasant society with a feudal-like history of large estates and sharecroppers, *id.* at 728:

> The majority of the population had very little land or no land and they worked for or were sharecroppers of large landowners. . . . If they were fortunate they had a mule or maybe a donkey, they commuted to their fields sometimes on mule back. . . . The mules lived in the household with the family. A typical . . . poor peasant's house was maybe one room or two rooms with perhaps alcoves for children to sleep in . . . and adjacent to that would be the stall with the family's mule.

*Id.* at 729.

Dr. Schneider also described the corrupt carbina, the Italian national police force, and its officers, the carabinieri:

> [T]he police in a rural town in those days would have been members of the car[b]ina and this is a quasi militarized national policing institution in Italy. . . . [T]he carabinieri would not have local ties . . . , you would be assigned to some community in Italy where you didn't have any local connection, so the carabinieri was for the most part outsiders to the communities in which they were policing. . . . [T]he police and carabinieri in Sicily, especially western Sicily, which got this history of large estates and the Mafia and so on, were very - - had a very bad reputation, a reputation for corruption, reputation for not prosecuting organized crime, criminal offenses. . . .

*Id.* at 732-33. A poor peasant family, Polizzi, his parents, and his six younger brothers and sisters shared their hovel with a mule. *Id.* at 942.

Polizzi was often forced to share a bed with his teenage uncle, who sexually molested him beginning when he was four years old. *Id.* at 952. At age seven, Polizzi was beaten and raped by this uncle, who threatened to kill him if he ever told anyone. *Id.* at 959-62. Despite the warning, he did tell his mother, only to be struck by her and accused of lying. *Id.* at 963.

A year later, Polizzi was raped again. Sent into the fields on an errand, a family friend—his brother's godfather—beat and sodomized him at knifepoint, threatening to kill him if he said anything. *Id.* at 970-71. Polizzi later revealed the abuse to the village priest, whose only comment was "don't do that again, because God [is] going to punish you." *Id.* at 990; *see id.* at 1247.

Additional incidents of sexual abuse took place when he was nine. Walking home from school, Polizzi was seized by two Italian carabinieri, who raped him in a stable. After they finished, one of the officers took his service revolver, inserted it in Polizzi's anus and then his mouth, telling him that he and his family would be killed if he ever told. *Id.* at 975-79. Polizzi never went back to school, instead obtaining work in a bakery. *Id.* at 980.

Polizzi had two friends in the village, boys his age who had also been raped by the police. *Id.* at 983-84. Playing hide and seek on the outskirts of town one summer night, they suddenly heard "screaming, running." *Id.* at 987. Polizzi froze under a bush, but his two friends decided to run, only to be caught by carabinieri. The police officers beat one of his friends, punching and kicking him to the ground, where he hit his head on a rock. "[A]s soon as [his friend] fell he didn't move no more." *Id.* at 988. In testimony made more credible by the sociologist's testimony about carabinieri practice in rural Sicily at the time, the defendant swore that the carabinieri fled, taking one boy with them and leaving the other dead. Polizzi never again saw the boy the police had taken away. *Id.* at 987-88. A year or two later, Polizzi left for the United States with his family.

2.        Resulting Psychological Trauma

Although he achieved the American dream in many ways, Polizzi retained, according to his own testimony and that of experts, psychological scars from his childhood abuse. His wife and children did not know these secrets from his past. After he left Sicily, the next person Polizzi told about these rapes, some forty years later, was a counselor assigned after his arrest. *Id.* at 990, 1240, 1302. Polizzi's adult life was marked by post-traumatic stress and obsessive-compulsive disorders; prior to trial, he never sought any mental health treatment. *Id.* at 791,

1209. Lacking self-awareness, he considered his behavior normal. *See* Trial Tr. 873. It was only during supervised release associated with the sentence for his possession counts that he obtained treatment, to which he responded successfully. *See* Part II.E.2, *infra*.

Concussive head injuries were suffered by the defendant from several car accidents in the early 1990s. *See* Trial Tr. 1139-40. Because the only medical record introduced was a recent MRI scan that by itself did not reveal anything of significance, it is impossible to say how, if at all, head trauma affected him. *See id.* at 1262-64, 1320.

The opposing experts at trial disagreed on the extent of his mental functioning and health. *See* Parts II.C.2.b-d, *infra*. Upon a retrial, the physical and psychological history of the defendant will be examined in greater depth.

## B. Arrest and Indictment

Polizzi's arrest followed an extensive investigation of Hardcore, a "private child porn club," advertised in a spam email message that ultimately was forwarded to the Suffolk County Police Department by a Long Island householder. Trial Tr. 182, 199. Computers and information seized from companies hosting Hardcore's website included an "access log" of visitors. The log recorded 900,000 internationally traded Internet Protocol addresses during a ten-day period in March 2005, representing some 1,900 unique "customers." Trial Tr. 261, 263, 273. One of the addresses included in the log was traced to Polizzi. *Id.* at 270. Entries showed repeated access by defendant on March 28, 2005, indicating downloading of a number of images from Hardcore's "archive girls" area. *Id.* at 273.

1.    Execution of Warrant

On November 16, 2005, FBI and local law enforcement agents arrived at defendant's home to execute a federal court-ordered search warrant seeking computer equipment and evidence related to the possession of child pornography. *Id.* at 150, 208, 279. Arriving at 6:00 p.m. at the single-family residence, the agents waited almost two hours for Polizzi and his wife to arrive home from work in their restaurant. Trial Tr. 280. While pulling into their driveway, the couple was approached by the agents who identified themselves and explained that they were there to search the house for child pornography pursuant to a warrant. *Id.* at 283. Polizzi said nothing, but nodded, opened the driveway gate for the agents, and drove inside.

Polizzi's wife became "hysterical" as the officers questioned the couple and their youngest son, then sixteen, in the kitchen. *Id.* at 286, 296, 592-98, 742. She suggested that whatever happened might have been caused by a friend of one of her sons. *Id.* at 286.

Polizzi fully cooperated with the agents. *Id.* at 174. He informed them that there was a family computer in the basement; it was seized. *Id.* at 285. This computer had no forbidden images on it. *Id.* at 518.

After fifteen to twenty minutes of trying to calm his "extraordinarily upset" wife, Polizzi told the agents there were additional computers in the detached garage. *Id.* at 276, 746; *see id.* at 1049. *But see id.* at 294. Two agents escorted him there, *id.* at 291-96; the two others remained behind with Polizzi's family to "make sure [his wife] was okay." *Id.* at 296.

On the staircase leading up to the rooms on the second floor of the garage, Polizzi informed the officers that "[t]his is where are [sic] I look at the children." *Id.* at 687. It was, he said, himself and not his sons who had downloaded the images. *Id.* at 313. Polizzi then asked

them what could be done to stop the child abuse depicted: "What are we going to do about this?" *Id.* at 1367, 1379. Inside the two upstairs rooms—one with two door locks and the other with three, to which he alone had keys—he showed the agents the computers they sought. *Id.* at 145-47, 300, 686.

Polizzi was then questioned by the agents. Upon being read Miranda warnings, *id.* at 306, he signed forms waiving his rights and stated he was willing to talk without an attorney present. *Id.* at 309, 312. Polizzi then signed the following statement at 8:40 p.m., *id.* at 156, 305-19:

> I, Peter Polizzi, Senior, being duly sworn and deposed says I am 52 years old, having been born on . . . [19]53. I live with my family at . . . , Glendale, New York, with my family.
>
> I am here giving this statement to Detective Forrestal and Special Agent Danielle Massineo having been made no threats or promises to do so. Some time in February or March, 2005, I received an email in my AOL email account, ppoli . . . @aol.com inviting me to join a website called "Hard Lovers." It was $79 or $89 to join and I had to use my credit card to join. I used my MasterCard from Citibank; it's in my name. The number is . . . .
>
> After I joined, I would visit ever [sic] couple of days. After I joined, I knew it was a child pornography website. I downloaded pictures and videos from this website. I keep the pictures on my external hard drive that's a Maxtor 300 gig that I bought new about six months ago. I have another external hard drive that I used and transferred everything over from an external drive that I also bought new.
>
> The computer I used to go to, the . . . hard lovers website I had custom made at a computer store on Cypress and Weirfield. I had bought it new about two years ago. It was the black tower where I pointed to the Detective Forrestal at my desk. I'm not sure how may [sic] child pornography pictures I have but I have a lot. I know I'm a member of the site now and I downloaded this morning. I know I have of a lot. I know I'm a member of the site now and I have Red [sic] something, I don't remember exactly, it's in my favorites. I used the same credit card number, the Citi MasterCard to join. I don't send them out, it's only private. The different passwords of the websites are in my AOL email that I have so I know what they are.
>
> I do have anti-virus software, it's in my computer, and I'm the only person that uses my computer. I keep it in a locked room upstairs that I only have access to. I have read the above two page handwritten statement and I swear that it is all true.

*Id.* at 317-18.

Over 5,000 digital still images and some motion videos of child pornography (in addition to adult pornography) were found stored on the garage computers and three external hard drives. The images and videos had been downloaded over a period of at least four years, *id.* at 145-46, 349-50; the agents found a list of child pornography search terms dated June 9, 2001. Also in his garage were huge collections of music, baseball cards, comic books, stamps, and other materials. *Id.* at 765, 860, 862, 888. *See* Part II.C.2.b, *infra*.

### 2. Twenty-Three Count Indictment

Polizzi was arrested and charged with twelve counts of receipt and twelve counts of possession of seventeen different photos and videos he had downloaded from the Hardcore website. *See* 18 U.S.C §§ 2252(a)(2) (receipt) and 2252(a)(4)(B) (possession). *See* Arrest Warrant, Jan. 12, 2006, Docket Entry ("D.E.") No. 4. The receipt counts (Counts One through Twelve) charged him with receiving two illicit images on February 20, 2005, two on March 5, 2005, four on March 16, 2005, and four on March 20, 2005. The possession counts (Counts Thirteen through Twenty Four) charged him with possessing, on November 16, 2005, the day his home was searched, twelve prohibited images or videos, stored on three different external hard drives.

He was charged with both receipt and possession of several of the images: Counts One and Twenty were based on the same depiction, as were Counts Three and Eighteen, Four and Nineteen, Seven and Twenty-Three, Eight and Twenty-Four, Eleven and Twenty-One, and Twelve and Twenty-Two. *See* Superseding Indictment, D.E. No. 35. One of the possession

counts (Count Thirteen) was dismissed on the government's motion before trial. Govt.'s Letter to Dismiss Count Thirteen, Aug. 27, 2007, D.E. No. 62. Defendant's motion to dismiss the indictment on constitutional grounds was denied. *Polouizzi I*, 549 F. Supp. 2d at 329-30.

### C. Trial Proceedings

At trial, defendant's knowing receipt and possession of pornographic images and the fact that they depicted minors engaging in sexually explicit conduct were not disputed. Polizzi admitted collecting child pornography and described at length how and why he began to do so. *See Polouizzi I*, 549 F. Supp. 2d at 330. The only contested issue at trial was his defense of insanity. *See* 18 U.S.C. § 17.

Polizzi contended that obsessive-compulsive and hording behavior, combined with the trauma he re-experienced upon seeing images of abused children, caused him reflexively to collect child pornography in an attempt to "help the children." *See* Part II.C.2.b, *infra*. The jury's deliberations on this issue were critical, with some jurors expressing the view, after the verdict, that Polizzi needed mental treatment, not imprisonment. *See* Part II.D.2, *infra*.

### 1. Images

During jury selection, potential jurors were informed that the case would involve "offensive" and "distasteful" depictions of "individuals engaged in sexually explicit conduct." *See* Juror Questionnaire 11. At trial, a few illicit images from Polizzi's computer were introduced through the testimony of an officer with the Suffolk County Police Department who had viewed the images on Polizzi's computer in connection with the underlying investigation. *See Polouizzi I*, 549 F. Supp. 2d at 326-29 (describing underlying investigation).

To prevent unnecessary prejudice, the images were shown to the jury in brief flashes. Short segments of the videos were played, followed by testimony that each segment was

representative of the video from which it was excerpted.  *See id.* at 331 (discussing presentation of images to jury); *Polouizzi II*, 564 F.3d at 148-50 (same).

2.    Testimony

Testimony was elicited from a number of witnesses regarding Polizzi's insanity.  To satisfy the federal Insanity Defense Reform Act ("IDRA"), Polizzi had to prove by clear and convincing evidence that he was legally insane when the offenses occurred, in that: 1) he had a severe mental disease or defect at the time he received and retained the images; and 2) as a result he had been "unable to appreciate the nature and quality or the wrongfulness of his acts."  18 U.S.C. § 17.

Focusing on Polizzi's childhood sexual abuse, the defense emphasized lasting psychological effects as manifested in defendant's post-traumatic stress and obsessive-compulsive disorders.  Defendant contended that when he first accidentally came across child pornography, he had re-experienced his own abuse and obsessively began to collect as many photos as he could to help the children.  Trial Tr. 1069-70 ("I have been collecting, the material that I've been collecting, every time I was on the internet, collect anything I find that was not appropriate to see it [sic], in my opinion should not be there, I save all of them, all the materials I come across.").  According to defense counsel,

> Mr. Polizzi was doing what he believed to be right. He could not appreciate that downloading pictures of the children was wrong. What is wrong, what Mr. Polizzi knows is wrong . . . is child abuse. . . . Mr. Polizzi, in a wrong way maybe, but in his way because of his psychological trauma, is trying to figure out a way to stop child abuse.

*Id.* at 1368; *see id.* at 782.

Two defense experts, Dr. Eric Goldsmith and Dr. Lisa Cohen, testified about Polizzi's mental condition.  Dr. Naftali Garcia Berrill provided expert evidence in rebuttal for the

government. The experts were permitted to opine on whether Polizzi "did or did not have the defect or disease relied upon as a defense." Jury Charge 19. Their opinions on whether Polizzi was "legally insane," were not permitted, since that was a question for the jury. *See id.* at 1215-16; Fed. R. Evid. 704(b) ("No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.").

    a)  Polizzi's Testimony

  Polizzi testified in detail to the severe sexual abuse he had suffered in Sicily as a child. His distress in reliving the events was evident. A recess was required several times when he broke down while he was on the stand. Trial Tr. 1047; *see id.* at 959, 998. When the first charged photo was shown to the jury, Polizzi suffered an acute anxiety attack and was taken by ambulance to a hospital. *Id.* at 397-99. The trial continued the following day. To avoid another breakdown, Polizzi voluntarily removed himself from the courtroom while the sixteen images of child pornography were shown to the jury. *Id.* at 405.

  The defendant testified that he had originally learned of Internet child pornography accidentally, in 2001 or before, through a "pop-up" while visiting an adult pornography website. *Id.* at 1046. "'Pop-up' windows are windows containing notifications or advertisements that appear on the screen, usually without any triggering action by the computer user." *1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 476 n.18 (S.D.N.Y. 2003). In his written statement to the police, he said he had later discovered the Hardcore website after receiving an email in his AOL account.

16

The images, he testified, shocked and horrified him. *See* Trial Tr. 1178, 1230. Seeing such graphic depictions reminded Polizzi of being raped and molested in Sicily. *Id.* at 1046 ("Oh, boy. I see my childhood, the event of the abuse happened over and over."). Curiously, he said he thought he might be able to find a photograph of himself: "Oh, my God. When I used to see this material I used to see myself in there, I look for my picture and my uncles [sic]." *Id.* at 1048.

He said he knew that child pornography was wrong, but he believed the online images were legal. Had they been illegal, he reasoned, such "garbage" would not be available on the Internet. *Id.* at 1105. Hence he had used his real name, email address, street address, and credit card number to pay the membership fee to join Hardcore. *Id.* at 152, 276, 317, 368. Despite the fact that many websites themselves cautioned that their material "was not legal in many countries," *id.* at 155, 253, he contended that he had not understood that his acts—the downloading of the pictures—were wrong. *Id.* at 1090. He said one reason for his downloading was to stop other children from being abused as he himself had been abused. Hence his first statement to the FBI agents was, "[w]hat are *we* going to do about this?" *Id.* at 1367, 1379. What he meant by that question, he later explained, was that

> whoever put this kind of material in there should be brought to justice because this is not right, because no one close to me should not have cause [sic] to others, because my life all the fear, all the nightmares, and everything else involved comes from this, and if it's nothing be done [sic] about this, a lot of innocent children will be raped because of this.

*Id.* at 1050.

Notwithstanding his desire to stop the depicted abuses, Polizzi never voluntarily informed law enforcement or anyone else of his collection. *See id.* at 858, 1138, 1180, 1309. He asserted that he did not trust the police on such matters after his experiences with the Italian carabinieri.

17

*Id.* at 1048. He could not go to the police because of "[m]any reason [sic]. The reason that I was abused in [sic] this carabinieri, which in this country mean the uniform of the police. Second, oh, boy, I been—I was at gun point by police. . . ." *Id.*

Polizzi recognized that if he "share[d] that information I would tell my even [sic] sickness, which I kept for 45 years and I could not." *Id.* at 1047. In order to explain why he had collected the photos, he would have to reveal his childhood sexual abuse, something he felt was impossible.

> 45 years it's inside of me, this has been like something unexchangeable [sic], only people that went through this, what this come from or what this causes and where you go from this. This is something that you keep inside because you cannot share with anybody because it's very, very, very awful thing to share with anybody and I don't wish my worse [sic] enemy what happened to me, why because is [sic] this is wrong.

*Id.* at 1062. When the FBI showed up in his driveway, Polizzi said he was relieved.

> [I]nside I had the feeling of joyness. Why? Because finally the stuff that I have turn it over or say to the police . . . they will find it there. To me it was a kind of relief. I also said because now that they find out I have to tell my secret, which was very hard because now finally my wife know [sic] I had secret.

*Id.* at 1048-49. Even after his arrest Polizzi did not immediately disclose his childhood experience to the police or anyone else. Not until six months into post-arrest counseling ordered by Pretrial Services did he speak with a therapist about the matter, after learning of a woman who had spoken to her family about similar abuses with positive results. *Id.* at 1054.

> When that happen, you know, make me felt [sic] that I was not alone in this, someone else be in the situation that I was, and regarding the information that we share there, by sharing this kind of information it was a kind of relief for her and I thought releasing this kind of information will be the same for me.

*Id.*

b)  Dr. Lisa Cohen

Dr. Lisa Cohen, a clinical psychologist at Beth Israel Hospital conducting research with individuals accused of child sex crimes, was the first expert to testify.  *Id.* at 766-902.  She had administered a battery of neuropsychological tests to Polizzi and interviewed him twice; she also interviewed one of his sons.  *Id.* at 771, 875.  Test results showed that Polizzi had significant "impairment of executive function," the "collection of cognitive abilities that have to do with being able to use judgment to think in complex ways, to think in flexible ways, to monitor one's own behavior, impulse control."  *Id.* at 774.  In the four cognitive functioning tests, his scores were quite low—between the 0.1 and 10.8 percentile—which Dr. Cohen attributed to possible brain injuries from Polizzi's car accidents; they also "showed memory problems."  *Id.* at 773-77, 870.  His overall IQ score was considered "borderline range of average intelligence."  *Id.* at 1280-83.  Dr. Cohen also evaluated Polizzi using the Yale-Brown Obsessive Compulsive Scale ("YBOCS"), "the standard measure of obsessive compulsive disorder."  *Id.* at 778.

Dr. Cohen's final diagnoses were "significant cognitive impairment," *id.* at 783, and "obsessive compulsive disorder characterized by severe hoarding" with "limited insight" as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV").  *Id.* at 882, 885.  She did not evaluate Polizzi for post-traumatic stress disorder.  *Id.* at 782, 882.

The "severe hoarding" Dr. Cohen identified referred to Polizzi's extensive and varied collections besides child pornography.  In his rooms over the garage, Polizzi had collected and organized tens of thousands of baseball, soccer, hockey, frisbee, and football cards, movies, musical recordings, comic books, stamps, and coins; he had never sold any.  *Id.* at 765, 860, 862;

*see id.* at 900. Polizzi estimated he had 4,500 videos, 10,000 comic books, 10,000 baseball cards, 4,000 CDs, 4,500 coins, 3,000 stamps, 150 boxing cards, and 500 soccer cards. *Id.* at 888.

According to Dr. Cohen, Polizzi, like other hoarders, did not see his collecting as a problem. *See id.* at 889. He rationalized that his collections were "a good investment for his children," *id.* at 861, and talked with his sons of "one day" opening a comic book store, *id.* at 749, 863, or a video store. *Id.* at 890. It was obvious, the expert declared, that such talk was only a dream; "people who hoard always think that they have a future use for the items that they're hoarding." *Id.* at 889.

Unlike most people with obsessive compulsive disorder ("OCD") who understand that their actions are not normal, Dr. Cohen found that "Polizzi had no insight into his obsessive compulsive disorder. He seemed to feel that it was all appropriate and reasonable behavior. . . ." *Id.* at 873.

> [N]o matter how many times I tried to explain the concept of obsessions and compulsions it was difficult for him to grasp. And the point of an obsession is that it should not make sense, it should be excessive and inappropriate. So he had a hard time differentiating from what was an appropriate concern and what was an excessive, inappropriate concern.

*Id.* at 856.

In the face of the government's repeated insistence that Polizzi's low cognitive test results were due to his "malingering," Dr. Cohen declared that she did not find that Polizzi was exaggerating his symptoms. *See id.* at 789 (defining malingering as "the intentional and conscious flaring of mental symptoms in order to gain what they call secondary gains or primary gains to gain something else."). Although she did not administer any specific validity tests, *id.* at 897, 1260, her testing included internal validity components. *Id.* at 830. Based on her

interviews with Polizzi and one son, Dr. Cohen concluded that "if anything, he seemed to be minimizing his problems and that was not in his interest. It would be in his interest to maximize his problems. So, in my mind, he was not trying to manipulate me to present him as sicker than he was." *Id.* at 905; *see id.* at 898.

  c) Dr. Eric Goldsmith

Dr. Eric Goldsmith, Polizzi's expert forensic psychiatrist, testified that he had diagnosed Polizzi with post-traumatic stress disorder ("PTSD") resulting from the sexual abuse defendant had suffered as a child. *Id.* at 1130 ff. Of the three experts, Dr. Goldsmith had spent the most time evaluating Polizzi. He had interviewed separately four of defendant's sons as well as his wife. *Id.* at 1131; *see id.* at 1176. Dr. Goldsmith had also prescribed medication for Polizzi's acute anxiety and PTSD symptoms. *Id.* at 1174. Medication was necessary, defendant testified,

> [S]ince I have this nightmares, a lot of nightmares actually, when you have those nightmares when you have, when you see . . . photos so, you know, you smell certain smells, the events come back and I told this nightmare that I have and told me if I slept well, when the time comes, when I go to sleep, I go to sleep very exhausted, because the crime that is involved, you know, the fear, it makes you, it takes everything out of you, which left you with very sadness and no kind of strength.

*Id.* at 1060.

Dr. Goldsmith corroborated Dr. Cohen's diagnosis of obsessive compulsive personality disorder as defined in the DSM-IV. *Id.* at 1134 ff., 1186. He also found that Polizzi "has no awareness it is a problem for him." *Id.* at 1143. Polizzi was "very very difficult" to interview "because of his obsessive pathology[:] he . . . gets stuck on a detail or particular issue and needs to retell the story over and over and over again . . . ." *Id.* at 1136-37. It required "hours and hours" for Dr. Goldsmith to obtain a medical history.

It is reflective of some significant obsession compulsive pathology. It explains his behavior of just downloading hundreds and hundreds of images. It explains his behavior of collecting thousands and thousands of baseball cards. It explains his routinized behavior, the styling of how he communicates and how it is just obsessive and obsessive and repetitive and repetitive.

*Id.* at 1139; *see also id.* at 779 (Dr. Cohen noting the difficulty of interviewing Polizzi). The jury had the opportunity to witness defendant's repetitive oral behavior firsthand on multiple occasions when Polizzi was on the stand. Dr. Goldsmith also found that,

[h]e has memory problems. He has difficulty in providing really specific information about times and dates. There has been a real problem throughout the course of the interviews with him. He has misinterpretations of statements. Sometimes you would ask him a question, he really doesn't understand what you are asking him and you have to re-ask it in a different way.

*Id.* at 1184.

During his first sessions with Dr. Goldsmith, Polizzi did not disclose what had happened to him in Sicily. This was not surprising to the doctor, given "the type of trauma that [Polizzi] experienced," because of the issues of "humiliation and shame and fear [that] pervade the adult mind" in such a victim of "severe child sexual abuse." *Id.* at 1136-37. When informed of the abuse, Dr. Goldsmith found Polizzi credible:

And it is not only what he says, that he was abused, and how he says it, and how he gives it such rich detail, reflective of just a true autobiographical experience that's so convincing, but what is really convincing about why this is not a malingered post-traumatic condition is all of the clinical factors there follow the trauma and abuse that he could just not make up. It's the re-experiencing phenomena, the description of the flashbacks. It is not just saying I have flashbacks, but describing what he goes through in showing it to me in the office, when I interview him about this, and how literally his mind and body kind of separate and he begins to just follow like he's back in the experience that he shows all of this emotion that is just reflective of true experience.

*Id.* at 1153.

After Polizzi revealed his childhood sexual abuse, Dr. Goldsmith added a PTSD diagnosis, *id.* at 1157, which is considered a "major mental illness," based on the DSM-IV

definition. *Id.* at 1257. In Dr. Goldsmith's opinion, Polizzi "when viewing child pornography on the Internet had a retraumatizing experience. In a regressed and obsessive state he downloaded and searched child pornographic images for evidence of victimization, something he had experienced as a child." Dr. Goldsmith's Addendum: Psych. Rep. 1, Jan. 2, 2007.

> His . . . level of sophistication, the way that his mind operates is again very concrete, extremely unsophisticated, old world . . . when he first downloaded all of the information over the internet, he had this very unsophisticated idea, by taking it all down off the internet, it could be off the internet and nobody else could see it. Really just not sensible. . . . [T]he images overwhelms [sic] him emotionally and overwhelms any kind of rational thought that he had of what he was doing.

Trial Tr. 1162-63. His PTSD, the expert believed, had caused Polizzi to develop OCD: "[T]he obsessive pathology that he experiences, that he has in adult life, is really a way to control everything in his environment so that it doesn't hurt him." *Id.* at 1160.

No trace of sexual deviance in Polizzi was found by Dr. Goldsmith. His first report, written before he learned of Polizzi's child abuse, did hypothesize that Polizzi had "possible low level deviant sexual arousal," but concluded he "[did] not confer high risk for future dangerous[ness]," and did not meet the DSM-IV criteria for pedophilia. *Id.* at 1150. At trial, Dr. Goldsmith explained why he had initially noted "low level sexual deviancy": because he had had no other explanation as to why Polizzi collected child pornography. *Id.* at 1151-52.

> [I]t seemed to me that the[re] credibly could be - - could have been at that time some deviant interest, because individuals who are arrested for these crimes often have a large level of denial and don't share and admit to their deviance. . . . At that time Mr. Polizzi was presenting consistent with that and it just didn't make sense why he clicked on the images.

*Id.* at 1185. Once he learned of an alternative reason—Polizzi's childhood trauma—Dr. Goldsmith concluded that Polizzi in fact had no deviant sexual arousal.

In my previous report from June 9, 2006, I speculated that Mr. Polizzi's past behavior of downloading and viewing child pornography was perhaps related to sexually deviant thinking. However, after further assessment it is my opinion, with a reasonable degree of psychiatric certainty, that Pietro Polizzi's encounter with child pornography elicited a post-traumatic stress reaction. Pietro Polizzi credibly describes how the child pornography pictures triggered memories from the past. Consistent with his compulsive hoarding behavior he downloaded hundreds and hundreds of images. While viewing these images Pietro Polizzi describes it as if he was reliving his own childhood sexual abuse. He looked for signs of forced injuries on the victims and evidence for the perpetrators.

In summary, his behavior of downloading and viewing child pornography is directly related to his history of childhood sexual abuse and obsessive compulsive behavior. The images triggered painful traumatic memories that had been repressed for many years. This behavior was not related to sexually deviant thinking or pedophilia. . . . Mr. Polizzi does not pose a risk of sexual predatory behavior against children.

Dr. Goldsmith's Addendum: Psych. Rep. 5, Jan. 2, 2007; Trial Tr. 1169 ("[It's c]lear in my mind that he's not a pedophile . . . He has no paraphilia [sexual interest in children in general], he has no deviant sexual arousal or interests.").

Like Dr. Cohen, Dr. Goldsmith did not believe Polizzi was malingering. Even though the doctor was aware that PTSD was frequently faked, Trial Tr. 1195 (noting that PTSD is "the most important area where malingering needs to be considered"), he concluded that "[n]one of the examiners and none of the testing and none of the data from the clinical exam identified that [Polizzi] was malingering." *Id.* at 1147.

d)      Dr. Naftali Garcia Berrill

Dr. Naftali Garcia Berrill, a board-certified forensic psychologist, was the government's expert. *Id.* at 1217-1329. Polizzi initially attended Dr. Berrill's clinic for mandatory sex offender counseling as required by Pretrial Services. *Id.* at 1223. (Through a contract with the

24

Department of Probation and Pretrial Services, Dr. Berrill's private practice assesses many defendants accused of sex offenses. *Id.* at 1221.) Polizzi participated in group counseling while he awaited trial; Dr. Berrill did not treat him. *Id.* at 1240.

Polizzi eventually requested that the court approve his transfer from the clinic to private counseling, citing the trauma he experienced during group therapy with other child sex offenders. Approval was given. *See* Order, Jan. 1, 2007, D.E. No. 20.

After Polizzi had filed a notice of intent to raise the insanity defense, Dr. Berrill evaluated Polizzi for an hour at the government's request, and administered several standard tests. One of his associated counselors wrote a report. Trial Tr. 1225, 1277. During his first interview with Dr. Berrill, Polizzi had not disclosed his history of child abuse. *Id.* at 1229. Dr. Berrill later evaluated Polizzi again for an additional four hours during which Polizzi informed him of his past abuse; the doctor then wrote a second report himself, but never spoke with Polizzi's wife or sons. *Id.* at 1315.

Dr. Berrill initially diagnosed Polizzi as having an adjustment disorder with anxiety and possibly generalized anxiety disorder. Such conditions, in his opinion, "shouldn't interfere with someone's ability to think clearly." *Id.* at 1233. After the second interview, *id.* at 1244, his diagnosis remained the same: Polizzi had "no severe mental disease or defect," *id.* at 1243, 1246-48, only an "anxiety disorder." *See* Dr. Berrill, Psycho-Legal Eval. 20, Aug. 3, 2007.

On the witness stand, the doctor agreed that defendant had some obsessive-compulsive personality disorder "features," but not OCD itself. Trial Tr. 1255. Having OCD, in any event, does not prevent a person, in Dr. Berrill's opinion, "from being [able] to appreciate what they are doing or knowing . . . . [that it] is wrong." *Id.*

Dr. Berrill considered Polizzi's history of child abuse irrelevant because "psychological testing . . . did not reveal a post-traumatic stress disorder." *Id.* at 1258, 1328. Had Polizzi suffered from PTSD, the doctor believed he would have avoided child pornography, not sought it out. The "criminal behavior" Dr. Berrill typically associated with PTSD, moreover, was an "explosive kind of behavior," not a prolonged quest. *Id.* at 1265.

His second report diagnosed Polizzi with "paraphilia" not otherwise specified (sexual interest in children in general), "hebophilia" (sexual interest in adolescents), and possible pedophilia (sexual interest in young children). *Id.* at 1233; *see* Dr. Berrill, Psycho-Legal Eval., Aug. 3, 2007. He gave no reasons for these conclusions in the report. Such diagnoses were appropriate, Dr. Berrill testified at trial, because

> Based on one of the tests that we had given and based [on] Mr. Polizzi acknowledging that he was looking at both young kids and adolescents in terms of the child pornography that he collected, number one, the tests results suggested first and foremost he was likely interested in adolescent girls, that is referred to clinically as Hebephilia. . . . I wasn't really sure whether he was interested in young children. I really couldn't tell based on my interview with him. He denied or disavowed an interest in all of this but nonetheless, testing raised some issues about teenagers and the fact that he collected pictures of kids who were younger than 10 raises a distinct possibility that was an area of interest.

Trial Tr. 1233-34. The doctor was concerned that Polizzi had "provided contradictory information during the evaluation," *id.* at 1301, denying all sexual interest in children, yet admitting he had collected child pornography for years. Polizzi had received a low score on the Abel Assessment, a test designed "to ascertain whether or not somebody is sexually interested in kids." *Id.* at 1297. He had "not endorse[d] items that reflect the types of rationalization or excuses frequently used by individuals sexually involved with kids," *id.* at 1300, but his answers on Dr. Berrill's Internet activity questionnaire were suspicious: he had checked several boxes indicating he had looked at child pornography "to avoid having sex with children" and "out of

curiosity," which had raised concern in the doctor's mind. *Id.* at 1116-18. Dr. Berrill did not explain the questions to Polizzi nor did he ask him why he had marked the boxes. *Id.* at 1078, 1394.

On the stand, Polizzi described what he had meant by his checkmarks—that he looked at the photos "to avoid [i.e., to stop child abusers from] having sex with kids"—and that he was "curious" to find out how the photos came to be on the Internet, i.e., to find out who was producing them. *Id.* at 1115-18 (testifying that he had "[c]uriosity what was up there, what was on that box. Why this was over there. Why this material. It is a lot of do you understand there's a lot of material, understand where this comes from, whose [sic] behind this, the curiosity, you know, why are they doing this.").

Although Dr. Berrill never mentioned malingering specifically in either of his reports, at trial he testified at length about Polizzi's possible exaggeration of his symptoms. *Id.* at 1248 ff, 1322 ("I am not sure I said he was malingering. I said one has to imagine that that is a possibility."). The doctor pointed out that Polizzi's second MMPI-2 diagnostic test included several true-false answers reporting paranoid or delusional symptoms, which Polizzi had not reported on his first test a year before. *Id.* at 1251, 1327, 1253 ("[I]t raises the specter of, you know, Mr. Polizzi trying to exaggerate some of the symptoms he's having right now. He's exaggerating the level of distress or exaggerating the kinds of problems he is encountering."). Dr. Berrill did note that Polizzi had never complained of any delusions or hallucinations. Dr. Berrill, Psycho-Legal Eval. 18, Aug. 3, 2007. Because Dr. Cohen had not conducted any independent validity testing, Dr. Berrill considered her cognitive testing results "worthless." Trial Tr. 1260.

Dr. Goldsmith rejected the malingering-related concerns cited by Dr. Berrill. That Polizzi had answered a few multiple-choice questions in odd ways was irrelevant: "you can't take one question from 567 questions and make anything of it." *Id.* at 1211. Such multiple-choice tests "are not great at detecting PTSD," Dr. Goldsmith warned, "but they have some symptomatology that . . . can come out with PTSD." *Id.* at 1205. Such tests were certainly not "substitute[s] for psychotherapy or psychiatric evaluations." *Id.* at 1211. To Dr. Goldsmith it "ma[de] perfect sense" that some of Polizzi's answers had changed over the course of the year; his PTSD symptoms had recently worsened because "as he tells the story, as he exposes the trauma . . . that is when all of the symptoms come up, and that's when the nightmares come about." *Id.* at 1204. Polizzi "was not experiencing the active symptoms of post-traumatic stress disorder in May of 2006, when he first took the MMPI-2. While taking the second MMPI-2 a year later, he was in the [midst] of a severe PTSD condition, talking about this with myself and other examiners, Dr. Berrill, bringing up all the active symptoms." *Id.* at 1212.

3.      Jury Charge

a)      Written Charge Sheet

Following a charging conference, a written charge and a verdict form showing questions to be answered, were prepared for the jury. As is the general practice of the court, copies of the charge and verdict form were distributed to jurors so they could follow the text of the instructions as they were delivered orally by the court. Trial Tr. at 1407:2-17. These documents were taken into the jury room to assist in deliberations. *See id. See generally United States v. Russo*, 110 F.3d 948, 953 (2d Cir. 1997) (stating that "submission of written instructions to a jury is often advisable" and "will usually enhance a jury's understanding of . . . crime[s] charged and

28

the burdens of the prosecution"); *United States v. Delano*, 55 F.3d 720, 732 (2d Cir. 1995) (recognizing discretion of trial court to provide written charge to jury); Leonard B. Sand & Steven Alan Reiss, *A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit*, 60 N.Y.U. L. Rev. 423, 453-56 (1985) (discussing propriety of written charge).

The charge repeatedly conveyed that the defendant was charged with a multiplicity of crimes: twenty-three crimes of child pornography. *E.g.* Trial. Tr. at 1413:4-11 ("[T]he indictment contains 23 counts . . . Counts One through Twelve charge the defendant with receiving child pornography. Counts Fourteen through Twenty-Four charge the defendant with possessing child pornography. . . . [E]ach act charged is charged as a separate crime."); *id.* 1413:13-14 ("Counts One through Twelve charge the defendant Peter Polizzi with receipt of child pornography."); *id.* at 1421:9-10 ("Counts Fourteen through Twenty-Four charge the defendant with Possession of Child Pornography."); *Id.* at 1413:22-1414:4 (noting that the defendant was charged with receiving child pornography on various dates: "[Count] One, on or about February 20, 2005; Two, February 20, 2005; Three, March 5, 2005 . . . . Count Four, March 5, Count Five, March 16, Count Six, March 16, Count Seven, March 16, Count Eight, March 16, Count Nine, March 20, Count Ten, March 20, Count Eleven, March 20; and Count Twelve, March 20"); *id.* at 1421:16-22 ("You have a separate file name and path for each count . . . . one for Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Three, and Twenty-Four. *Each constitutes a separate crime charged*.") (emphasis added).

The verdict form was eight pages long, listing the twenty-three crimes charged in the indictment. Beneath each listed crime was the name and file path of the illicit image associated with each count. Charge 23-30 ("COUNT ONE – RECEIPT OF CHILD PORNOGRAPHY

29

C:\Child 2\Photo\Girls\1\4.6.BMP . . . COUNT TWELVE RECEIPT OF CHILD

PORNOGRAPHY C:\Child 2\Mix\3\94.BMP . . . COUNT FOURTEEN POSSESSION OF

CHILD PORNOGRAPHY C:\ MY Site\Little Sites\MIXEDLOLITAS_files\07.JPG . . . .

COUNT TWENTY FOUR C:\Child 2\Up Date Photo\3-13\26.BMP"). For each of the twenty-

three counts, there was a question requiring jurors to indicate whether they found the defendant

"guilty," "not guilty only by reason of the legal definition of insanity," or "not guilty". *Id.*

> During its oral instructions, the court reiterated the number and nature of counts charged:

> > Now turn over [the sheet] and you will see the way the verdict sheet is set up.
> > For example, Count one, Receipt of Child Pornography, then it is C:\Child2\Photo\Girls\1\46\46.BMP. . . .
> > . . . .
> > . . . . [T]hen you will find again not guilty, not guilty only by reason of the legal definition of insanity, or guilty. . . .
> > Then you will go through each count . . . . You go through each one of these counts; Count One, Count Two, Count Three, Count Four, Count Five, Count Six, Count Seven, Count Eight, Count Nine, Count Ten, Count Eleven, Count Twelve, those are Receipt of Child Pornography . . . . .
> > Then you have Count Fourteen, Count Fifteen, Count Sixteen, Count Seventeen, Count Eighteen, Count Nineteen, Count Twenty, Count Twenty-One, Count Twenty-Two, Count Twenty-Three, Count Twenty-Four, and those are the Possession Counts.

*Id.* at 1432:13-1433:9.

Jurors were instructed that the indictment "is not evidence of guilt and it's entitled to no

weight in your judgment of the facts." *Id.* 1412:10-12. They were told that the list of twenty-

three crimes on the verdict form should guide their deliberations. *Id.* at 1408:8-9 ("At the end of

the charge, there will be a question list, and that will help you focus your discussion."). Jurors

were aware that multiple counts were at issue. *See id.* Trial Tr. at 1431:10-15 ("[The court:]

Then each of you is going to be asked 'is that your verdict' . . . [A Juror]: Excuse me your

Honor, to *each count* would we be asked that? [The court]: Yes[.]") (emphasis added); *see also*

*id.* 1432:6-9 ("[A juror]: Your Honor, on *each of the counts* we have to all agree on the count; is that correct? [The court]: *Each count* has to have a unanimous agreement.") (emphasis added).

    b)    Insanity Defense

After extensive briefing and argument on the definition of "legal insanity," for which the parties submitted sharply contrasting language, the court issued its own charge on the insanity defense; there were no objections. *United States v. Polizzi*, 545 F. Supp. 2d 270, 276-78 (E.D.N.Y. 2008) (defining "wrongfulness as "unlawfulness"); *Polouizzi I*, 549 F. Supp. 2d at 330 (discussing legal insanity charge); *Polouizzi II*, 564 F.3d at 153 (finding objections to insanity charge waived).

    c)    Mandatory Minimum Sentence

Defense counsel repeatedly sought to have the jury informed of the five-year mandatory minimum sentence of imprisonment applicable to the receipt counts. *See, e.g.*, Def.'s Letter, Sept. 7, 2007, D.E. No. 71. The government opposed. Govt.'s Letter Br., Sept. 6, 2007, D.E. No. 70.

On the eve of trial, the court issued a decision from the bench denying Polizzi's request that the jury be informed of the mandatory minimum. Hr'g Tr. 3, 19, Sept. 10, 2007. Also denied was defendant's request for an alternative instruction informing the jurors simply that a guilty verdict would necessarily result in imprisonment. *See id.* at 19-20.

The jury was not informed before rendering its verdict of the long prison sentence a conviction on the receiving counts entailed. It was specifically instructed that it should not consider sentencing when deciding on a verdict. *See* Charge 21 ("The question of possible punishment of the defendant is no concern for you and should not enter into or influence your

deliberations. The duty of imposing sentence rests with the court."); *accord* Trial Tr. 1430:23-1431:1.

### D.  Jury Verdict and Colloquy

#### 1.  Jury Verdict

On October 5, 2007, after three days of deliberation, the jury found Polizzi guilty on all twenty-three counts charged. Trial Tr. 1445-47.

#### 2.  Jurors Opposed To Incarceration

During jury deliberations, it was evident from the jury's questions that it quickly decided all issues against the defendant except insanity. Determining whether Polizzi had carried his burden of proving legal insanity took the jury several days during which jurors repeatedly reviewed exhibits concerning Polizzi's mental condition, including the medical reports. *See, e.g., id.* at 1439. The jury ultimately rejected the insanity defense.

A post-verdict colloquy with the jurors after they were discharged confirmed the seriousness of the jury's deliberations on the insanity defense. All of the jurors who spoke when invited to do so by the court acknowledged the defendant's mental illness, recognized his need for mental health treatment, and believed imprisonment was not called for. *See id.* at 1454-59.

Upon being informed by the court that Polizzi would mandatorily be subject to at least five years imprisonment rather than treatment, *see* 18 U.S.C. § 2252(b)(1), those jurors who evinced an opinion declared they would have voted to find the defendant not guilty by reason of legal insanity, causing a mistrial, had they known of the mandatory minimum. They believed treatment and supervision, not a long term of imprisonment, was required. The post-verdict colloquy with jurors proceeded as follows:

THE COURT: You [the jury] are discharged. However, stay here for a moment, please.

I know this has been a difficult case for you, and some of you are nodding, and you don't have to answer the questions I'm going to put to you, but it might be helpful. Just answer, if you want to answer as to yourself, not as to what anybody else said, because everybody is entitled to privacy.

Now, the Supreme Court of the United States has suggested that for constitutional reasons th[at] juries participate much more heavily in the sentencing, although the sentencing does not suggest in any way how you should decide. As I told you, in considering your verdict, you should not consider that. I will do the sentencing, not you. You all recall that?

However, because these are somewhat difficult cases, and they do involve to some extent the morality and the views of the community, it might be helpful, if you wish, to indicate what you think under these circumstances that you have heard here, the penalty for a person like this defendant might be, in terms of incarceration or other punitive aspects.

Do you have any view, juror one?

JUROR NO. 1: No.

THE COURT: Two?

JUROR NO. 2: No.

THE COURT: Three?

JUROR NO. 3: No.

THE COURT: Four?

JUROR NO. 4: No.

THE COURT: Five?

JUROR NO. 5: No.

THE COURT: Six?

JUROR NO. 6: No.

THE COURT: Seven?

JUROR NO. 7: No.

THE COURT: Eight?

JUROR NO. 8: No.

THE COURT: Nine?

JUROR NO. 9: [sic].

THE COURT: Ten?

JUROR NO. 10: Yes, I do.

THE COURT: What's your view?

JUROR NO. 10: My view is that if it is at all possible—and I don't know if it is—I see no useful purpose to have Mr. Polizzi confined. I believe that there should be an alternative, if possible, other than confinement.

THE COURT: What would that alternative be?

JUROR NO. 10: Treatment.

THE COURT: Compulsory treatment?

JUROR NO. 10: Oh, absolutely.

THE COURT: Juror eleven?

JUROR NO. 11: I agree with him.

THE COURT: You agree with juror ten?

JUROR NO. 11: Yes.

THE COURT: Juror twelve?

JUROR NO. 12: No.

THE COURT: You prefer not to speak?

JUROR NO. 12: Yes.

THE COURT: Now, as we discussed during the earlier preparation for the case a problem that doesn't arise very frequently, and that's what's called jury nullification. The power of a jury, if it doesn't like a rule of law, to ignore the instructions and just acquit, or, conversely, to convict for a higher [sic] crime. That's called nullification, and the judge is not permitted and should not suggest to the jury nullification. In fact, I told you, you have to follow the law. You remember that?

THE JURORS: Yes.

THE COURT: But some jurors do under some circumstances we believe nullify.

Now, the question comes up in this way: Had you known that the penalty was five to 20 years, a minimum of five, maximum of 20, probably concurrent, not times 20, but for the total, would that have affected the verdict of any of you, raise your hands?

MR. BODE: I object, your Honor.

JUROR NO. 9: Yes, I also feel that incarceration would not serve in this case. I think the gentleman should receive treatment, compulsory, but that he should definitely receive treatment. I don't think justice is served for incarceration.

THE COURT: Would your verdict have been affected if you knew that there was a minimum of five years imprisonment[?]

JUROR NO. 9: Yes.

THE COURT: How would it have been affected?

JUROR NO. 9: Under all the circumstances, I would have probably gone not guilty by reason of insanity.

THE COURT: Anyone else?

JUROR NO. 2: I would have done the same.

THE COURT: You would have found him not guilty, if you knew what the total punishment was.

Anyone else wish to speak? Juror eleven?

JUROR NO. 11: I would not. I would have found him [not] guilty by reason of insanity.

THE COURT: You would have nullified, if you knew what the punishment was.

Do any of you wish to say anything else about this case? I know it was very difficult and I do want to thank you. I know you gave it a great deal of attention.

JUROR NO. 7: I also believe that Mr. Polizzi should not be incarcerated. I believe that mental health treatment should be the proper verdict for Mr. Polizzi.

*Id.* at 1454-59.

Defense counsel reported to the court that he spoke with two of the jurors, Jurors No. 9 and No. 11, by telephone after the verdict and that they had indicated to him there was nearly universal support among the jurors for a non-jail disposition for Mr. Polizzi due to the unique circumstances of his case. Def.'s Mem. of Law Regarding the Sentencing of the Def. Peter Polizzi 3 n.2, D.E. No. 127; Def.'s Letter 2 n.3, Dec. 5, 2007, D.E. 114.

### E.     Post-Trial Proceedings

#### 1.     First Grant of New Trial Based on Trial Court's Perception of Error

Following the jury's verdict of guilty on all counts, the trial court granted a new trial on Counts One through Twelve (receipt). *Polouizzi I*, 549 F. Supp. 2d at 449-50. It noted its prior conclusion that it had no discretion to charge the jury that conviction on any of those counts would require a five-year minimum sentence. *Id.* at 448. *See also Polouizzi II*, 564 F.3d at 152 ("[T]he district court explained that it erred because, believing erroneously that it had no discretion to instruct the jury about the mandatory minimum sentence, it failed to exercise its discretion to give such an instruction."). Post verdict, the court concluded that it did have such discretion. It determined that if it had been properly informed of the law during the trial, it would have exercised its discretion so to charge the jury of the mandatory minimum incarceration, and that such an instruction might well have profoundly affected its verdict. *See Polouizzi I*, 549 F. Supp. 2d at 339-41.

36

The district court concluded, upon a historical review of the jury system since colonial times, that Polizzi had a Sixth Amendment right to be tried by a jury informed of the mandatory minimum sentence. *Id.* at 404-43. *See also* Parts IV.A-F, *infra*.

### 2. Sentencing on Counts Fourteen through Twenty-Four

Polizzi was sentenced on Counts Fourteen through Twenty-Four (possession) to one year and one day in prison, a fine of $50,000, a special assessment of $1,000, and a supervised release term of ten years. *See Polouizzi I*, 549 F. Supp. 2d at 448-49; *United States v. Polizzi*, No. 6-CR-22, 2008 WL 1820900, *3 (E.D.N.Y. Apr. 1, 2008).

Pursuant to federal and New York state law, Polizzi was required to register as a sex offender upon his release from prison; he will be subject to severe restrictions and reporting requirements for ten to fifteen years under federal law and twenty years under state law. *See* 42 U.S.C. §§ 16911, 16915(a)(1) (fifteen years for lowest risk federal offenders); § 16915(b) (possibility of early termination for federal offenders after ten years); N.Y. Correct. Law § 168-h(1) (twenty years for lowest risk offenders).

The defendant already has served his year-and-one-day sentence in connection with the possession counts. Since his release in August of 2008, he has been under strict supervised release, with house arrest and electronic monitoring. *See* Order setting Conditions of Release on Bond, Aug. 14, 2008, D.E. No. 173. According to defense counsel, the conditions of defendant's release have impeded his ability to provide care and emotional support to his wife, who has been diagnosed with cervical cancer. *See* Def.'s Memo. of Law in Supp. of Def. Resentencing 4, D.E. No. 209; Discharge Summary Report, Wyckoff Heights Med. Ctr, Jan. 21, 2009, D.E. No. 209-4.

While on supervised release, Polizzi has received treatment for mental problems resulting in his becoming more forthcoming about the sexual abuse he suffered as a child. *See* Def.'s Memo. of Law in Supp. of Def. Resentencing 3, D.E. No. 209. At the request of his counselors, Polizzi has given lectures to other victims about the lifelong impact of such abuse. *Id.* Polizzi has reportedly fully complied with the conditions of his release.

### F.    Appeal

By its written opinion of April 24, 2009, the Court of Appeals reversed the trial court's grant of a new trial. The appellate court concluded that the trial court's decision *not* to inform the jury of the mandatory minimum punishment associated with the receipt counts was "certainly within its discretion." *Polouizzi II*, 564 F.3d at 160.

Rejected on appeal was the government's contention that the trial court's grant of a new trial "was premised on an erroneous belief that it had discretion to instruct the jury of the applicable mandatory minimum." *Id.* at 152. Without reaching the question whether it would have been appropriate to so instruct the jury in the circumstances of this case, the Court of Appeals for the Second Circuit observed that "*The District Court Has Discretion to Instruct the Jury on* [*the*] *Applicable Mandatory Minimum Sentence in Some Circumstances.*" *Id.* at 161 (italics in original). *See also id.* (reviewing the Supreme Court's decision in *Shannon v. United States*, 512 U.S. 573, 586 (1994), stating that "[f]ar from prohibiting all instructions to the jury regarding the consequences of its verdict . . . . [I]n some, albeit limited circumstances, it may be appropriate to instruct the jury regarding those consequences").

In its decision, the Court of Appeals sharply reduced the permissible scope of indictments in cases involving child pornography and the Internet. As a matter of first impression, it held that possessing a collection of downloaded images cannot, consistent with congressional intent,

be punished with multiple convictions under 18 U.S.C. § 2252(a)(4)(B). *Polouizzi II*, 564 F.3d at 153-57. It explained that multiple possession counts "*affect[ed] Polizzi's substantial rights,*" *id.* at 156 (emphasis added), and that "*maintaining these convictions would seriously affect the fairness, integrity, or public reputation of judicial proceedings,*" *id.* at 157 (emphasis added). Recognizing that concurrent sentences would not remedy the defect, *see id.* at 156-57, the Court of Appeals ordered vacatur of all but one of the possession counts, directing "[t]he district court [to] exercise its discretion when determining which conviction should remain," *id.* at 157. It observed:

> [T]he rule of lenity requires the conclusion that a person who receives multiple prohibited images in a single transaction can only be charged with a single violation of § 2252(a)(2) [receipt]. . . . [The] record would appear to support Polizzi's conviction on four receipt counts—one for each date on which he received images—but not multiple receipt counts per day.

*Id.* at 158.

The trial court's decision to grant a new trial was reversed. The case was remanded by the Court of Appeals, with instructions "to vacate all but one of the § 2252(a)(4)(B) [possession] convictions and [all but four of the § 2552(a)(2) (receipt) convictions] and for further proceedings consistent with this opinion." *Id.* at 163.

### G.    Proceedings on Remand

Following reversal, on April 30, 2009, the district court held a conference with the parties to discuss how to conduct "further proceedings consistent with [the appellate] opinion." Order, Apr. 24, 2009, D.E. No. 188. The defendant orally moved for a new trial. *See* Hr'g Tr.7:2-4, Apr. 30, 2009 ("The only way of correcting [the prejudice to defendant] is actually giving Mr. Polizzi a new trial."). Noting that the case "[is] before the appellate court," the trial court stated that it "has no jurisdiction to act at this time except with respect to bail." *Id.* at 10:9-11.

The trial court declined defendant's invitation to choose receipt counts that would necessarily lead to a double jeopardy conclusion, as inconsistent with a reasonable reading of the decision of the Court of Appeals. *Id.* at 8:22-9:20 ("[Defendant's Counsel]: There are . . . four receipt counts that are identical to the possession counts. Your honor, you could say those are the four receipt counts and say those counts do not survive because of double jeopardy. . . . The Court: I'm not going to exercise that kind of discretion. I'll obviously follow the suggestion of the Court of Appeals.").

An advisory memorandum issued the same day by the trial court considered methods of complying with the decision of the Court of Appeals. *Polouizzi III*, 257 F.R.D. 33 (E.D.N.Y. 2009). It stated that the district court was, at the moment, without jurisdiction to act since there was no mandate from the appellate court, but suggested that a new trial might be required in light of the extreme overindictment, now reduced by the Court of Appeals. *Id.* at 34, 36-38. Shortly thereafter, the trial court indicated in *Polouizzi IV* that, if it granted a new trial, it intended to inform the jury of the mandatory minimum sentence associated with the receipt counts. 2009 WL 3163520, at *2.

The parties were urged by the trial court in its advisory memorandum to seek clarification of the remand from the Court of Appeals. *See Polouizzi III*, 257 F.R.D. at 38-39. They did not do so. The mandate was issued by the Court of Appeals on July 7, 2009 and entered on the docket of the district court on July 30, 2009.

Defendant filed a letter motion moving for a new trial under Rule 33. Def.'s Letter, July 31, 2009, D.E. No. 202. The government opposed. Govt.'s Letter, Aug. 13, 2009, D.E. No. 204; Govt.'s Letter, July 27, 2009, D.E. No. 199.

Argument on defendant's motion for a new trial was heard on September 29, 2009. A new trial was granted for reasons set forth in the trial court's April memorandum. *See Polouizzi IV*, 2009 WL 3163520, at *1-2. The trial court accepted the government's suggestion—subject to appeal and without waiver of the government's objection to the grant of a new trial—that retrial proceed on Counts Two, Three Six, and Nine (Receipt of Child Pornography) and Count Fourteen (Possession of Child Pornography). Order, Sept. 30, 2009, D.E. No. 212.

## III.    Second Grant of New Trial

### A.    Standard

Rule 33(a) of the Federal Rules of Criminal Procedure directs the trial court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Court of Appeals for the Second Circuit has observed that "[t]his rule 'confers broad discretion upon a trial court to set aside a jury verdict and order a new to avert a perceived miscarriage of justice.'" *Polouizzi II*, 564 F.3d at 159 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). *See also United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) ("[A] new trial is proper when a district court 'is convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice.'") (quoting *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)).

Despite the trial court's broad discretion, a Rule 33 motion should be granted "sparingly" and in the "most extraordinary circumstances." *Cote*, 544 F.3d at 101 (quoting *Sanchez*, 969 F.2d at 1414); *accord United States v. Bell*, 584 F.3d 478, 483-84 (2d Cir. 2009). *See also United States v. Perez*, No. 01-CR-848, 2003 WL 721568, at *3 (S.D.N.Y., Feb. 28, 2003) ("It is well settled . . . that 'motions for new trials are not favored and should be granted only with great caution.'") (quoting *United States v. Costello*, 255 F.2d 876, 879 (2d Cir. 1958)).

In determining whether to grant a new trial, "the trial court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001). *See also* 5 Lester B. Orfield, Criminal Procedure Under the Federal Rules § 33:9 (1968) (noting in context of Rule 33 that "[j]ustice is not a sentimental concept which each person may have as to right or wrong with relation to a given cause, or any duty he may have in connection with it, but it is an impartial, fair and reasonable application of prescripts of law both vengeful and protective") (internal quotation marks omitted).

"[A] motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Landau*, 155 F.3d at 104 (citing *Bevevino v. Saydjari*, 574 F.2d 676, 683 (2d Cir. 1978); *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)). "The 'ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (quoting *Ferguson*, 246 F.3d at 133)). The Court of Appeals for the Second Circuit has held that "there must be a real concern that an innocent person has been convicted." *Id.* An "innocent person," in this context, includes a person who, after a fair trial, is found not guilty only by reason of the legal definition of insanity. *See* 18 U.S.C.A. § 17 (providing for affirmative defense of legal insanity); *cf. United States v. Bohle*, 475 F.2d 872, 874-75 (2d Cir. 1973) (characterizing the jury's decision whether to credit insanity defense as "for the jury as part of guilt determination."); *Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir. 1999) (Posner, J.) (holding, in habeas context, that "when the accused . . . has an affirmative defense of insanity . . . [and is] acquitted on ground of insanity, he is actually innocent"). *But cf. Herrera v. Collins*, 506 U.S. 390, 419-20 (1993) (O'Connor, J., concurring)

(stating that petitioner who sought a new trial was not "innocent" in the eyes of the law when found guilty after a "fair trial.").

The merits of defendant's motion are considered in detail below. Although a new trial will not be granted on the ground that the trial court failed to recognize, and exercise, its discretion to inform the jury of the mandatory minimum sentence associated with a conviction on the receipt counts, *see* Part III.B, *infra*, a new trial is required in light of the sharp reduction in the child pornography counts charged against the defendant, *see* Part III.C.2, *infra*.

Having considered the special and unique circumstances of this case, the trial court is "convinced that . . . the [guilty] verdict is a miscarriage of justice." *Cote*, 544 F.3d, at 101 (internal quotation marks omitted). The overindictment would have affected the jury's deliberations regarding the insanity defense. There is a substantial probability that, in the absence of the overindictment, the jury—even if it were unaware of the high minimum sentence—would have either acquitted or returned a verdict of not guilty by reason of insanity. A new trial is required to "avert this perceived miscarriage of justice." *Polouizzi II*, 564 F.3d at 159 (internal quotation marks omitted). *See also id.* at 162 ("[A] compelling reason involving substantial unfairness [can] justify undoing the jury's verdict and ordering a new trial").

**B.    Preliminary Issue**

A preliminary issue is whether to grant a new trial on the ground that the trial court failed to know it had, and to exercise, its discretion to inform the jury of the five-year minimum sentence associated with a conviction for receipt of child pornography. *See Polouizzi II*, 564 F.3d at 162 n.8 ("A district court, if it becomes aware of its own error, may well be justified in ordering a new trial . . . .").

Although the opinion of the Court of Appeals is ambiguous about the particular circumstances in which it is within the court's discretion to inform the jury of a mandatory minimum sentence, *see* Part II.F, *infra*, it is evident from the opinion that, under the circumstances of this case, it would be an abuse of discretion for the trial court to now grant a new trial on this ground. The Court of Appeals wrote:

> In this case, it is not necessary to decide whether it would have been within the district court's discretion to inform the jury of the applicable mandatory minimum sentence. Even assuming *arguendo* that the district court had discretion to give such an instruction, it was certainly within the trial court's discretion to decline to instruct the jury on the mandatory minimum sentence.

*Polouizzi II*, 564 F.3d at 162.

As indicated in the trial court's prior memorandum reviewing the opinion for the Court of Appeals, *see Polouizzi III*, 257 F.R.D. at 38-39, it was suggested that the parties seek further clarification from the Court of Appeals before remand, and that, without further clarification or modification of the opinion, a new trial would not be granted on this ground. Neither party sought clarification. *See* Hr'g Tr. 2:19-3:11, Sept. 29, 2009.

## C. Overindictment

The main issue now presented arises from the seminal opinion of the Court of Appeals for the Second Circuit in *Polouizzi II*. As described above, Part II.F, *infra*, in a major break with prior practice in the trial of child pornography cases, the appellate court reduced the indictment from twenty-three counts to five. *See Polouizzi II*, 564 F.3d at 153-58. The question now posed is whether a new trial should be granted in light of the substantial change in the indictment.

There are two subsidiary issues: 1) whether the evidence would have been different if the case had been tried with the indictment now limited, and 2) whether the extreme overbreadth of the indictment itself would have had a substantial effect on the jury in its deliberations.

### 1. No Prejudice From Evidence Admitted

As to the first issue, the evidence would have been essentially the same under the indictment tried and the indictment as reduced by the Court of Appeals. Although the trial court would have been likely to have somewhat limited repetitive evidence admitted under Federal Rules of Evidence 403 and 404(6), had the trial proceed on five counts rather than twenty-three, the jury would have known the number and nature of the hoard of pornographic materials the defendant possessed. *See Polouizzi II*, 564 F.3d at 153 (finding that content of images was relevant to the jury's consideration of the insanity issue). The government was as solicitous of the defendant and non-prejudicial as it could be in introducing materials downloaded and retained by the defendant. *See Polizzi I*, 549 F. Supp. 2d at 331 ("The still photos and moving video were shown to the jury in brief flashes on a courtroom screen to avoid unnecessary prejudice."); *Polizzi II*, 564 F.3d at 153 ("[T]he risk of unfair prejudice was minimized by the mode of presentation."). The extreme sensitivity in the presentation by the government would have prevented any undue prejudice from the introduction of the same evidence whether the trial involved five or twenty-three counts.

### 2. Prejudice From Overbreadth of Charges Tried

A trial court is guided in applying its authority to grant a new trial under Rule 33 by the decisions of the Court of Appeals for the Second Circuit recognizing broad *nisi prius* discretion. *See, e.g.*, *Polizzi II*, 564 F.3d at 159 ("This rule confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.") (internal quotation marks omitted).

Based upon its own observation of hundreds of jury criminal trials and of many

thousands of potential jurors, reinforced by a review of available studies on the sociology of

juror deliberations, the trial court concludes that the jury was overwhelmed by the seriousness of

the defendant's criminal conduct as reflected in the long indictment on twenty-three counts. As

this trial court has noted previously:

> . . . [A] twenty-three count child pornography trial is qualitatively different
> from a five count trial – where a serious defense is insanity. Jurors would be
> more inclined to find lack of insanity when trying the large multiple-count
> indictment, with its overtone of a far more serious threat to many children
> requiring a heavier condemnation by society. . . .
>
> An indictment so multiplicitous exaggerates the jury's impression of the
> nature and scope of defendant's criminal activity by charging – and requiring a
> separate finding of guilty – "an offense multiple times, in separate counts, when,
> in law and fact, only one crime has been committed." *United States v. Chacko*,
> 169 F.3d 140, 145 (2d Cr. 1999). *See also, e.g, United States v. Reed*, 639 F.2d
> 896, 904 (2d Cir. 1981) ("The vice in multiplicity of charges is that it may lead to
> multiple sentences for the same offense and *may improperly prejudice a jury by
> suggesting that a defendant has committed not one but several crimes*.")
> (emphasis added); *United States v. Ketchum*, 320 F.2d 3, 8 (2d Cir. 1963) (finding
> that the objectives of preventing multiplicitous counts are "primarily those of
> promoting the order and efficiency of the trial and avoiding the risk that the prolix
> pleading *may have some psychological effect upon* a jury" by overstating the level
> of the defendant's criminal activity) (internal quotation marks and citation
> omitted; emphasis added); *United States v. Carter*, 576 F.2d 1061, 1064 (3d Cir.
> 1978) (multiplicitous indictment "may prejudice the jury against the defendant by
> *creating the impression of more criminal activity on his part than in fact may
> have been present*.") (emphasis added); *United States v. Langford*, 946 F.2d 798,
> 802 (11th Cir. 1991) (multiplicitous indictment "may improperly prejudice a jury
> by *suggesting that a defendant has committed several crimes – not one*")
> (emphasis added); *United States v. Duncan*, 850 F.2d 1104, 1108 n.4 (6th Cir.
> 1988) (multiplicitous counts "*may falsely suggest to a jury that a defendant has
> committed not one but several crimes*") (emphasis added), *overruled on other
> grounds by Schad v. Arizona*, 501 U.S. 624 (1991); *United States v. Clarridge*,
> 811 F. Supp. 697, 702 (D.D.C. 1992) (The reason for keeping unnecessary counts
> from the jury is that, "[o]nce such a message [of multiple crimes] is conveyed to
> the jury, the risk increases that the jury will be diverted from a careful analysis of
> the conduct at issue" and "[c]ompromise verdicts or *assumptions that, with so
> many charges pending the defendant must be guilty on at least some of them, pose
> significant threats to the proper functioning of the jury system.*") (emphasis
> added).

*Polouizzi IV*, 2009 WL 3163520, at *1-2 (underlining added).

Jurors are human beings, not slot machines. They do not work in a mechanical fashion. Depending on the circumstances of a particular case, jurors may be lenient. *E.g. United States v. Powell*, 469 U.S. 57, 65 (1984) (Rehnquist, J.) (refusing to overturn "inconsistent verdict," noting the possibility that the jury "returned a guilty verdict on the compound offense, and then . . . through . . . lenity, arrived at an inconsistent conclusion on the lesser offense."). Or, as in treating recidivists and repeat offenders, jurors may harsh. *E.g. United States v. McCallum*, 584 F.3d 471, 476-77 (2d Cir. 2009) (recognizing risk of undue prejudice arising from introduction of prior convictions); *Durr v. Mitchell*, 487 F.3d 423, 444 (6th Cir. 2007) (recognizing prejudice where prosecutor's closing arguments "impl[ied] that defendant was . . . a recidivist continually engaged in criminal conduct"). Our jury system brings human understanding to difficult criminal cases.

"[E]ven when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one." *United States v. Smith*, 112 F.2d 83, 85 (2d Cir. 1940). *See* U.S. Dep't of Justice, United States Attorneys' Manual, tit. 9, Criminal Resources Manual 215 (1997) ("In order to promote the fair administration of justice, as well as the perception of justice, all United States Attorneys should charge . . . as few separate counts as are reasonably necessary to prosecute fully and successfully . . . . To the extent reasonable, indictments . . . should be *limited to fifteen counts or less*.") (emphasis added).

There is a sense in our society that individuals may "slip" from time to time. But when a crime is committed again and again, that tendency to forgive is seriously attenuated.

This inherent "human element" in jury deliberations is magnified in the context of the insanity defense, where "[s]anity and insanity are concepts of incertitude," *Leland v. State of Oregon*, 343 U.S. 790, 803 (1952) (Frankfurter, J., dissenting), and the determination of "legal insanity" involves assessments of culpability and public morality. *See* 18 U.S.C. § 17 (requiring defendant to prove, *inter alia*, that he was "unable to appreciate the nature and quality or the *wrongfulness* of his acts") (emphasis added); *accord Polouizzi I*, 545 F. Supp. 2d at 278 (instructing jurors to "Ask yourselves, for example, was [Polizzi] not only intellectually able to understand, but was he emotionally able to realize the nature and quality or wrongfulness of his acts?"). Even in the instant case, where the trial court defined "wrongfulness" as "unlawfulness," rather than "contrary to public morality," assessments of public morality were central to the litigation. *See, e.g.*, *Polouizzi II*, 564 F.3d at 153 (finding the "nature and content" of illicit images relevant to the insanity defense, noting that "the government . . . has a right to present evidence . . . to establish the "*human significance*" of the fact and to "*to implicate the law's moral underpinnings.*") (internal quotations omitted; emphasis added).

An experienced jurist or lawyer may see no essential difference between an indictment for child pornography charging five counts and an indictment charging twenty-three counts, but it is highly probable that a lay juror would be prepared to find a defendant guilty more readily if he were tried for twenty-three rather than five separate child pornography crimes.

Child pornography is abhorrent, as indicated by harsh punishments associated with conviction. It is precisely these kinds of cases in which one would expect juries to be *less* likely to credit the insanity defense than jurists or lawyers. *See, e.g.*, Harry Kalven Jr. & Hans Zeisel, The American Jury 404-05, 405 n.11 (1966) (comparing actual verdicts to verdicts favored by judges, reporting that insanity cases involving "heinous and violent" crimes were "virtually the

only cases in which the judge rates the case as clear for acquittal where the jury nevertheless refuses to acquit"); *id.* at 405 (characterizing such cases as an "extreme form . . . of jury revolt in favor of greater severity."). *See also* Rita James Simon, The Jury and the Defense of Insanity 89 (1967) (conducting first systemic research on jury reactions to the insanity defense, observing that jurors were relatively hesitant to defer to psychiatric testimony when a defendant has committed a heinous crime). *See also generally* Dennis J. Devine et al., *Jury Decision Making: 45 Years of Empirical Research on Deliberating Groups*, 7 Psych., Pub. Pol. & L. 22 (2001) (reviewing empirical literature on sociology of jury decision making).

The overindictment—resulting in a verdict sheet requiring jurors to answer twenty-three questions, covering eight pages—cannot have failed to affect the jury's deliberation on the insanity defense. *Cf. United States v. Spock*, 416 F.2d 165, 182 (1st Cir. 1969) (expressing concern with "subtle, and perhaps open, direct effect that answering special questions may have upon the jury's ultimate conclusion" where a verdict form includes a "progression of questions each of which seems to require an answer unfavorable to the defendant"). As explained above, Part II.C.3.a, *supra*, the trial court's instructions necessarily emphasized that the indictment contained many counts, and it was apparent from discussions during the charging conference that jurors would be keyed in to the fact that multiple counts of child pornography were at issue. The overindictment was a serious impediment on any objective deliberations on the insanity defense.

That the Court of Appeals understood the deleterious effect of this overindictment was apparent. It made its view clear: maintaining multiplicitous convictions in this case would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Polouizzi II*, 564 F.3d at 154 (internal quotation marks omitted).

Where a district court is presented with a multiplicitous indictment before or during trial, potential prejudice can sometimes be avoided by requiring the prosecution to elect between counts charged rather than merging sentences. *See, e.g.*, *United States v. Clarridge*, 811 F. Supp. 697, 702-07 (D.D.C. 1992) (requiring government to elect between multiplicitious counts of false statements and perjury). The reason for keeping unnecessary counts from the jury is that, "[o]nce such a message [of repeated crimes] is conveyed to the jury, *the risk increases that the jury will be diverted from a careful analysis of the conduct at issue*," and "[c]ompromise verdicts or assumptions that, *with so many charges pending the defendant must be guilty* on at least some of them, pose significant threats to the proper functioning of the jury system." *Id.* at 702 (emphasis added).

If the profound peril of prejudice and a miscarriage of justice from flagrant overindictment has not been negated before or at trial, a new trial is warranted. In the instant case, neither the parties nor the trial court were aware of the serious overcharging before the appellate court ruled that the defendant had been excessively charged, as a matter of first impression on this appeal.

Although in some instances curative instructions on how to appropriately consider each individual crime charged may adequately avoid prejudice to a defendant faced with multiplicitous counts, *see United States v. Chipps*, 410 F.3d 438, 449 (8th Cir. 2005), this technique is not now available. Once the impression of enhanced criminal activity "'is conveyed to the jury, *the risk increases that the jury will be diverted from a careful analysis of the conduct at issue*, and will reach a compromise verdict or assume the defendant is guilty.'" *United States v. Johnson*, 130 F.3d 1420, 1426 (10th Cir. 1997) (quoting *Clarridge*, 811 F. Supp. at 702) (emphasis added).

50

Questions of jurors during deliberations and post-verdict statements support a serious concern that a less extensive indictment would have led to an acquittal because of the insanity defense. Having considered objectively the totality of the circumstances, this court finds that there was a high probability that the unlawfully increased number of child pornography charges caused the jury to consider the defendant's conduct to be more systematic and dangerous than it would have if the counts were substantially reduced—with the likely result that the jury would have found him insane. *See Polouizzi III*, 257 F.R.D. at 38.

Because this court is convinced that the initial verdict constituted a manifest injustice, a new trial is required in the exercise of this court's discretion. A retrial must proceed on all five counts—both those for possession and receipt. The overindictment cannot have failed to infect the deliberations with respect to every count charged on the indictment. As explained previously,

> [t]hat the cause of a juror's action might be psychological, predicated upon unanalyzed feelings, rather than rational, based on the evidence and charged law, does not control the issue posed: under the special and unique facts of this case, would the jury be more likely to accept the defense of insanity if one instead of eleven counts of child pornography possession was being tried, and four instead of twelve counts of receipt of child pornography were before them at the same time? Based on this court's experience with many thousands of citizens called from a cross-section of the Eastern District's heterogenous community for service as petit jurors, the answer is yes.

*Polouizzi IV*, 2009 WL 3163520, at *1. Where, as here, the interest of justice requires, "a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Landau*, 155 F.3d at 104. *See also United States v. Quintanilla*, 193 F.3d 1139, 1149-50 (10th Cir. 1999) (Seymour, C.J., dissenting) (noting that when a new trial is sought on grounds other than newly discovered evidence, "'the motion should be neither favored nor disfavored, and the question is only what the interest of justice requires.'") (quoting 3 Charles A. Wright, Federal

Practice & Procedure § 551 (2 ed. 1982)); *cf. Mattox v. United States*, 146 U.S. 140, 149 (1892) ("It is vital . . . that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.").

It must be emphasized that this is an unusual case, where there was no question of receipt and possession of child pornography by the defendant, but the only issue for the jury was the insanity defense. And questions from the jury indicated that this was a serious sticking point over a period of its days of deliberation. Eighteen erroneously charged counts could not have failed to have affected juror deliberations and analysis of the insanity issue.

**D.     Timeliness**

Notwithstanding the government's contentions to the contrary, *see* Govt.'s Letter 13-14, July 27, 2009, D.E. No. 199; Govt.'s Letter 3, Aug. 13, 2009, D.E. No. 204, the fact that defendant's motion was filed after this case was remanded by the Court of Appeals does not impinge on this court's jurisdiction to grant now a new trial.

1.     "Seven-Day" Rule

Rule 33(b)(2) states in pertinent part that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within seven days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). *See also* Advisory Committee Notes to 1998 Amendment to Rule 33 ("It is the intent of the Committee . . . [to use] the trial court's verdict or finding of guilty as the triggering event."). Rule 33 must be read in conjunction with Rule 45, which governs how to compute time and extensions. *United States v. Owen*, 559 F.3d 82, 84 (2d Cir. 2009) (citing *Robinson*, 430 F.3d at 541 (2d Cir. 2005)).

Rule 33(b)(2) was amended, effective December 1, 2009, to change the time limitation for filing a new trial motion from seven to fourteen days after the verdict. Because Polizzi's motion for a new trial was filed before the effective date of December 1, 2009, the pertinent time period remains seven days, subject to extension for excusable neglect. As explained in the Advisory Committee notes to the 2005 amendment to Rule 33:

> The defendant may under Rule 45 seek an extension of time to file the underlying motion as long as the defendant does so *within the seven day period.* But the court itself is not required to act on that motion within any particular time. *Further, under Rule 45(b)(1)(B), if for some reason the defendant fails to file the underlying motion for a new trial within the specified time, the court may nonetheless consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect.*

*Id.* (emphasis added). Rule 45(b)(1)(B) states that "[w]hen an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B).

A party need not seek or obtain leave to file a belated motion for a new trial pursuant to Rule 45. *See* Fed. R. Crim. P. 45(b)(1)(B) ("[T]he court *on its own* may extend the time . . . if the party has failed to act because of excusable neglect.") (emphasis added). Nor do the Rules limit the time in which a district court may properly decide on a new trial motion. *See* Advisory Committee Notes for 2005 Amendment to Rule 45 ("The rules . . . do not force the court to rule on a motion to extend the time for filing . . . within a particular period of time . . . .").

Rule 33 is not jurisdictional. *Eberhart v. United States*, 546 U.S. 12, 13-15 (2005) (*per curiam*) (denominating Rule 33 a "claim processing rule[]"); *United States v. Owen*, 559 F.3d 82, 83-84 (2009) (same); *United States v. Melendez*, No. 04-CR-473, 2006 WL 1379624, at *5 (S.D.N.Y. May 15, 2006) (same).

As explained above, Part II.G, *supra*, defendant orally requested a new trial on April 30, 2009—days after the Court of Appeals issued its opinion in this case. *See* Hr'g Tr. 7:2-3, Apr. 30, 2009. Defendant's letter motion was filed on July 31, 2009. Neither application was made within the seven-day window specified in Rule 33(b)(2), since it is the jury's October 5, 2007 verdict, not the date of remand, that triggers the seven-day clock.

### 2. Excusable Neglect

Consideration of the merits is appropriate because defendant's belated filing was excusable under Rule 45—a finding inherent in prior action of this court following remand. *See Polouizzi III*, 257 F.R.D. at 36-38 (suggesting that, upon remand, a new trial might be required). *See also, e.g., United States v. Owen*, 559 F.3d 82, 84 (2d Cir. 2009) (construing trial court's indication that it would "have to hear" a *pro se* Rule 33 motion as embodying a finding of excusable neglect).

This court's finding of excusable neglect is based on consideration of all relevant circumstances, including: 1) the danger of prejudice to the non-moving party; 2) the length of delay and impact on judicial proceedings; 3) the reason for the delay, including whether it was in the reasonable control of the moving party; and 4) whether the moving party acted in good faith. *See Pioneer Inv. Servs. Co.*, 507 U.S. 380, 395 (1993) (setting forth factors for determination of equitable neglect in context of Bankruptcy Rule 9006(b)). *See also Eberhart v. United States*, 546 U.S. at 19-20 (explaining that Bankruptcy Rule 9006(b) and Federal Rule of Criminal Procedure 45(b) are both modeled on the Federal Rule of Civil Procedure 6(b)) (internal quotation marks omitted); *United States v. Riley*, No. S1 06-CR-80, 2008 WL 2662277, at *1 n.3

(S.D.N.Y. July 7, 2008) (applying *Pioneer* in context of Rule 33); *United States v. Urena*, No. S3 05-CR-0760, 2008 WL 2229847, *2-3 (S.D.N.Y. May 29, 2008) (same).

These four factors—separately and together—support a finding of excusable neglect.

There is no risk of prejudice to the government, where a possible new trial has been the focus of this litigation for over a year. It has long been apparent—at least since the close of evidence in this case—that defendant's counsel intended to seek a new trial on any and all available grounds. The government learned of the present grounds for the motion immediately after the Court of Appeals for the Second Circuit filed its opinion. *See* Hr'g Tr. 7:2-3, Apr. 30, 2009; *Polouizzi III*, 257 F.R.D. at 36-38. It was in effect in the same position to respond to a Rule 33 motion as it was immediately after the verdict. *Cf.* Hr'g Tr. 10:6-8 ([AUSA:] "In terms of timing, I have no objection if your Honor wants to set a long date or mark it off calendar.").

The reason for the delay tips heavily in favor of the defendant. Defendant's contention that it was only after the appellate decision that he became aware of the need for a new trial on the basis of prejudicial spillover, Def. Letter, July 31, 2009, D.E. at 202, is credible and justified. As described above, Part II.F, *supra*, it was as a matter of first impression that the Court of Appeals limited the number of crimes that could be charged in cases involving downloading and viewing of child pornography though the Internet, reducing the crimes charged against the defendant from twenty-three to five. *See Polouizzi II*, 564 F.3d at 153-61.

Failure of defendant's counsel to anticipate that decision can hardly be characterized as neglect, much less inexcusable neglect. *See Canfield v. Van Atta Buick/GMC Truck, Inc.*, 127 F.3d 248, 250 (2d Cir. 1997) ("'[N]eglect,' for purposes of interpreting 'excusable neglect' in the federal rules, has its normal, expected meaning: inadvertence, carelessness, and mistake."). Attorneys are expected to be zealous advocates, not clairvoyants. *Cf. Hawknet, Ltd. v. Overseas*

*Shipping Agencies*, No. 09-2128-CV, 2009 WL 4911944, at *2 (2d Cir. Dec. 22, 2009) ("The

doctrine of waiver demands conscientiousness, not clairvoyance, from the parties."); *United*

*States v. Roberts*, 978 F.2d 17, 24 (1st Cir. 1992) ("In general, mistake or inadvertence as to the

meaning of a rule is not a sufficient reason to grant a belated application . . . . Nonetheless,

ambiguity in a rule . . . can give rise to excusable neglect sufficient to warrant an extension of

time.") (citations omitted).

It is well established that, as a general matter, "there is nothing to prevent the court from

granting the defendant a significant extension of time." Advisory Committee Notes to 2005

Amendment to Rule 45. A significant extension was particularly appropriate here, where a long

delay in any new trial was unavoidable. Consistent with this court's instructions, *see, e.g.*,

*Polouizzi III*, 257 F.R.D. at 34 (stating that the trial court could not act until a "mandate ha[d]

been . . . received"), the defendant filed the instant motion immediately after the mandate of the

Court of Appeals for the Second Circuit was docketed with the district court. Although

technically this court had jurisdiction to decide a motion for a new trial when the mandate was

issued some days earlier, *see United States v. Rivera*, 844 F.2d 916, 921 (2d Cir. 1988),

defendant's counsel cannot be faulted for following the district court in assuming—what was not

the case—that this court would receive the mandate the same day it was issued by the Court of

Appeals. *Cf., e.g., Spear, Leeds & Kellogg v. Pub. Serv. Co. of New Hampshire*, 700 F. Supp.

791, 794 (S.D.N.Y. 1988) (finding excusable neglect arising from "ambiguous" order of the

district court). *See also De Santa v. Nehi Corp.*, 171 F.2d 696, 698 (2d Cir. 1948) (finding

excusable neglect arising from order of district court which was not "clear[ly] . . . correct");

*Roberts*, 978 F.2d at 24 (finding that "ambiguity in a . . . court order can give rise to excusable

neglect"). To the extent that defendant's counsel misinterpreted any prior order extending time,

*see Polouizzi I*, 549 F. Supp. 2d at 447, to extend the time following remand, *see* Def. Letter 1

n.1, July 31, 2009, D.E. No. 202, any delay was excusable. *See United States v. Marquez*, 291

F.3d 23, 28 (D.C. Cir. 2002) (recognizing permissibility of belated filings where a party is

"misled by a ruling or order of the court containing assurances that the deadline has been

extended.").

There has been no accusation or showing of bad faith on the part of defendant. His

counsel has pursued a new trial consistently from the time of verdict.

In light of the unique procedural circumstances of this case, defendant's belated filing is

excused. Even if the delay could properly be characterized as "neglect"—which is dubious—it

was excusable. *See United States v. Owen*, 559 F.3d 82, 84 (2d Cir. 2009) ("[T]he District Court

is in the best position to decide, in the exercise of its informed discretion, whether . . . [a] motion

was timely under Rule 33 and Rule 45(b)."). It would be a grave injustice to refuse to consider

the merits of defendant's motion here, where a new trial is required in the interests of justice. *Cf.*

*Ogden v. United States*, 112 F. 523, 525 (3d Cir. 1902) ("The right to move for a new trial, and

to have that motion considered upon the reasons presented for it, is an absolute one . . . . To

refuse leave to make or file such a motion and the reasons therefore is the denial of a right

. . . .").

3.    Supplemental Order

This court had, and has, jurisdiction to issue a supplemental memorandum and order

granting a new trial to facilitate an expeditious and informed appeal to the Court of Appeals. *See*

*Polouizzi IV*, 2009 WL 3163520, at *2 ("This abbreviated memorandum and order is issued now

to permit an expedited appeal by the government. A more expansive explanation will be issued

shortly."). *See also United States v. Katsougrakis*, 715 F.2d 769, 777, n.7 (2d Cir. 1983) (noting

that although filing of notice of appeal transfers jurisdiction to the appellate court, the trial court

still may act "to aid the appeal"). *Cf. In re Walker*, 515 F.3d 1204, 1211 (11th Cir. 2008)

("[W]hen a trial court reduces its oral findings to writing and cites relevant case law, it does not

lack jurisdiction to do so because the losing party filed a notice of appeal after the oral hearing

but before the entry of the written order. Such a subsequent order aids appellate review."); *In re

Silberkraus*, 336 F.3d 864, 869 (9th Cir. 2003) ("[T]he bankruptcy court retained jurisdiction to

publish . . . . findings of fact and conclusions of law because they were consistent with the

court's oral findings and because they aid us in our review of the court's decision.") (footnote

omitted; citation omitted). *See also generally* Catherine T. Struve, *Power, Protocol, and

Practicality: Communications from the District Court During an Appeal*, 84 Notre Dame L. Rev.

2053 (2009) (discussing actions district courts may properly take while appeal is pending).


## IV.        Informing New Jury of Mandatory Minimum Sentence

The motion for a new trial having been granted because of the ground provided by

*Polouizzi II*, the question which must be decided is whether to inform the new jury of the five-

year mandatory minimum sentence of imprisonment required with a finding of guilt on any of

the receipt counts. *See* 18 U.S.C. §2252(b)(1). All else being equal with the first trial, the court

will so instruct the jury.

Colonial constitutional history establishes this court's duty to inform the jury in special

cases, such as the instant one, the minimum terms of punishment. *See Polouizzi I*, 549 F. Supp.

2d at 404-43 (enunciating this view); Parts IV.A-G, *infra* (reiterating this view). From the

discussions with the jury after the first verdict, it is apparent that this knowledge would probably have affected the outcome—resulting in either a mistrial or acquittal on the ground of insanity.

### A.       The Sixth Amendment – History and Context

A brief historical review demonstrates the Sixth Amendment right of the defendant—in cases such as this one—to be tried by a jury that knows the sentencing impact of its decisions.

Under the majority approach of the Supreme Court to the Sixth Amendment, championed by Justice Scalia and others, judges must look to criminal practices of the Thirteen Colonies and England in 1791, when the amendment was adopted. *See* Parts IV.B-C, *infra* (discussing effect of sentencing decisions of the Supreme Court). Judges today must deal with the caveats of Professor Julius Goebel, Jr. and other historians about difficulties in understanding the vagaries of colonial practice. *See, e.g.*, *United States v. Khan*, 325 F. Supp. 2d 218, 226 (E.D.N.Y. 2004) ("The Constitution requires that we apply 1780 jury practice in our courts. Yet any attempt to fully understand and apply eighteenth-century rules for juries in twenty-first century federal sentencing is bound to be somewhat chimerical."); Essay, *The Role of Judges in a Government Of, By, and For the People*, 30 Cardozo L. Rev. 1, 36-37 (2008) (criticizing some of the historiography of Supreme Court originalism). Reception of British law before and at the time of the Declaration of Independence makes contemporary English practice particularly important in construing the Sixth Amendment. *See, e.g.*, Julius Goebel, Jr., Cases and Materials on the Development of Legal Institutions 298-329 (7th ed. 1946).

Interpreting and extrapolating from eighteenth century practice is particularly difficult since original materials are hard to come by and the technological, political, and legal contexts in each of the Thirteen Colonies were then so different from what they are today. Yet it appears fairly clear, from a review of legal and historical scholarship on eighteenth-century colonial and

English criminal practice, that the petit juries of 1791 would have been aware of any harsh sentence imposed mandatorily upon a finding of guilt of a particular crime. It is equally apparent that a jury so apprised would have been expected to deliver a verdict of not guilty or guilty of a lesser crime had it believed the punishment excessive for the crime actually charged and proved.

The Sixth Amendment was adopted in 1791 as one of the first matters of business of the new republic, guaranteeing the right of a defendant "[i]n all criminal prosecutions . . . [to] trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. IV. It was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt. In later years this fundamental power of the jury—and the right of the accused—has been termed the power to "nullify." Negative current connotations of this characterization of the jury's power and responsibility ignore history and the meaning of the Sixth Amendment.

When a jury refuses to convict on the basis of what it thinks is an unjust law as applied, a misconceived prosecution, or an excessive penalty, it is performing exactly its role as imposed by the Sixth Amendment. As the following discussion demonstrates, these powers of the jury were exercised consistently by jurors before, and for many years after, the Sixth Amendment was adopted. *See, e.g.*, *Polouizzi I*, 549 F. Supp. 2d at 450-54 (providing as an appendix a selected bibliography on powers of jurors when Sixth Amendment was adopted); *see also* Jeffrey Abramson, We, The Jury: The Jury System and the Ideal of Democracy 30-31, 63-64, 67-77 (1994); The Complete Juryman: Or, a Compendium of the Laws Relating to Jurors 194-202, 246-47 (1752); Clay S. Conrad, Jury Nullification: The Evolution of a Doctrine 13-63 (1998); William L. Dwyer, In the Hands of the People: The Trial Jury's Origins, Triumphs, Troubles, and Future in American Democracy 62-72 (1st ed. 2002); The English-mans Right: A Dialogue