Between a Barrister at Law and a Jury-Man 10-35 (1680); Norman J. Finkel, Commonsense Justice: Jurors' Notions of the Law 24-31 (1995); Thomas Andrew Green, Verdict According to Conscience: Perspectives on the English Criminal Trial Jury 1200-1800, at 153-99 (1985); John Hostettler, The Criminal Jury Old and New: Jury Power From Early Times to the Present Day 30-32, 48, 70-72, 92-103, 112-14, 121, 133-34 (2004); Larry D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review 28-29 (2004); Leonard W. Levy, The Palladium of Justice: Origins of Trial by Jury 69-105 (1st ed. 1999).

Introduced by James Madison as a promised quid pro quo for approval of the Constitution by the people of the States, the Sixth Amendment's right to a jury trial in criminal cases solidified and ratified the primary power of the petit jury as one of essential institutions upon which the people's liberties would depend.  It was expected to limit the kind of governmental overreaching that led to the Revolutionary War.  *See, e.g.*, Abramson, *supra*, at 28-29, 32 ; Kramer, *supra*, at 29-34, 70, 157; Shannon C. Stimson, The American Revolution in the Law: Anglo-American Jurisprudence Before John Marshall 142-43 (1990).

For the Framers, there would have been no need to go back before the Magna Carta for support in the "courts of conscience."  *See, e.g.*, Andrew J. Parmenter, *Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification*, 46 Washburn L.J. 379, 380 (2007). They could look to recent and contemporary juries, such as those in the well-known trials of John Lilburne, William Penn, and John Peter Zenger, which had refused to convict when authorities insisted that the law required them to do so.

In the mid-seventeenth century, Colonel John Lilburne had been repeatedly acquitted in England of the crime of distributing pamphlets critical of the British government.  *See The Trial of Lieutenant-Colonel John Lilburne*, *in* 4 Cobbett's Collection of State Trials 1270, 1320, 1466

61

(Old Bailey 1649).  In his second trial he asked the jury to acquit if it found capital punishment too severe.  It responded by finding him "not guilty of any crime worthy of death," thus directly involving itself in the issue of punishment.  *Id.* at 197.  Lilburne was released and then financially compensated for being improperly tried.

The Quakers, William Penn and William Mead, were prosecuted in London in 1670 for preaching to an unlawful assembly and for breach of the peace.  *Trial of Penn and Mead*, *in* 6 Cobbett's Collection of State Trials 950 (London, T.C. Hausard 1810).  After the jury acquitted Mead of all charges and found Penn not guilty of disturbing the peace, it was deprived of food, water and heat.  Despite these coercive tactics, the jury still refused to find guilt, and was fined. Some jurors, including a man named Bushell, refused to pay; they were imprisoned, until ordered released by the Chief Justice on the ground that the jury in effect determines the law when deciding by general verdict.  *Bushell's Case*, 124 Eng. Rep. 1006, 1012-13 (1670).

One of the most famous of the colonial cases in which juries frustrated the crown and its judges was the *Trial of John Peter Zenger*.  *See* T.B. Howell, *The Trial of Mr. John Peter Zenger in* 17 A Collection of State Trials 675 (1735).  In 1735, a jury acquitted Zenger after his counsel argued that truth was sufficient basis to refuse to convict even though the jury had been charged to the contrary.  Anti-monarchist writings are sprinkled with encomiums for the *Zenger* and other defiant juries.  *See* Parmenter, *supra*, at 384 nn.53-61 and accompanying text.  For other like cases, *see, e.g.*, Levy, *supra*, 55 ff. (1999).  The right to trial by jury incorporated in the Constitution by the Sixth Amendment was envisaged as a check against overreaching by the new federal government.

The power of colonial and British jurors depended in large measure upon the fact that they were from the vicinage, were well-informed and self-confident property owners, *see, e.g.*,

Randolph A. Jonakit, The American Jury System 107-09 (2003), and knew the essentials of the local criminal law and its punishments. *See, e.g.*, Abramson, *supra*, at 22-29, 32, 34-35 ("[J]urors did not even need to rely on a judge's instructions to know the common law of the land."); Neil Vidmar & Valerie P. Hans, American Juries: The Verdict 49 (2007) (noting that John Adams "remarked that the common law was known by everyone and 'imbibed with the Nurses Milk and first Air'" and that, accordingly, "[i]n many cases judges gave the jury no instructions on the law" (quoting 1 The Legal Papers of John Adams 230 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965))).

Jury power not to convict was extensively exercised when the punishments that would be expected to follow from conviction were deemed excessive. *See, e.g.*, 4 William M. Blackstone, Commentaries on the Laws of England *342-44 (1769) (noting with approval that juries often found the value of stolen goods to be less than twelvepence in order to avoid the mandatory death penalty for theft of goods worth more than twelvepence, calling such practice "pious perjury"); Conrad, *supra*, at 20; Dwyer, *supra*, at 49; Green, *supra*, at 28-29, 35-44; Leon Radzinowicz, A History of English Criminal Law and Its Administration from 1750: The Movement for Reform 1750-1833, at 93-97 (1948) (discussing elimination of capital charges by "pious perjury"). Exercise of the power to reduce the sentence presupposed knowledge of the expected punishment.

It is not strange that jurors should, in the second half of the eighteenth century, know details of criminal law and punishment—matters of which many of our present jurors do not know and are deliberately kept from knowing. Criminal law then was much simpler than today. Now it requires tomes of highly abstruse, convoluted definitions and extraordinary combinations of statutory prison maximums and minimums, fines, restitutions, forfeitures, probationary terms,

treatment for mental health, and post-incarceration supervision, and it presents legal problems in and out of prison, sentencing guidelines, caselaw and local practice.  It would have been inconceivable, for example, that a New York jury of 1791 trying a child pornography video case (were there such a case) would not know—as this jury did not—that conviction required a five-year minimum prison term and an even higher term under applicable federal guidelines.  It is hardly likely that a present jury would be aware of the fact that "receiving" one illicit image by the Internet in private called for at least a five-year term in prison while "possession" of 5,000 such depictions would permit probation.

Practice received from eighteenth-century England varied among, and within, the separate colonies.  Much of it has not been, and cannot be, fully known or understood in its details.  Yet modern courts cannot ignore the former predominant jury power to control sentences simply because judicial views beginning after the Jacksonian period have gradually eroded the influence of laity.  *See e.g.*, *Bryant v. State*, 296 S.E.2d 168, 169-70 (Ga. Ct. App. 1982) (citing early cases); *Stevenson v. State*, 423 A.2d 558, 569-70 (Md. 1980); *Commonwealth v. Leno*, 616 N.E.2d 453, 457 (Mass. 1993) ("declin[ing] to require an instruction on jury nullification" in accordance with the prevailing view, though "recogniz[ing] that jurors may return verdicts which do not comport with the judge's instructions"); *State v. Bonacorsi*, 648 A.2d 469, 470 (N.H. 1994) ("While recognizing the prerogative [of a jury to nullify], we have nonetheless consistently held that jury nullification is neither a right of the defendant, nor a defense recognized by law." (citation omitted)); *State v. Ragland*, 519 A.2d 1361, 1373 (N.J. 1986) ("It will not do for defendant to recite the acknowledged virtues of jury independence when what is really approved is the dark side of jury nullification."); *People v. Douglas*, 680 N.Y.S.2d 145, 151 (N.Y. Sup. Ct. 1998) (history of power of jury not to convict in New York);

*State v. Lang*, 264 S.E.2d 821, 828 (N.C. Ct. App. 1980), *rev'd on other grounds*, 272 S.E.2d

123 (N.C. 1980); *State v. Champa*, 494 A.2d 102, 104 (R.I. 1985); *Walls v. Commonwealth*, 563

S.E.2d 384, 387 (Va. Ct. App. 2002); Green, *supra*; Samuel K. Dennis, *Maryland's Antique*

*Constitutional Thorn*, 92 V. Pa. L. Rev. 34 (1943); Dierdre A. Harris, *Jury Nullification in*

*Historical Perspective: Massachusetts as a Case Study*, 12 Suffolk U. L. Rev. 968, 970-74

(1978); Gary J. Jacobson, *The Right to Disagree: Judges, Juries and the Administration of*

*Criminal Justice in Maryland*, 1976 Wash. U. L. Q. 571 (1976); Stanton D. Krauss, *An Inquiry*

*into the Right of Criminal Juries to Determine the Law in Colonial America*, 89 J. Crim. L. &

Criminology 111, 212-14 (1998).  For a selective bibliography, see *Polouizzi I*, 549 F. Supp. 2d

at 450-54 (Appendix A).  *See also, e.g.*, Barbara J. Shapiro, Beyond Reasonable Doubt and

Probable Cause: Historical Perspectives on the Anglo-American Law of Evidence (1991); Lance

Cassak & Milton Heumann, *Old Wine in New Bottles: A Reconsideration of Informing Jurors*

*About Punishment in Determinate—and Mandatory—Sentencing Cases*, 4 Rutgers J. L. & Pub.

Pol'y 411, 420-37 (2007) (modern federal cases narrowing the scope of jury discretion must be

revisited in view of recent Supreme Court cases); Teresa L. Conaway, Carol L. Mutz & Joann M.

Ross, *Jury Nullification: A Selective Annotated Bibliography*, 39 Val. U. L. Rev. 393 (2004)

(listing articles, some books, cases and state constitutions); Note, *The Changing Role of the Jury*

*in the Nineteenth Century*, 74 Yale L. J. 170, 170-92 (1964) (noting that at the outset of the

nineteenth century the jury was regarded as a mainstay of liberty and an integral part of

democratic government, but outmoded by the end of the century); Parmenter, *supra*, at 380-97

(tracing history of the nullification doctrine from the Magna Carta to O.J. Simpson and beyond);

Arie M. Rubenstein, Note, *Verdicts of Conscience: Nullification and the Modern Jury Trial*, 106

Colum. L. Rev. 959, 967-72 (2006); Steve J. Shone, *Lysander Spooner: Jury Nullification and*

*Magna Carta*, 32 Quinnipiac L. Rev. 651, 669 (2004) (endorsing powerful "theoretical arguments" for jury nullification over "the more modern attempts to find precedents or constitutional authority for the practice in the extensive, but somewhat repetitive law journal literature."); *see also generally State v. Poulin*, 277 A.2d 493 (Me. 1971); *Commonwealth v. Feaser*, 723 A.2d 197 (Pa. Super. Ct. 1999); *State v. Findlay*, 765 A.2d 483, 488-89 (Vt. 2000).

Two authors stand out in their reliability and usefulness in understanding the colonial jury's knowledge and control of sentencing: Julius Goebel, Jr. (George Welwood Professor of Legal History at Columbia University School of Law), and John H. Langbein (Sterling Professor of Law and Legal History at Yale Law School). The works of both are discussed below.

1.      American Practice *Circa* 1791

Although there has been extensive recent historical research on the subject, the preeminent analysis of colonial practice continues to be that of the late Julius Goebel, Jr. and T. Raymond Naughton: Law Enforcement in Colonial New York (1944) (hereinafter "Goebel"). Some quotations from Professor Goebel's seminal work demonstrate that the vicinage and property requirements for jurors—that they be local "freeholders," responsible men having some stake in the community—assumed the jury's knowledge of the law and awareness of its power to control penalties.

> The policy of the Province [of New York] respecting the qualifications of persons who were to do jury service was patterned on the English, that is to say, freeholding was taken as the basic standard.

*Id.* at 466.

> The English statutes had long set for petit jurors a high property qualification. This policy, which rested upon the presumed higher responsibility and intelligence of propertied persons, had found expression in a series of statutes going back to the fifteenth century. In 1699 the colonists, perhaps under the influence of a recent English act, by statute fixed upon a house with ten acres

66

freehold in the country, a dwelling house or personal estate of £50 in New York City and Albany.  This statute was continued and revived until the year 1741 when in a new and elaborate act the qualification was set at a freehold in lands, tenements or rents of the value of £60.  In New York City (and later Albany) the alternative of a personal estate of like value would serve to qualify a man.  As the preamble shows this was done to approximate somewhat the modern "blue ribbon" standard.  A body of fairly substantial persons was assured.

*Id.* at 467 (footnotes omitted).

The chief obstacle [to conviction by government] was the necessity of using (even for trials at bar) juries of the vicinage who did not always convict when they should have.  In many of the cases where crown rights were involved, the defendant was a person of power and standing in the community.  The juries were picked from the freeholders, as we have intimated the very class most likely to entertain the reasonable doubt when a squire-in-chief was in the dock.

*Id.* at 221.

Freeholder opinion and conviction made the jury an instrumentality of great independence, the more to be reckoned with as the judges were many of them men of small or mediocre parts.  This was perhaps the most interesting outcome of the tedious process of making trial practice conform to English models, for it contributed largely to *the feeling in Revolutionary times that of all incidents of criminal justice trial by jury should remain inviolate.*

*Id.* at 679 (emphasis added).

The several constitutions of the state [of New York] from 1777 onward have all contained the provision that trial by jury as "heretofore used" or guaranteed should remain inviolate.  These words are a direct reference to the pre-Revolutionary practices which, musty though they be, it behooves the citizen to know.

The Charter of Liberties of 1683 [New York's first constitution] which the Crown rejected had provided that all trial should be by twelve men, "as neer as may be peers or Equals" of the neighborhood in the country "where the same should arise and grow." . . .  The [New York] Judicature Acts of 1691 and 1692 also contained provisions that no man's rights or property should be determined (except as facts were admitted or there had been default) unless the facts be found by verdict of twelve men of the neighborhood.  This safeguard was also contained in Bellomont's judiciary ordinance.  Although the jury of the vicinage was revered as a constitutional fundamental, like all fundamentals it was subject to vicissitudes for, as we have seen, summary jurisdiction was expanded, and the colonists took great pains to require a property qualification for jurors.  With one

67

detail, however, there was little tampering, viz., the necessity of trial by the vicinage.  Indeed from the viewpoint of the inhabitants this was the chief *raison d'être* . . . .

*Id.* at 603 (footnotes omitted).

After being tried in a well-publicized trial and found guilty of treason in 1702, Nicholas Bayard, a former commanding officer of the New York militia and mayor of New York under British rule, appealed to the British Crown based on irregularities in the jury composition—i.e., the jurors' ignorance of the law:

> In his petition and "appeal" to Queen Anne, Nicholas Bayard stated among other things that he had been "convicted by an illegal petty jury of Aliens and Dutch unduely returned and *very ignorant of the English Laws* and Language" . . . .  Among the affidavits taken by John Bridges and Samson Shelton Broughton, under the Queen's order of reference for the collection of evidence in connection with the Bayard appeal, are statements of some of the petit jurors who had joined in the verdict declaring Bayard guilty of high treason.  Thomas Sanders and Isaac Stoutenbergh, two of the trial jurors, made oral statements as follows, confirming the allegations made by Bayard in his petition: ". . . these Depon doe owne [sic] their great Ignorance of the Laws of England at that time not knowing what was High Treason . . . the Foreman . . . Did assert it was High Treason . . . to disturb the peace good and quiet of this Government and that Colonell Bayard had disturbed the peace by the addresses and eight or nine jurors were for clearing . . . Bayard but were perswaded [sic] by the foreman."

*Id.* at 604 n.7 (emphasis added).

> The impact of the Bayard case upon New York politics outlasted the lifetime of the participants, and it may be that publication of the proceedings and especially their inclusion in [Howell's] *State Trials* [one preeminent source on seventeenth-, eighteenth-, and nineteenth-century case law] kept alive recollections respecting the issues over the jury.  In any event, it is striking that through the rest of the colonial period the visne was treated with tenderness so that only on a few occasions was a venue changed, and then specifically because the neighborhood was prejudiced against a defendant.
>
> Beyond the circumstances of particular cases, beyond even the colonists' own legislation lurked the deep-seated feeling—and feeling it was—that the common law was controlling in this fundamental matter of the jury, and that nothing could avail to diminish the rights of Englishmen, even if expatriate, in respect thereto.

*Id.* at 605.

That colonial and British juries had great power to decide law and fact after being informed is demonstrated by the practice of counsel, in closing arguments, to highlight not the facts but the law of the case.

> Most of the early examples of defendants' closing . . . contain little or no comment on the evidence. Neither Nicoll nor Emott in their closing for Colonel Bayard dwelt upon the glaring omissions in the Crown's case, but devoted themselves to a discussion of the law.

*Id.* at 660 (footnote omitted).

> It is obvious that the jury derived most of its guidance as to the weight and effect of the evidence and as to the law from the arguments of counsel. Under these circumstances it is understandable that, as in the Makemie and the Zenger cases, the jury might encroach upon the judicial function and settle whether as a matter of law a particular accusation was a crime. . . .
>
> After the charge, the jury was left to deliberate on its verdict, a process which might be accomplished without [leaving the courtroom]. Usually . . . the jury withdrew and a constable was sworn to attend. The constable's oath required:
>
> > You shall well and truly keep every person sworn of this inquest together in some private and convenient Room without Meat, Drink, Fire or Candle light. You shall suffer no person whatever to speak to them or any of them, neither shall you yourself speak to them or any of them unless to . . . [know] if they are agreed on their verdict.
>
> The common law apparently proceeded on the theory that conscience-searching best went forward with a little fasting.

*Id.* at 669 (footnotes omitted).

The jury's right to decide the law—or rather how the law would apply to the case at bar—could take several forms. The jury could acquit an obviously guilty defendant. Through "special" or "partial" verdicts, a jury could convict, but on a lesser charge—murder becoming manslaughter and larceny shrinking from grand to its petty form. "Not infrequently the juries in

69

New York would return special verdicts, and apparently, as we have seen in the Makemie and Zenger cases, it was regarded as the privilege of the jury to decide whether or not it would so do." *Id.* at 676 (footnotes omitted).

Often juries returned special verdicts convicting on a lesser charge in order to make the defendant eligible for "benefit of clergy," i.e., immunity from hanging. Jury lenity was often motivated by the desire to avoid conviction on a capital charge if the crime or the offender was felt not deserving of death. "[A] system of mitigated sanctioning . . . by which a person convicted of a less serious crime was spared capital punishment," the benefit of clergy allowed a first-time offender to instead be branded on the thumb. John H. Langbein, The Origins of the Adversary Criminal Trial 193 (2003) (hereinafter Langbein, Origins); *see* Goebel, *supra*, at 192-93. Branding, which visibly labeled a person a felon, also ensured that the convict could not again take advantage of "his once-in-a-lifetime privilege to invoke the doctrine of benefit of the clergy." Langbein, Origins, *supra*, at 193. Professor Goebel discusses such special verdicts at length:

> The verdicts . . . are illustrative of one of the most important aspects of the jury's prerogative—*the power to effect a mitigation in the severity of the law by verdicts which would let off an obvious offender with penalties less than the worst of the charges against him* would make inevitable. This power was not confined to the selection of a relatively innocuous count on which to return a conviction, but extended, as indicated above, to a finding of an offense less in degree than that charged in the indictment. The importance of this rule in the case of felonies was obvious, since it was possible thus for the defendant to pray clergy and escape the rigor of the otherwise inevitable judgment of life and limb. The rule was essential where a homicide, by misadventure or in self-defense, was involved since the limitations of criminal pleading required that facts in extenuation or excuse be put in evidence and the jury give its verdict thereon. . . .
> . . . .
> . . . John Fisher was indicted in April term, 1698, for murder, but on April 7, 1698, "the jury . . . finds the prisoner not guilty of murder but homicide and by misadventure and that he did not flea for it." Huybert Vendenberg was tried on an indictment for murder on March 12, 1713/14 and "the jury find the defendant not

70

guilty of murder but guilty of Chance Medley only."  Jacob Koole and two others were indicted for manslaughter and were tried on October 22, 1754, when

> the jurors find that the prisoners are not guilty nor is either of them guilty of the Felony charged in the indictment . . . nor did either of them flie for it.  But the Jurors say that the prisoners did on the day charged in the indictment . . . shoot and discharge a gun . . . into some Reeds . . . to kill a Bear . . . not knowing or mistrusting that the said Cornelius Vanck was in the said Reeds . . . [and that the said Cornelius was killed by three wounds] . . . by misfortune and that the prisoners nor either of them had any goods or chattels to their knowledge at the time of the crime charged in the indictment . . . Ordered discharged . . .

A curious case was that of Frederick Locidon (Lowden?), who was arraigned on an indictment of "killing se defendendo," and was also arraigned on a coroner's inquest for manslaughter.  He was tried on August 3, 1764, and "the jury without going from the bar find the prisoner not guilty of manslaughter but guilty of homicide in his own defense and that he did not fly for it to their knowledge," whereupon the court ordered him discharged.

We have noticed many cases where defendants indicted for murder were merely convicted of manslaughter.  Peter Mullinder was tried on March 13, 1712/13, on an indictment for murdering Henry Clarke and "The Jury find the defendant guilty of manslaughter and that he had no goods or chattels lands or tenements at the time of the felony committed or since to their knowledge." Patrick Kreamer was arraigned on a coroner's inquest for the murder of Martinus Cregier, and was also arraigned on an indictment for manslaughter.  He was tried on both charges and "the jurors find the prisoner not guilty of murder on the coroner's inquest and guilty of manslaughter on the indictment and that he had no goods or chattels to their knowledge.

Another situation where mitigation could be effected were those cases where grand larceny was charged.  It had long been settled in England that where an indictment charged the stealing of goods of a certain value above 12*d*., the jury might find the defendant guilty but could find the value of the goods to be less than 12*d*.  Verdicts of this sort were usual in New York, and there is evidence that the colonists added some variations as where persons indicted for burglary were merely found guilty of felonious stealing.

Goebel, *supra*, at 673-75 (footnotes omitted) (emphasis added).  Upon the return of a guilty verdict, juries could also mitigate the sentencing implications for a defendant's family.  By finding an offender guilty but penniless, the jury could avoid turning his family into paupers; otherwise forfeiture of property to the crown apparently was mandatory.

71

The jury's finding with respect to a convicted prisoner's property may also have something to do with the alleviation of the law's severity. The return as to flight, chattels and tenements was essential to establish the royal forfeitures, and the year and day in felony cases. In New York, however, we have found only three cases where the jury found goods. In 1733, Edward King was convicted of murder and the jury at Circuit found "he had no goods chattels lands or tenements at the time of the murder but what are in the coroners hands." A convicted counterfeiter in 1756 was found to have a horse and saddle valued at £5, and John Allen, indicted in 1775 for "larceny from the person privilly was found to have a Jersey bill of credit, a *Johannis* and a guinea, of goods and chattels." The failure otherwise to find chattels is not completely explained by the fact that felons were often from the poorest class. We think it likely that owing to the feeble growth of exchequer powers in New York, the juries, as a persistent matter of policy for the purpose of relieving the families of felons and the general burden of poor relief, deliberately avoided finding forfeitures.

*Id.* at 676 (footnotes omitted). Repeated references by juries to the lack of goods owned by the defendant prevented such forfeitures.

According to Professor Goebel, New York juries could, in sum, provide mercy in a variety of ways:

We have spoken of the grooves in which *the jury might exercise its charity*: the verdict in thefts for amounts under the 12*d.* boundary between grand and petit larceny, and the privilege of finding manslaughter, self-defense or accident upon indictments for murder. These prerogatives the juries in New York did not hesitate to assert, and to these old and established powers of mitigation may be added, perhaps, the avoidance in New York of the incidents of felony judgment by the persistent finding of no goods or tenements. Of considerably greater significance than these possible interferences of the jury, but connected therewith in the case of verdicts for crimes of a less degree when murder, burglary, arson, highway robbery and certain others were charged, is the mitigation obtained by benefit of clergy.

*Id.* at 751 (footnote omitted) (emphasis added).

2.      British Practice *Circa* 1791

a)      Ryder Papers

Responsible scholarship supports Professor Goebel's conclusions that an informed jury had power to refuse to convict or to convict of a lesser crime when it deemed the potential

72

punishment excessive.  One of the most useful windows into the eighteenth-century jury's control over sentencing is through the notebooks of Sir Dudley Ryder, an Old Bailey criminal trial judge from 1754 to 1756 (hereinafter "Ryder").  *See* John H. Langbein, *Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources*, 50 U. Chi. L. Rev. 1 (1983) (hereinafter Langbein, *Ryder Sources*).  Judge Ryder's trial notes reveal the jury's knowledge of the punishments that would follow from its findings—often because judges told it precisely what they would be.  Apparently other judges and juries were taking parallel courses, so that Ryder's notes may be taken as typical.  *Id.* at 2.

Like the early New York juries described by Goebel, London juries could precisely tailor their verdicts by acquitting, convicting of lesser crimes, or "downsizing" the amounts found to have been stolen; thus avoided were harsh punishments, such as death by hanging, hanging plus dismemberment to make afterlife more difficult, or transportation out of England to a colony as an indentured servant.  By the time Sir Ryder presided, the courts and parliament had manipulated the benefit of clergy concept to mitigate the death penalty so literate males could commit, in most cases, one felony (for which their thumb was branded on conviction) without fear of the death penalty.  *Id.* at 37-41.

A critical issue in many of Ryder's larceny, theft, and shoplifting cases was the amount stolen, which determined whether the offender, if guilty, would live or die.  At one time the defining cutoff for theft as grand larceny was a shilling:

> Grand larceny, defined as theft of goods or money worth more than a shilling, was by far the most commonly prosecuted offense at the Old Bailey. Hence, *in theory*, practically every accused at the Old Bailey was on trial for his life.  No feature of English criminal law became more notorious, or aroused more indignation, than the nominally capital character of small thefts.  A seventeenth-century tractitian reproached English law in the following words, which were echoed incessantly in reformist literature down into the nineteenth century:

> "Doest thou value the life of a man no more than so as to cut it off for the value of a garment, yea even of a pair of shoes or stockings or a shirt or any other thing above such a piece of money"?

*Id.* at 36 (emphasis in original). Importantly, the amount stolen was determined by the jury—not by the judge, or the prosecutor, or the evidence. After 1713, when the clergy defense was withdrawn by law from shop and home thefts of forty shillings or more, jury valuations for property taken of exactly thirty-nine shillings (or four shillings and ten pence, for five-shilling capital crimes) increased, allowing defendants to pray clergy and avoid the noose. The resulting "downsizing" practice is reflected in much the same way as the current debate on modern jury "nullification."

> An act of 1699 withdrew clergy from shoptheft of goods to the value of five shillings or more; an act of 1713 withdrew clergy from thefts of goods to the value of forty shillings or more committed in dwelling houses. Since most thefts would have occurred in shops and homes, and many would have extended to property of such values, these two acts would have inflicted a heavy toll of capital punishment if fully enforced. In practice, these and the other statutes that withdrew clergy from crimes of larceny on condition of circumstance or amount were invoked relatively sparingly. The victim could and often did "undercharge" by declining to charge the circumstances or amount that made the offense nonclergyable. Further, when the victim charged the offense fully, the jury could convict of a lesser and clergyable offense. The jury could "downcharge" by convicting of simple larceny while refusing to find that the theft occurred in the shop or dwelling house or that it had been committed by means of breaking and entering; or the jury could "downvalue" by finding the worth of the stolen goods to be below the respective five- and forty-shilling ceilings. The recurrent verdicts of four shillings ten pence and thirty-nine shillings in Old Bailey trials are telltale signs of this process, bringing the offenses within the benefit of clergy in order that the offenders be transported rather than executed.

*Id.* at 40-41 (footnote omitted).

But how was a jury to know of the particular cut-off for the particular crime? Doubtless many jurors knew already, from prior jury service or general knowledge; John H. Langbein, *The Criminal Trial Before the Lawyers*, 45 U. Chi. L. Rev. 263, 284 (1978) (hereinafter Langbein,

*Criminal Trial*) ("The juries were laden with veterans, who needed less instructing" than modern

American juries); often, however, Judge Ryder made sure to so instruct them:

> Ryder sometimes found time to jot down a little of what he was telling the jury. John Taplin was tried before Ryder in October 1754 on an indictment charging theft from a dwelling house of a watch, valued at forty shillings, and of more than twenty guineas in money. The OBSP [Old Bailey Session Papers, *see infra*] report of the outcome is as curt as possible, "Guilty 39s.," meaning that the jury convicted him but determined the combined value of what was stolen to be thirty-nine shillings (less than two guineas, hence well below the value charged in the indictment). Ryder's notes explain why. "The jury found him guilty to [the] value of 39s., which they did *after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy.* It is by Act of 12 Ann." Ryder thus records his own role in guiding the jury's prerogative of "valuing" the loot. Because the statute of 1713 to which Ryder refers withdrew so-called benefit of clergy from thefts of forty shillings' value or more when committed in a dwelling house, it foreclosed the primary ground upon which a convict could escape the death penalty for such an offense. *The convention of the day, immortalized in Blackstone's phrase as the jury's "pious perjury," was that the jury could "downvalue" the goods*, in this instance to thirty-nine shillings, in order to consign the convict to a lesser sanction of transportation for seven years.

Langbein, *Ryder Sources*, *supra*, at 22 (footnotes omitted) (emphasis added).

> Another example, . . . occurs when Ryder explains the verdict in the case of Daniel Malone and Richard Dudley, charged with stealing several pounds' worth of rigging from a vessel on the Thames. . . . Ryder reports the verdict, guilty to the value of 39 shillings, and adds:
>
>> Note: They found it to that value being under 40s. because it was in reality a crime, if of 40s. value, without benefit of clergy. For the clergy is taken away from felony in stolen goods on board a vessel in a navigable river of 40s. value, but not if under it . . . [by] the statute of 24 G.2 [24 Geo. 2, ch. 45 (1751)] and so would be only simple felony.
>
> *Ryder must have instructed the jury* about this special statute, which set a 40-shilling ceiling on benefit of clergy for river thefts, and he may have done it *in a manner that invited the "downvaluing" that results.*

*Id.* at 23 n.79 (emphasis added).

The result of routine downsizing of the crime by the jury is dramatically revealed by a Langbein sample of 171 cases: fifteen showed a jury finding of forty shillings or more while fifty-three were for just under forty shillings resulting in a much lower punishment. *Id.* at 42. This "downsizing" ran through the system right down to the original complaint. "It also seems plausible that officials advised victims in some cases to undercharge on the ground that the jury would downcharge if the indictment attempted to charge fully." *Id.* at 51. Judges themselves engaged in downsizing in misdemeanor cases tried at quarter sessions without a jury.

Downsizing or downvaluing goods was one way in which a jury could return a special or a partial verdict in property cases. Referring to the same sample cases, Langbein writes: "In thirty-nine of our 171 cases, involving forty-four accused, the jury returned what we call (following Beattie) a 'partial verdict.' The jury convicted the accused, but only in part; the jury convicted him of a less serious offense than the indictment charged, either by downcharging or by downvaluing the goods." *Id.* at 52 (footnote omitted). For example, "Old Bailey juries [would] return petty larceny verdicts in grand larceny cases when they chose to downvalue goods to below one shilling, which is one of the forms of 'partial verdict.'" *Id.* at 42 (footnote omitted).

The juries were thoughtful and responsible in exercising their own form of clemency through partial verdicts:

> Partial verdicts did not occur randomly across the various types of offenses. Rather, juries distinguished, first, according to the seriousness of the offense, and second, according to the conduct and character of the accused in a particular case. Some offenses were seldom or never the subject of partial verdicts, in others partial verdicts were routine, but in most the matter was more circumstantial.
>
> Thus, in our sample, partial verdicts were not returned in any of the cases of livestock theft and highway robbery. Livestock theft was peculiar in that the offense was defined in a way that did not lend itself to a viable form of downcharging—the accused either stole the horse (or other beast) or not, and the

governing statute did not further condition the capital sanction on the value of the animal or on any aggravating circumstance that the jury could manipulate in a partial verdict. Highway robbery could be downcharged—a jury could convict of theft not on the highway—but this did not happen much and not at all in our sample.

By contrast, we find the juries all but invariably downvaluing in pickpocket cases that were charged capitally (at a shilling or above). There were nine such cases in the four Ryder sessions. The juries downvalued below a shilling in eight but convicted capitally in the last.

Most of the major property crimes fell between these extremes of offenses routinely subjected to partial verdicts and offenses never so treated. The quality of the evidence in the individual case became more important than the type of offense. The juries were lenient in dealing with persons indicted of shoptheft and theft from dwelling houses above the capital sums. The only cases not downcharged or downvalued were those in which the evidence indicated the offenders were professionals or gang members. The juries were quite unashamed about returning partial verdicts even in situations involving thefts of money, in which downvaluing became transparent fiction. We noticed in another connection the case of John Taplin, indicted for stealing twenty-one guineas in money and a watch. The jurors valued this loot at thirty-nine shillings, and with the active connivance of Dudley Ryder, who recorded that *they did it "after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy."* Favorable evidence also motivated the juries fairly frequently to downvalue from grand to petty larceny in order to turn transportation into whipping, especially when the goods were of relatively small amount or when the accused was a married woman or a family man. The jurors took a harsher attitude towards burglary and breaking and entering, being more reluctant to prevent the capital sanction from being imposed.

*Id.* at 53-54 (footnotes omitted) (emphasis added). Important to a jury's decision to downsize or

acquit was the nature of the defendant, as Ryder likely pointed out to the jury:

Occasionally, the Ryder notes attribute a rationale for the jury's verdict that we suspect originated in his instruction. Thus, in a case in which a child was acquitted of a theft, Ryder notes after the verdict: "Her father on my examining him said she was 12 years old excepting one month. The only color for finding her Not Guilty was her age, which made it a matter for their judgment whether she had sufficient discretion to be guilty of felony."

*Id.* at 23.

What is particularly significant for our purposes is that the jury—often after being informed of the precise effect of their decision on the sentence—was in effect deliberately deciding the sentence.

> The jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict. Since guilt was typically although not inevitably a forgone conclusion in many (perhaps most) cases, *sentence is what was at stake* when these cases were "contested."

*Id.* at 55 (emphasis added). Langbein's most fascinating conclusion is just this: that the jury's primary function was, as a practical matter, to determine punishment rather than guilt.

> Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In most cases the accused had been caught in the act or otherwise possessed no credible defense. *To the extent that trial had a function* in such cases beyond formalizing the inevitable conclusion of guilt, *it was to decide the sanction. These trials were sentencing proceedings.* The main object of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction from death to transportation, or to lower the offense from grand to petty larceny, which ordinarily reduced the sanction from transportation to whipping.

*Id.* at 41 (emphasis added).

Much of the Ryder materials are supported by those of Professor Goebel, discussed above, as well as the extensive collections listed in Appendix A to *Polouizzi I*, 549 F. Supp. 2d at 450-54. That there were variations among the colonies, some of which gave the juries less power than others, does not reduce the enormous weight of evidence contemporary with the adoption of the Sixth Amendment demonstrating the jury's critical sentencing role based on its knowledge of the punitive effects of possible verdicts. *See, e.g.*, Laura I. Appleman, *The Lost Meaning of the Jury Trial Right*, 84 Ind. L. R. 397 (2009) (analysis of various state practices to demonstrate why juries determined all critical aspects of punishment); *see also generally* Douglas Greenberg, *Crime, Law Enforcement, and Social Control in Colonial America*, 26 Am.

J. Legal Hist. 293 (1982) (placing varying colonial law enforcement practices in historical context).

> b)      Old Bailey Session Papers

Another study by Professor Langbein based upon the more superficial Old Bailey Session Papers ("OBSP"), a group of "reports" from the mid-1670s to the mid-1730s, supports many of the scholarly conclusions about jury sentencing power at the time our Constitution was adopted. *See* Langbein, *Criminal Trial*, *supra*. The OBSP confirm the criminal practices—and the primary nature of the jury as a sentencing body—described by Professors Goebel and Langbein. Repeatedly, the court informed defendants they should not plead guilty because on such a plea hanging was mandatory, while a quick trial would permit the jury to mercifully downgrade the offense. *Id.* at 279-80.

Significantly for our inquiry, juries were more likely to know beforehand—or be informed by the judge—of the effect of their verdicts on punishment. The same English jury would try multiple cases so that the "substantive criminal law held few mysteries for these experienced jurors." *Id.* at 277. "When instructing a jury, the judge possessed what seems to have been a wholly unrestricted power to comment on the merits of the case. . . . [T]he judge had no hesitation about telling the jury how it ought to decide." *Id.* at 285. Despite more extensive instructions and commentary from the bench, court control over jury knowledge and conclusions was much less stringent than it is today. *Id.* at 272 ff. Both judges and jurors could recommend royal mercy through pardon upon a guilty verdict. *Id.* at 297.

Summing up on the issue, Professor Langbein states:

[*T*]*he jury of that time had a large role* in what we think of as sentencing, that is, in *determining the sanction.* In a significant fraction of the cases that went to trial, the real issue was whether the jury would choose to exercise its power to

"value" stolen goods in ways that would affect the applicable sanction. *It was understood that the value that the jury assigned was fictional, and that the jury was in truth deciding whether to rescue the culprit from the ordinary sanctions* of transportation and death by so characterizing the crime that only a lesser sanction could be invoked. If the goods were valued below 12 pence (in practice the Old Bailey juries used the figure of 10 pence), the crime became petty larceny, hence a misdemeanor, and the convict escaped with a whipping or a short jail term. Under certain circumstances the jury could, by valuing goods below other monetary ceilings, bring the culprit under the rubric of benefit-of-clergy, for which the sanction was branding in the thumb. The decision between finding an accused guilty of murder or manslaughter, which also belonged to the jury, can be seen as the choice between capital punishment and branding. It could be argued that in all these situations *the jury was in reality discharging a sentencing function*, and even today we expect sentencing officers to consult past conviction evidence. But we have seen that the OBSP show that the juries were using past conviction evidence to determine guilt, and with no constraint from the bench. Furthermore, modern juries have the power to affect the sanction by not convicting on all counts or by finding only a lesser included offense, yet we do not, on that account, deem them sentencing officers entitled to learn of the accused's criminal record.

Another possibility is that it was not thought feasible to apply a rule of exclusion to past conviction evidence, since *already-branded defendants necessarily carried their thumbs into court.* But many of the former offenses that are laid to Old Bailey defendants would not have left them branded, branding itself was sometimes proved by record, and *in any event the judges could have devised, had they cared to, a routine that would have kept defendants' hands out of jurors' sight.*

*Id.* at 303-04 (footnotes omitted) (emphasis supplied).

In a more recent book, The Origins of Adversary Criminal Trial (2003), John H.

Langbein recapitulates much of what were the jury's powers on sentencing.

Trial as a Sentencing Proceeding

The sentencing practices of the later seventeenth and eighteenth centuries were a powerful source of pressure on the defendant to speak at his trial. Our modern expectation is that sentencing will occur in a separate post-verdict phase, after the trial has determined guilt. Furthermore, in jury-tried cases, we expect the judge, not the jury, to exercise whatever sentencing discretion the law might bestow. In early modern times, however, these *divisions of function in sentencing matters between trial and post-trial, and between jury and judge, were less distinct. The trial jury exercised an important role in what was functionally the*

*choice of sanction* through its power to manipulate the verdict by convicting on a charge that carried a lesser penalty. (A vestige of this power to mitigate the sentence survives in modern practice, when the jury convicts of a lesser included offense, or when it convicts on fewer than all the counts that are charged and proved).

The practice of juries convicting only of a lesser charge, or "downvaluing" stolen goods in order to make the offense less serious, and especially in order to mitigate against the death penalty, was immortalized in Blackstone's as "pious perjury" to describe these verdicts that convicted the defendant but reduced the sanction.

In the Elizabethan-Jacobean period partial verdicts were relatively uncommon. It was the development of alternatives to the death penalty in the eighteenth century, especially the system of transportation to the New World for a term of penal servitude, that allowed partial verdicts to burgeon. Transportation became the sanction for offenses that fell within the rubric of benefit of clergy, giving the jury an effective choice between convicting an offender in a manner that would lead to the imposition of capital punishment or in a way that would result in transportation. For example, if the jury convicted a defendant of burglary, the punishment was death; but if, on the same facts, the jury convicted of the clergyable offense of mere theft, the convict would be transported. Not all partial verdicts involved transportation: When the jury valued stolen goods at less than a shilling (invariably at 10*d.*), the offence became petty rather than grand larceny, for which the common sanction was whipping. In a sample of London cases from the Old Bailey in the 1750s I found that the juries returned partial verdicts in nearly a quarter of the cases. For a few offenses, like picking pockets, the juries all but invariably downvalued, expressing a social consensus that the capital sanction was virtually never appropriate. At the opposite end of the spectrum were a few property crimes, especially highway robbery and gang-style burglary, that were regarded as so menacing that juries virtually never mitigated the capital sanction. Across the broad range of property crimes, however, jury discretion held sway. In deciding whether to return verdicts of mitigation, juries distinguished, first, according to the seriousness of the offenses, and second, according to the conduct and character of the accused.

*The jury's power to mitigate sanctions profoundly affected the purpose of the criminal trial* for those many offenses in which the jury might return a partial verdict. Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In many cases, perhaps most, the accused had been caught in the act or with the stolen goods or otherwise had no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. Because *the main purpose of defending such a case was to present the jury with a sympathetic view of the offender and of the circumstances of the crime that would encourage a verdict of mitigation*, the criminal defendant labored under an enormous practical compulsion to speak in his own defense. By structuring *sentencing as an incident of the trial*, the procedure foreclosed the

81

defendant from participating in what was in function his sentencing hearing unless he spoke about the circumstances of the offense.  To be sure, character witnesses could and did carry some of this burden for the defendant in some cases; it was not impossible to remain silent and still obtain jury leniency.  But it was a grave risk that few defendants had the stomach to undertake.  Thus, the same factors that caused the procedure to prefer trials over guilty pleas also induced criminal defendants at trial to speak to their knowledge of the events.

The partial verdict system abated slowly, toward the end of the eighteenth century and during the early decades of the nineteenth century, as the sanction of imprisonment replaced transportation. The modern system of post-verdict judicial sentencing arose in response to many factors.  The movement to revise the substantive criminal law by consolidating and rationalizing the categories of offenses invited the grading of sentences according to severity.  This development was deeply connected to the appearance of imprisonment as the routine punishment for cases of serious crime.  The older sanctions, death and transportation, had lent themselves to jury manipulation, because they came as "either-or" choices.  Because the new sanction of imprisonment for a term of years was all but infinitely divisible, it invited the concept of the sentencing range, which transferred to the judge the power to tailor the sentence to the particular offender.

*Id.* at 57-60 (footnotes omitted) (emphasis added).

With the advent of mandatory minimum sentences, however, federal juries today again face—albeit often unknowingly—"either-or" choices similar to those facing the British and colonial juries of 1791.  To fully exercise their historical function, juries today must understand the implications of their decision in a case such as the present one.  They cannot rely on the court to mitigate because it is bound by the statutory minimum term of imprisonment.

**B.     Caselaw**

Recent Supreme Court cases have recognized the appropriate power of the jury in some circumstances, to consider punishment in deciding guilt or innocence, and in so doing have emphasized the need to interpret the Sixth Amendment in light of its historical context.

Those who would limit the powers historically exercised by juries must now consider the Supreme Court's *Booker-Apprendi* line of sentencing decisions, *see United States v. Booker*, 543

82

U.S. 220 (2005); *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its reinvigoration of the

Confrontation Clause in *Crawford v. Washington*, 541 U.S. 36 (2004).  These decisions bear on

the question of whether juries should be informed of the sentences in some instances that would

result from guilty verdicts.  They emphatically reaffirm three propositions that support the

argument that juries can be trusted with this information.  First, the right to a jury trial is a

fundamental constitutional right; it provides a check on the courts equivalent to that of the voter

on elected officials.  Second, the Supreme Court, in interpreting the Sixth Amendment, relies on

criminal practice the Court believes existed in the late eighteenth century.  Third, the Supreme

Court is willing to overturn long-established legal misconceptions, with some measure of

reasoned disregard for the consequences of doing so, when it determines that precedent impinges

on the constitutional powers historically exercised by juries (or, in *Crawford*, the historical scope

of the confrontation right).  These three principles make it inappropriate to cavalierly treat jurors'

power to refuse to convict (or to be informed of mandatory minimums) as improper.

      1.      Jury's Historic Sentencing Role

      The Supreme Court's recent line of sentencing decisions have not left much doubt of the

Court's belief that the right to a jury as embodied in the Sixth Amendment is one of the

Constitution's most cherished liberties.  These cases have addressed varying permutations of the

same question:  When must facts that enhance the possible punishment of a defendant be proved

beyond a reasonable doubt to a jury?

      The Supreme Court recently addressed this issue in *Jones v. United States*, 526 U.S. 227

(1999), when it used the constitutional issue avoidance canon to sidestep the question.  *Id.* at 239,

248, 251-52.  Fifteen months later, in *Apprendi*, it held that "any fact that increases the penalty

for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. It then applied this holding to a range of situations. Most notable is *United States v. Booker*, 543 U.S. 220 (2005), in which one majority opinion concluded that statutory provisions mandating the U.S. Sentencing Guidelines were unconstitutional, *id.* at 226-27, 244; a different majority then effectively rendered the Guidelines advisory rather than mandatory, *id.* at 245; *see also Blakely v. Washington*, 542 U.S. 296, 305, 313 (2004) (holding unconstitutional Washington state sentencing procedure); *Ring v. Arizona*, 536 U.S. 584, 592-93, 609 (2002) (invalidating law allowing trial judge to find aggravating factors necessary to impose capital punishment).

The rationale supporting these decisions was that the courts could not be allowed to make factual findings that would enhance a sentence that must be imposed if that practice would infringe upon the Sixth Amendment right to a jury trial. *See, e.g., Blakely*, 542 U.S. at 305-06 ("Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. . . . Without [*Apprendi*] the jury would not exercise the control that the Framers intended."). When explaining its reasoning, the Supreme Court took pains in each case to stress the importance of the jury's appropriate constitutional powers and its essential role within the Constitution's system of checks and balances. Repeatedly, the Court relied upon strong language. Thus, in *Jones*, it quoted Blackstone:

> Identifying trial by jury as "the grand bulwark" of English liberties, Blackstone contended that other liberties would remain secure only "so long as this palladium remains sacred and inviolate, not only from all open attacks, (which none will be so hardy as to make) but also from all secret machinations, which may sap and undermine it; by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue, and courts of conscience. And however convenient these may appear at first, (as doubtless all arbitrary powers, well

84

> executed, are the most convenient), yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters."

*Jones*, 526 U.S. at 246 (quoting 4 W. Blackstone, Commentaries on the Laws of England 342-44 (1769)); *see also Apprendi*, 530 U.S. at 477 (stating that jury right is meant to "'guard against a spirit of oppression and tyranny on the part of rulers'" and is "'the great bulwark of [our] civil and political liberties'" (quoting 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873))).

Justice Scalia's majority opinion in *Blakely* contains language to the same effect: "[The jury] right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely*, 542 U.S. at 305-06; *see also Booker*, 543 U.S. at 238-39 ("The Framers of the Constitution understood the threat of judicial despotism that could arise from arbitrary punishments upon arbitrary convictions without the benefit of a jury in criminal cases.") (internal quotation marks omitted).

Perhaps the most evocative of the recent Supreme Court writings concerning the jury is an opinion by Justice Scalia in a non-sentencing case, *Neder v. United States*, 527 U.S. 1, 10, 15 (1999) (holding that harmless error rule applies to failure to submit issue of materiality to the jury). In that opinion, Justice Scalia called juries the "spinal column of American democracy." *Id.* at 30 (Scalia, J., concurring in part and dissenting in part). He continued:

> Perhaps the Court is so enamoured of judges in general, and federal judges in particular, that it forgets that they (we) are officers of the Government, and hence proper objects of that healthy suspicion of the power of government which possessed the Framers and is embodied in the Constitution. Who knows?—20 years of appointments of federal judges by oppressive administrations might

85

produce judges willing to enforce oppressive criminal laws, and to interpret criminal laws oppressively—at least in the view of the citizens in some vicinages where criminal prosecutions must be brought. And so the people reserved the function of determining criminal guilt *to themselves*, sitting as jurors. It is not within the power of us Justices to cancel that reservation.

*Id.* at 32 (emphasis in original); *see Blakely*, 542 U.S. at 607 (addressing "the plausibility of the claim that the Framers would have left definition of the scope of jury power up to judges' intuitive sense of how far is too far," the Court found "that claim not plausible at all, because the very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury"). These passages confirm that the modern Supreme Court attributes great value to defendants' Sixth Amendment right to trial by a jury— with power to prevent sentences it deems excessive.

### 2. Keeping Jury in the Dark Incompatible with Historic Jury Role

Recent sentencing opinions show that the Supreme Court is willing is strike down precedents and statutes that impinge on the historical functions of the jury. The opinions do so in the teeth of arguments that pro-jury doctrines could have adverse consequences, such as reducing the efficiency of the adjudicatory process, creating unfair sentencing disparities, and throwing the federal criminal courts into disarray. A similar tale is told by *Crawford* and the current interpretation of the Confrontation Clause of the Constitution.

The Supreme Court's decisions in its recent sentencing cases were based on the need to prevent the erosion of the historical function of the jury. The cases forced the Court to "face[] . . . the issue of preserving an ancient guarantee under a new set of circumstances. . . . [I]n a meaningful way [this] guarantees that the jury would still stand between the individual and the power of the government under the new sentencing regime." *Booker*, 543 U.S. at 237. The

Court's "answer [was] not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance." *Id.* at 237; *see, e.g.*, *Blakely*, 542 U.S. at 305; *Apprendi*, 530 U.S. at 518 ("Today's decision, far from being a sharp break with the past, marks nothing more than a return to the *status quo ante*—the status quo that reflected the original meaning of the Fifth and Sixth Amendments." (Thomas, J., concurring)); *see also, e.g.*, Bertrall L. Ross, *Reconciling the Booker Conflict: A Substantive Sixth Amendment in a Real Offense Sentencing System*, 4 Cardozo Pub. L. Pol'y & Ethics J. 725, 728 (2006) ("[I]n a system based on a punishment model, the jury has a constitutionally protected substantive role to play in checking government power.").

The resulting *Booker-Apprendi* line of cases was founded largely on the Court's interpretation of the jury's role in sentencing in early American and English cases. *See, e.g.*, *Apprendi*, 530 U.S. at 478-83. Its approach to the Sixth Amendment is useful for present purposes since, if the court examines the case law of that period on juries' power to find the law and refuse to convict, it would, it is respectfully submitted, be compelled to determine that the jury's Sixth Amendment powers over sentencing were then well-established.

These cases demonstrate that the Supreme Court holds the jury right in such high esteem that it was willing to invalidate widespread accepted sentencing practice, even though critics portended that dire consequences would result. In response to Justice Breyer's dissenting argument in *Apprendi* that the majority's solution would be unworkable, Justice Scalia noted that it was constitutionally required:

> I feel the need to say a few words in response to Justice Breyer's dissent. It sketches an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. (Judges, it is sometimes necessary to remind ourselves, are part of the State—and an increasingly bureaucratic part of it, at that.) The founders of the American

87

Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights.  It has never been efficient; but it has always been free.

. . . .

In Justice Breyer's bureaucratic realm of perfect equity, by contrast, the facts that determine the length of sentence to which the defendant is exposed will be determined to exist (on a more-likely-than-not basis) by a single employee of the State.  It is certainly arguable (Justice Breyer argues it) that this sacrifice of prior protections is worth it.  But it is not arguable that, just because one thinks it is a better system, it must be, or is even more likely to be, the system envisioned by a Constitution that guarantees trial by jury.  What ultimately demolishes the case for the dissenters is that they are unable to say what the right to trial by jury *does* guarantee if, as they assert, it does not guarantee—what it has been assumed to guarantee throughout our history—*the right to have a jury determine those facts that determine the maximum sentence the law allows.*  They provide no coherent alternative.

*Apprendi*, 530 U.S. at 498-99 (Scalia, J., concurring) (emphasis added).  Justice Scalia's majority

opinion in *Blakely* sounded the same theme:

Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice.  One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course.  There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury.

*Blakely*, 542 U.S. at 313.  Lest he be misunderstood, Justice Scalia repeated the argument in

*Booker*:

We recognize, as we did in *Jones, Apprendi*, and *Blakely*, that in some cases jury factfinding may impair the most expedient and efficient sentencing of defendants.  But the interest in fairness and reliability protected by the right to a jury trial - - a common-law right that defendants enjoyed for centuries and that is now enshrined in the Sixth Amendment—has always outweighed the interest in concluding trials swiftly.

*Booker*, 543 U.S. at 243-44.

Concern about difficulties spawned by changes in practice and precedent is not a ground for ignoring the Constitution. Some have lamented the Court's sentencing revolution as threatening to throw the federal system of criminal justice into disarray. *See, e.g.*, *United States v. Penaranda*, 375 F.3d 238, 247-48 (2d Cir. 2004) (en banc) (warning of "an impending crisis in the administration of criminal justice in the federal courts"); Richard G. Kopf, *The Top Ten Things I Learned From* Apprendi, Blakely, Booker, Rita, Kimbrough, *and* Gall, OSJCL Amici: Views From the Field (Jan. 2008), http://moritzlaw.osu.edu/osjcl/blog/Articles_1/kopf-final-12-28-07.pdf (last visited Jan. 18, 2010) ("It is telling and painfully obvious that not a single Justice ever had to look a federal defendant in the eye while not knowing what law to apply."). One commentator even suggested that "the *Blakely* decision disrupts nearly every (seemingly established) aspect of current sentencing law and practice." Douglas Berman, *Supreme Court Cleanup in Aisle Four*: Blakely *Is Too Big and Messy to Ignore*, Slate, July 16, 2004, http://www.slate.com/id/2104014/ (last visited Jan. 18, 2010).

In point of fact, the changes required by *Booker* and its siblings have proven easy to implement. They have reduced practice problems while enhancing due process.

*Crawford*'s reinvigoration of the Confrontation Clause reflects a similar jurisprudential shift. The Court had previously held, in *Ohio v. Roberts*, 448 U.S. 56 (1980), that the Confrontation Clause did not prohibit courts from admitting an unavailable witness's statement against a criminal defendant if there were "adequate indicia" of the statement's reliability, at least under some circumstances. 448 U.S. at 66. In *Crawford*, the Court reviewed English and early American historical materials, determining that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."

89

*Crawford*, 541 U.S. at 53-54.  The Court then adopted this as constitutional doctrine, reversing

*Roberts*, a precedent that had been the law for more than twenty years.  *Id.* at 63-69.  It took this

path even though some, including Chief Justice Rehnquist, argued that it could result in the

exclusion of reliable evidence and impair the truth-finding process.  *Id.* at 73-75 (Rehnquist, C.J.,

concurring in the judgment).

 *Crawford* has not proven disruptive, even though some argue that it is based in part on

dubious historical analysis.  *See* Essay, *The Role of Judges in a Government Of, By, and For the*

*People*, 30 Cardozo L. Rev. 1, 37 n.125 (2008) (citing historians' views).  Implementation of

*Crawford* has created no insuperable problems.

 Implications of the *Booker* and *Crawford* interludes in our constitutional history are

apparent in the instant case.  As in the sentencing cases, modern practice has eroded a right

historically reserved to the jury, to wit, the power to refuse to convict or to modify its decisions

based upon its knowledge of overly harsh sentencing implications.  Supposed efficiency—which

is an objection largely based on phantoms of chaos—cannot trump the Constitution.

   3. Jury's Power to Moderate Harsh Effects of Law

 The argument for informing the jury of sentencing implications proceeds by some degree

of analogy, but there is language in some of the sentencing cases that directly addresses the issue

of jury nullification.  In *Jones*, the Court was faced with the constitutional question of whether a

federal statute should be interpreted to create three distinct offenses or a single crime that carried

three different maximum penalties, with two of the maximums only applicable if a judge (not a

jury) made certain factual findings.  *Jones*, 526 U.S. at 229, 239-40.  In determining that there

would be a constitutional issue raised if the statute were to be read to allow federal courts to

impose higher sentences based on findings of fact not made by a jury, Justice Souter's majority

opinion noted that:

> The question might well be less serious than the constitutional doubt rule requires if the history bearing on the Framers' understanding of the Sixth Amendment principle demonstrated an accepted tolerance for exclusively judicial factfinding to peg penalty limits. But such is not the history. To be sure, the scholarship of which we are aware does not show that a question exactly like this one was ever raised and resolved in the period before the Framing. On the other hand, *several studies demonstrate that on a general level the tension between jury powers and powers exclusively judicial would likely have been very much to the fore in the Framers' conception of the jury right.*

*Id.* at 244 (emphasis added). In support of this assertion that the Framers did not want to leave

too much power in the hands of the judiciary, the Court's first example of a check on the

judiciary was what today would be called jury nullification:

> Even in this system, however, competition developed between judge and jury over the real significance of their respective roles. *The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power* when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences. This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as "pious perjury" on the jurors' part.

*Id.* at 245 (emphasis added).

The Court then discussed various attempts to limit the power of the jury, but it soon

returned to the concept of nullification. It continued:

> A second response to the juries' power to control outcomes occurred in attempts to confine jury determinations in libel cases to findings of fact, leaving it to the judges to apply the law and, thus, *to limit the opportunities for juror nullification. Ultimately, of course, the attempt failed, the juries' victory being embodied* in Fox's Libel Act in Britain, see generally T. Green, Verdict According to Conscience 318-55 (1985), and exemplified in John Peter Zenger's acquittal in the Colonies, see, *e.g.*, J. Rakove, Original Meanings 300-02 (1996). It is significant here not merely that the denouement of the restrictive efforts left

the juries in control, but that the focus of those efforts was principally the juries' control over the ultimate verdict, applying law to fact (or "finding" the law, *see, e.g.*, *id.* at 301), and not the factfinding role itself. There was apparently some accepted understanding at the time that the finding of facts was simply too sacred a jury prerogative to be trifled with in prosecution for such a significant and traditional offense in the common law courts. That this history had to be in the minds of the Framers is beyond cavil. According to one authority, the leading account of Zenger's trial was, with one possible exception "the most widely known source of libertarian thought in England and America during the eighteenth century." L. Levy, Freedom of Speech and Press in Early American History 133 (1963). It is just as much beyond question that Americans of the period perfectly well understood the lesson that the jury right could be lost not only by gross denial, but by erosion.

*Id.* at 246-48 (emphasis added) (footnotes omitted). The *Jones* Court went on to conclude that the Framers' concern with erosion of the jury's power supported doubts about the constitutionality of allowing judges to impose higher penalties based on judicial fact finding. *See also Apprendi*, 530 U.S. at 479 n.5 (noting that "juries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant") (citing *Jones*, 536 U.S. at 245)).

To be sure, these passages do not flatly state that the Sixth Amendment encompasses any sort of right to jury discretion. But it is telling that when the Court recognized a need to expound upon the historical ability of juries to check the judiciary, its first resort was to cite the jury's power to refuse to convict (or to convict of a crime that carried a lesser sentence). Also significant is the fact that the Court discussed the *Zenger* trial, thought by many to be one of the prime examples in support of the historical argument in favor of nullification. *Jones*, 526 U.S. at 246-47. Finally, rather than denigrate the *Zenger* case, the Court cited a commentator who labeled it the "most widely known source of libertarian thought" in eighteenth-century America. *Jones*, 526 U.S. at 247. It is hard to come away from this passage with anything other than the

92

conclusion that the Court accepts the view that jury exercise of its power to ameliorate excessively harsh sentencing laws in limited circumstances such as the instant case is one of the consequences of the Sixth Amendment.

### C.    Attempts to Restrict Sixth Amendment Jury Discretion

#### 1.    Eighteenth and Nineteenth Century

That the eighteenth-century recognition of the jury's right to decide the law—or to decide how the law applies to particular defendants in light of the severity of punishment—was incorporated into the Sixth Amendment's right to "trial by jury" is illustrated by the 1794 Supreme Court case, *Georgia v. Brailsford*, 3 U.S. 1 (1794). The jury, sitting in original jurisdiction because the State of Georgia was a party, *see* U.S. Const. art. III, § 2, was charged as follows by Chief Justice John Jay:

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. But it must be observed that *by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy.* On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are [sic] the best judges of law. *But still both objects are lawfully, within your power of decision.*

3 U.S. at 4 (emphasis added). With justices who had been instrumental in framing the Constitution, the Supreme Court of 1794 accepted the jury's power and right to decide both the facts and the law of a case—and to be so instructed by a judge.

*Brailsford*'s ruling was attenuated in the late nineteenth century. Two major Supreme Court Justices' opinions in the nineteenth century have language relied upon by subsequent courts as restricting the Sixth Amendment's jury discretion and right to know the effect of its

decision.  They are Justice Story's in the Circuit Court of the District of Massachusetts, *United States v. Battiste*, 24 F. Cas. 1042 (C.C.D. Mass. 1835) and the first Justice Harlan's in *Sparf v. United States*, 156 U.S. 51 (1895).

*Battiste* is distinguishable from modern anti-nullification cases.  Justice Story's statement was made in the context of *preventing a conviction unfounded under the statute as he construed it, not to prevent the jury from refusing to convict a person technically guilty.*

Justice Harlan's opinion, sixty years later, in *Sparf*, contains a long and learned analysis. It restricts the effect of the historical Sixth Amendment by preventing the jury from finding the lesser of the crimes of murder or manslaughter—the difference between death or life for the prisoner.

Modern historical research demonstrates that the equally long and learned dissent of Justice Gray in *Sparf* had the history of the Sixth Amendment right.  He wrote:

> Until nearly forty years after the adoption of the Constitution of the United States, not a single decision of the highest court of any State, or of any judge of a court of the United States, has been found, denying the right of the jury upon the general issue in a criminal case to decide, according to their own judgment and consciences, the law involved in that issue—except the two or three cases . . . concerning the constitutionality of a statute. . . .
>
> It must frankly be admitted that in more recent times, beginning with . . . Mr. Justice Story's charge to a jury in 1835 in *United States v. Battiste*, 2 Sumn. 240, [24 F. Cas. 1042], the general tendency of decision in this country (as appears by the cases cited in the opinion of the majority of the court) has been against the right of the jury . . . .

156 U.S. at 168.

It would be an example of inordinate tediousness and supererogation to rehearse again the superb historical analyses of Justices Harlan and Gray that include detailed statements of the views of such luminaries as Alexander Hamilton, John Marshall, John Jay, Samuel Chase, Joseph Story, Lemuel Shaw, Lord Coke, Lord Bacon, John Milton, and John Adams; details of

94

cases such as *Anthes*, *Bushell*, *Zenger*, *Penn & Mead*, *Burr*, and others; as well as the Magna

Carta and statutes adopted on both sides of the Atlantic. *Cf., e.g.*, The Three Trials of William

Hone (Tegg ed. 1876) (three different juries refused to convict in three different trials despite

judicial instructions); *Bushell's Case, in* 6 Howell's State Trials 999 (1670); *Penn & Mead's*

*Case, in id.* at 951 (1670) (jury refusing to convict William Penn of unlawful assembly despite

threats from judge); James Alexander, A Brief Narrative of the Case and Trial of John Peter

Zenger (1963).

Justice Harlan's majority opinion was well designed to produce a more efficient court

system calculated to deal with the growing complexity of the law; the much improved training

and professionalism of bench and bar; a lay public increasingly out-of-touch with the law's

details; and a desire to provide predictable rules protecting our growing national industry and

commerce. In addition, courts following *Sparf* appear to reflect a pervasive fear that our

heterogeneous jurors, unbound by common principles of morality, education and dedication to

the law, may deviate too far from judicial views of the rule of law unless they are tightly

controlled. *Cf., e.g.* James Bradley, The Imperial Cruise 23-34 (2009) (noting that, as the

nineteenth century turned into the twentieth, America's ruling classes accepted the myths of

racial superiority); *id.* at 33 ("Such beliefs ruled America."). This appellate lack of faith in the

good sense of juries is not generally shared by today's trial judges—including the one who signs

this memorandum—who deal with them on a daily basis. Our sense of our jury's bona fides and

judgment is quite high.

Whatever the judicial system's evaluation of modern juries and their proper role, the

Supreme Court has recently instructed us that in matters of sentencing as well as hearsay, it is

necessary to go back to the practice as it existed in 1791 to construe the meaning of

constitutional provisions such as the Sixth Amendment.  Justice Gray dissenting in *Sparf* seems to have hit both the modern and ancient marks.  Judges are today forcefully reminded in *Crawford v. Washington*, reevaluating the constitutional right of confrontation and the limits on the use of "testimonial" hearsay, that no matter how long and firm a precedential line of Supreme Court cases, if analysis shows it was ill-based historically it must be abandoned.  541 U.S. 36 (2004).

It is worthwhile recalling that the author of the majority opinion in *Sparf* was the first Justice Harlan.  His minority opinion in *Plessy v. Ferguson*, 163 U.S. 537 (1896), which approved over his strong dissent the doctrine of separate but equal, degrading African-Americans, was adopted more than a half century later in *Brown v. Board of Education*, 347 U.S. 483 (1954), overruling *Plessy*.  By contrast, Justice Harlan's *Sparf* majority ruling limiting jury power is in effect overruled now, more than a century later, by the recent *Booker* line of cases, essentially adopting the minority conclusion in *Sparf*.  It is not particularly significant that the same 1890s Supreme Court appears to have been wrong—by our present standards—on two important cases, but it is notable that the Supreme Court feels called upon now to overrule major precedents going back to the late nineteenth century based upon a revised historical analysis.

As for Justice Story's early eighteenth-century opinion—*Battiste*—the first significant federal case seeming to limit Sixth Amendment discretion—it lends little support to *Sparf*. *Battiste*, 24 F. Cas. 1042 (1835), was a capital case charging a violation of the 1820 United States statute outlawing international trade in slaves; Justice Story held that, on the facts, the defendant had committed no crime.  *See id.* at 1044, 1046.  He held that the mere transportation of those already enslaved from one part of the Portuguese enclaves in Africa to another was internal carriage, not the kind of international trade outlawed by the statute.  *Id.* at 1045-46.

96

In the course of his dispositive analytical opinion on the statute's meaning, Justice Story

declared that in criminal and civil cases,

> [The jury's] verdict, when general, is necessarily compounded of law and of fact;
> and includes both.  In each they must necessarily determine the law, as well as the
> fact.  In each, they have the physical power to disregard the law, as laid down to
> them by the court.  But *I deny, that, in any case, civil or criminal, [jurors] have
> the moral right to decide the law according to their own notions, or pleasure*.  On
> the contrary, I hold it the most sacred constitutional right of every party accused
> of a crime, that the jury should respond as to the facts, and the court as to the law.
> It is the duty of the court to instruct the jury as to the law; and it is the duty of the
> jury to follow the law, as it is laid down by the court.  This is the right of every
> citizen; and it is his only protection.  If the jury were at liberty to settle the law for
> themselves, the effect would be, not only that the law itself would be most
> uncertain, from the different views, which different juries might take of it; but in
> case of error, there would be no remedy or redress by the injured party; for the
> court would not have any right to review the law as it had been settled by the jury.
> Indeed, it would be almost impracticable to ascertain, what the law, as settled by
> the jury, actually was.  On the contrary, if the court should err, in laying down the
> law to the jury, there is an adequate remedy for the injured party, by a motion for
> a new trial, or a writ of error, as the nature of the jurisdiction of the particular
> court may require.  Every person accused as a criminal has a right to be tried
> according to the law of the land, the fixed law of the land; and not by the law as a
> jury may understand it, or choose, from wantonness, or ignorance, or accidental
> mistake, to interpret it.  If I thought, that the jury were the proper judges of the
> law in criminal cases, I should hold it my duty to abstain from the responsibility
> of stating the law to them upon any such trial.  But believing, as I do, that every
> citizen has a right to be tried by the law, and according to the law; that it is his
> privilege and truest shield against oppression and wrong; I feel it my duty to state
> my views fully and openly on the present occasion.  It is not, indeed, an occasion,
> on which there is any reason to doubt, that an intelligent jury can understand the
> principles of law applicable to the subject, as well as the court; for they are the
> principles of common sense.  And as little reason is there, in my view, to suppose,
> that they can operate injuriously to the real merits of the case of the prisoner.

*Id.* at 1043 (emphasis added).

Since the defendant, Battiste, *was being protected by Justice Story* against an incorrect

interpretation of the statute by a jury that could have convicted a guiltless defendant, Story had

the obligation to prevent exercise of jury discretion against the law.  This is the law today—as it

must be—under the Federal Rules of Criminal Procedure, which grant courts broad discretion to

97

*prevent a criminal conviction* unfounded under the law.  No one challenges the power of the

judge to prevent an unlawful conviction, and the lack of right of the jury *to convict* against the

law.  But that does not permit judges *to compel a criminal conviction* by withholding information

from the jury that, if known by it, would likely result in acquittal.

*Battiste* does not address what was the practice and conceded power of the jury *to refuse*

*to convict* even when the judge instructed that the law required conviction.  That view was

inherent in the Sixth Amendment even though judges in the late-nineteenth, twentieth and

twenty-first centuries were increasingly trying to control juries by limiting their power and

prerogative not to convict or to convict of a lesser crime to reduce the sentence.  Placing the

pejorative characterization of "nullification" on the jury's Sixth Amendment power does not

define it out of existence.

Evisceration of felony death penalties—as well as the pre-Civil War Fugitive Slave Acts

in the North—continued well into the nineteenth century, leading ultimately to considerable

reduction in the number of capital offenses since such draconian penalties could not be enforced.

*See* John Clark, *The Social Psychology of Jury Nullification*, 24 Law & Psychol. Rev. 39, 43-44

(2000).  Increased pressure on the judiciary to assert control denied it by the Sixth Amendment

was created by growing diversification of the jury pool and reluctance of juries to convict, for

example, in labor unrest cases, liquor prohibition cases, cases of white violence against blacks,

Vietnam War resister cases, and consensual statutory rape cases involving members of the armed

forces in World War II.  *See, e.g.*, *United States v. Dougherty*, 473 F.2d 1113, 1136-37 (D.C. Cir.

1972) (denying nullification instruction, over strong dissent, for clergy who had ransacked a

napalm chemical plant); *see also, e.g.*, Parmenter, *supra*, 393-96 & nn.143-74 (discussing the

Marion Barry, Rodney King, Menendez brothers, O.J. Simpson and "Bronx" juries).

The notoriety of the *Dougherty* case at the time of Vietnam War unrest was probably

sufficient to make a nullification charge unnecessary to apprise the jury of its power. *See*

Parmenter, *supra*, 389-90. By contrast, the current lack of awareness of the many statutory-

based minimum sentence requirements renders juries vapid through their lack of awareness of

the effects of their verdicts. *See id.* at 402-416 nn.231-370 (illustrating the increasing frustration

of courts at jury refusals to convict, leading to increasing pressure by courts on juries not to

nullify, including threats of contempt, removal of a nullifying juror, and instructing the jury that

they could not nullify).

Consistent modern judicial attempts to water down the Sixth Amendment have not

escaped notice by academics and other scholars whose commentary has been generally critical of

limitations on Sixth Amendment jury power to dispense mercy. *See, e.g.*, *Polouizzi I*, 549 F.

Supp. 2d at 450-54 (providing selected bibliography on powers of jurors when Sixth Amendment

was adopted); *see also, e.g.*, Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale

L.J. 1131, 1191-99 (1991) (noting that juries had power to declare laws unconstitutional and

calling that argument "strong," but cautioning that "I do not mean to suggest that I am wholly

persuaded"); David C. Brody, Sparf *and* Dougherty *Revisited: Why the Court Should Instruct the*

*Jury of Its Nullification Right*, 33 Am. Crim. L. Rev. 89, 105 (1995) ("The time has come for the

Supreme Court to reconsider its decision in *Sparf*, as well as the question of whether the jury

should be instructed of its nullification power."); Paul Butler, *Racially Based Jury Nullification:*

*Black Power in the Criminal Justice System*, 105 Yale L.J. 677, 679 (1995) (arguing that

African-American jurors should nullify in some cases to combat racism in criminal justice

system); David N. Dorfman & Chris K. Iijima, *Fictions, Fault, and Forgiveness: Jury*

*Nullification in a New Context*, 28 U. Mich. J.L. Reform 861, 900-01 (1995) (arguing that jury

99

nullification is a "popular check on executive and judicial discretion"); Arie M. Rubenstein,

Note, *Verdicts of Conscience: Nullification and the Modern Jury Trial*, 106 Colum. L. Rev. 959

(2006) (basing argument in favor of jury nullification on recent Supreme Court jury right cases);

Alan W. Scheflin, *Jury Nullification: The Right to Say No*, 45 S. Cal. L. Rev. 168, 224 (1972)

("Preservation of . . . the right to nullify . . . [is] essential to a restoration of the vaunted stature

the judicial system should occupy."); Alan W. Scheflin & Jon M. Van Dyke, *Merciful Juries:*

*The Resilience of Jury Nullification*, 48 Wash. & Lee L. Rev. 165, 166 (1991) ("[O]ur judicial

system would be better served if judges instructed jurors of their true powers."); Ran Zev

Schijanovich, *The Second Circuit's Attack on Jury Nullification in* United States v. Thomas: *In*

*Disregard of the Law and the Evidence*, 20 Cardozo L. Rev. 1275, 1278 (1999) ("*Thomas* is

unsound both as a matter of law and as a matter of policy."); Chaya Weinberg-Brodt, *Jury*

*Nullification and Jury-Control Procedures*, 65 N.Y.U. L. Rev. 825 (1990) (arguing for

refocusing arguments regarding nullification on defendants' rights and reconsidering doctrines

that impede nullification). *But see* Pamela Baschab, *Jury Nullification: The Anti-Atticus*, 65 Ala.

Law. 110, 114 (2004) ("Jury nullification, no matter how you slice it, is at bottom a desecration

of the basic premise that we are all equal under the law."); Leo P. Dreyer, *Jury Nullification and*

*the Pro Se Defense: The Impact of* Dougherty v. United States, 21 U. Kan. L. Rev. 47, 60-63

(1972-73) (arguing against allowing instructions to juries regarding their power to nullify);

Andrew D. Leipold, *Rethinking Jury Nullification*, 82 Va. L. Rev. 253 (1996) (arguing that jury

nullification has a larger cost than is normally realized and that the Sixth Amendment does not

protect the right of jury nullification); Richard St. John, *License to Nullify: The Democratic and*

*Constitutional Deficiencies of Authorized Jury Lawmaking*, 106 Yale L.J. 2563 (1997)

(criticizing legislative proposals to authorize jury nullification).

2.      Contemporary

Since the late nineteenth century, jury power has increasingly been suppressed in favor of

judicial control in both civil and criminal trials through case law and amendments to the statutes

and rules governing the trial process.  This trend—especially since the 1990s—is so strong that

one commentator considers it "war."  *See* Andrew J. Parmenter, *Nullifying the Jury, The Judicial*

*Oligarchy Declares War on Jury Nullification*, 46 Washburn L.J. 379 (2007).  That the courts of

three out of the four states that grant juries the power in criminal cases to decide both law and

fact "have eviscerated any literal translation of these constitutional provisions" is one such

example.  *Id.* at 391; *see* Ga. Const. art. I, § 1, para. x1(a) (1998); Ind. Const. art. I, § 19 (1999)

("In all criminal cases whatever, the jury shall have the right to determine the law and the

facts."); Md. Code Ann., Const. art. 23, Declaration of Rights (same).

The reasons for this trend are beyond the scope of this opinion, but hypotheses include

"changes in the American psyche, transitioning a young republic with revolutionary zeal and

distrust for governmental authority into a mature democracy" more concerned with law and

order; professionalization of the legal profession and prioritizing law over facts; fears of an

increasingly diverse jury pool due to the twentieth-century opening up of jury service,

particularly with a post-World War II influx of immigrants to the country on a non-

discriminatory basis from all parts of the world; and the need to have a uniform predictable

national law and its enforcement that would favor the growth of national commerce.  *See*

Parmenter, *supra*, at 386-87; *see also Husain v. Springer,* 494 F.3d 108, 138 (2d Cir. 2007), *cert.*

*denied*, 128 S.Ct. 1658 (2008); *Monroe v. Kuhlman*, 436 F. Supp. 2d 474, 480 (E.D.N.Y. 2006),

*aff'd*, 248 F. App'x 223 (2d Cir. 2007) (suggesting that causes include "'the reluctance to expand

the powers of totally passive and unenlightened juries stems from three sources: (1) the

tremendous inertia of long-standing legal tradition; (2) a basic distrust of juries; and (3) trial

attorneys' and judges' fear of loss of control of the trial process.'" (quoting Mark A. Frankel,

*Legal Institutions: A Trial Judge's Perspective on Providing Tools for Rational Jury Decision-*

*Making*, 85 Nw. U.L. Rev. 221, 222 (1990))).

Relying on *Sparf v. United States*, judges now generally refuse to inform juries of their

full powers, including their power to nullify.  Nullification instructions, historically common, are

no longer given.  It is generally accepted that defendants have no right to such a charge.  Yet

*Sparf*—supposedly the bedrock case against jury nullification—adopted no such holding:

> Harlan's opinion did not preclude judges from rendering nullification instructions
> or allowing nullification arguments in proper circumstances, it did not require
> judges to mislead jurors about their power to judge the law, and it did not sanction
> a judicial denial of the jury's nullification power, either by instruction or
> interference.  *Sparf* only held that it was not reversible error to instruct the jury
> that it would be wrong to disregard the court's instruction as to the law.  In fact,
> the trial judge in *Sparf* informed the jury that it had the "physical power" to
> render a verdict contrary to his instructions.

*Parmenter*, *supra*, at 388 (footnotes omitted).

Not only are juries not informed of their constitutional and historic power to nullify,

judges increasingly issue directive and authoritative jury instructions, which increase judicial

control over jurors.  *See* B. Michael Dann, *"Must Find the Defendant Guilty" Jury Instructions*

*Violate the Sixth Amendment*, 91 Judicature 12, 12 (2007) (stating that a "survey of the states'

and federal circuits' corresponding jury instruction language reveals that 24, almost 40 percent,

of state courts and federal circuits use the command 'must' or its equivalent ('shall' or 'duty') to

point juries to verdicts of guilty when all of the elements of the alleged crime have been proven.

Another 7, or 13 percent, use the milder admonition 'should' to steer the jury's decision to

guilt."). Some judges have gone as far as to tell jurors they have a legal obligation to apply the law, that they could face sanctions upon nullification, and that they "had a duty to notify the court if any juror expressed intent 'to disregard the law.'" *See* Parmenter, *supra*, at 404, 409.

Judicial control over potential and actual members of the jury has steadily increased. Voir dire, in practice since the Fugitive Slave Acts, is used to weed out potentially nullifying jurors. *See* Parmenter, *supra*, at 398 (citing Lysander Spooner, Trial by Jury (1852)). The Court of Appeals for the Eleventh Circuit has upheld a trial court's sua sponte dismissal of a juror because the juror knew the jury had the power to nullify. *United States v. James*, No. 98-1479, 2000 U.S. App. LEXIS 1738 (11th Cir. Feb. 7, 2000).

Dismissals for cause based on jurors' beliefs still result, especially in death penalty cases, in pro-conviction jury panels not fairly selected as a cross-section of the community. *See, e.g.*, *Uttecht v. Brown*, 55 U.S. 1 (2007) (approving a trial court's decision to dismiss a juror for cause after finding that the juror's ability to impose the death penalty was substantially impaired, even though he indicated that he would follow the law as instructed by the judge).

Since the 1990s, there has been a growing trend towards discharging jurors who may nullify. *See* Parmenter, *supra,* at 408-10 (citing cases). The court in *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997), discussed further in Part IV.D.1, *infra*, utilized Federal Rule of Criminal Procedure 23(b) to approve removal of a juror during deliberations, thus allowing the return of an eleven-person verdict, citing as "good cause" the juror's possible nullificatory intent. Other circuits have followed *Thomas*. *See* Parameter, *supra*, at 407 n.279. After *Thomas*, judges might well feel empowered to disqualify potentially nullifying jurors at both voir dire and trial under Rule 24(c). *See* Fed. R. Crim. P. 24(c)(1) ("The court may impanel up to 6 alternate

103

jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties.").

A completely distinct division between the roles of judge and jury as is said to be embodied in *Sparf* is unsupported historically, *see* Parts IV.A and IV.B, *supra*, and now, post-*Booker*, it is unsupportable legally.  *See* Part IV.D., *infra*.  Providing jurors sentencing information would enable the jury to more effectively fulfill its historical Sixth Amendment role as the conscience of the community and guardian against government oppression.

**D.      Second Circuit Court of Appeals: Jury Knowledge**

An analysis of *Sparf*'s Second Circuit Court of Appeals recent progeny, *Thomas* and *Pabon-Cruz*, is illustrative of the approach now sometimes required in this circuit.  It should be compared with the Court of Appeal for the Second Circuit's expansive—and more historically apt—language regarding the nature of the jury's role in *Gilliam*.  *Compare United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004) *and United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) *with United States v. Gilliam*, 994 F.2d 97 (2d Cir. 1993).

1.      *Thomas* and *Pabon-Cruz* Premises

It is no criticism to respectfully point out that the statements of the Court of Appeals for the Second Circuit in *Thomas* and *Pabon-Cruz* suggesting strict limitations on information which may be made available to a jury must be read in the light of Supreme Court cases reinterpreting the Sixth Amendment and its own analysis in *Polouizzi II*, 564 F.3d 142 (2008).

a)      *Thomas*

*Thomas* is an example of judicial attempts to control the jury's mercy-dispensing powers, one of many discussed in Part IV.C, *supra*.  The *Thomas* court did not simply discourage—as many other courts have done—jury nullification; it went further in suggesting that a trial court

may dismiss a potentially nullifying juror during jury deliberations.  *See* Ran Zev Schijanovich,

*The Second Circuit's Attack on Jury Nullification in* United States v. Thomas: *In Disregard of*

*the Law and the Evidence*, 20 Cardozo L. Rev. 1275, 1277 (1999) ("The Second Circuit's

holding represents perhaps the most far-reaching action taken by the federal courts to suppress

the jury's prerogative to refuse to follow the law 'based on its own sense of justice or fairness' in

reaching a verdict.").  The *Thomas* court's assertion that its ruling was "one fully consistent with

our history and traditions," 116 F.3d at 622, might have been supported by a broad reading of

late nineteenth- and twentieth-century cases.  But it cannot stand in light of colonial history and

practice at the time the Sixth Amendment was adopted, as that history must now be interpreted

pursuant to twenty-first century Supreme Court jurisprudence.

 In *Thomas*, the defendants were convicted by an eleven-person jury after the trial court

dismissed the twelfth juror during jury deliberations pursuant to Rule 23(b)(3)'s "just cause"

provision, after finding that the juror "was purposefully disregarding the court's instructions on

the law—in effect, that the juror intended to acquit the defendants regardless of the evidence of

their guilt."  116 F.3d at 608; *see* Fed. R. Crim. P. 23(b)(3) ("After the jury has retired to

deliberate, the court may permit a jury of 11 persons to return a verdict, even without a

stipulation by the parties, if the court finds good cause to excuse a juror.").  On appeal, the Court

of Appeals declared "a deliberating juror's intent to nullify constitutes 'just cause' for dismissal"

under Rule 23 (as long as certain high evidentiary standards were met).  *Thomas*, 116 F.3d at

612.  It declared the presiding judge had a duty to dismiss such a juror.  *Id.* at 616.  But, because

it was not "clear beyond doubt" that the dismissed juror in *Thomas* had not simply been

unconvinced by the prosecution's case, the appellate court vacated the judgment and ordered a

new trial.  *Id.* at 608-09.

The Court of Appeals for the Second Circuit's dictum in *Thomas* that trial courts have a duty to dismiss potentially nullifying jurors was based on its

> categorical[] reject[ion of] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent. Accordingly, we conclude that a juror who intends to nullify the applicable law is no less subject to dismissal than is a juror who disregards the court's instructions due to an event or relationship that renders him biased or otherwise unable to render a fair and impartial verdict.

*Id.* at 614 (citation and footnote omitted).

Before it rejected the possibility of jury nullification, the *Thomas* court briefly reviewed—but ultimately found unpersuasive—nullification's history as a form of "tolerable" "civil disobedience" as exemplified in *Zenger*, *id.* at 614, and the "long and complicated history of juries acting as judges of the law as well as the evidence" in the "Anglo-American legal system," *id.* at 614-15; the various procedural rules that serve to protect jury verdicts from outside inquiry (e.g., secrecy of deliberations, general verdicts, inconsistent verdicts), *id.* at 615; the jury's part in "'introduc[ing] a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions,'" *id.* (quoting *U.S. ex rel. McCann v. Adams*, 126 F.2d 774, 776 (2d Cir. 1942) (Hand, J.)); and the federal courts' common acknowledgment of the "de facto *power* of a jury to render general verdicts 'in the teeth of both law and facts.'" *Id.* (quoting *Horning v. District of Columbia*, 254 U.S. 135, 138 (1920)).  But, because jury nullification can lead to a "sabotage of justice," *id.* at 616 (quoting Randall Kennedy, *The Angry Juror*, Wall St. J., Sept. 30, 1994, at A12) (referring to acquittals of white defendants by white juries in 1960s civil rights trials), and because of existing Supreme Court precedent—*Sparf v. United States*, 156 U.S. 51 (1895)—the Court of Appeals for the Second Circuit concluded that "trial courts have the duty to forestall or prevent [potential nullification], . . . where it does not

106

interfere with guaranteed rights or the need to protect the secrecy of jury deliberations, by dismissal of an offending juror from the venire or the jury." *Id.* at 616 (citations omitted).

Most respectfully, it is submitted that it is doubtful whether *Thomas* fully expresses the law in view of current Supreme Court rulings. That Rule 23(b)'s "just cause" provision may be used to dismiss a potentially nullifying juror is dubious in view of what appears to be Colonial history and the design of the 1983 amendment to Rule 23 of the Federal Rules of Criminal Procedure to dismiss only those jurors who are unable to continue to serve due to sudden physical illness or mental stress. *See* Advisory Committee Notes, Fed. Crim. Code and Rules 119 (Thomas/West 2007) ("[O]ne of the jurors is seriously incapacitated or otherwise found to be unable to continue service upon the jury"); Schijanovich, *supra*, at 1309-13.

Application of the *Thomas* test—to permit judicial inquiry to determine whether jurors are simply unconvinced by the evidence or are intent on nullification—inevitably destroys the essential secrecy of jury deliberations, as the court itself acknowledged. *See Thomas*, 116 F.3d at 621 ("Where . . . as here, a presiding judge receives reports that a deliberating juror is intent on defying the court's instructions on the law, the judge may well have no means of investigating the allegation without unduly breaching the secrecy of deliberations."). Because it is difficult to distinguish between a "juror who favors acquittal because he or she is purposefully disregarding the court's instructions on the law, and the juror who is simply unpersuaded by the Government's evidence," dismissals of jurors will, in some cases, necessarily violate a criminal defendant's right to a unanimous jury verdict. *Id.* at 621 ("[T]o remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict."). Despite the appellate court's serious efforts to develop a "balancing test" in *Thomas*, its approach does not guarantee protection of constitutional Sixth Amendment rights of jurors or

107

of defendants.

In any event, because it is based primarily on *Sparf*—now largely abrogated by the *Booker* line*, see* Parts IV.A-C, *supra*—the *Thomas* ruling probably exceeds the power of judges under the Sixth Amendment to control juries.  That it is a criminal jury's duty "to take the law from the court and apply that law to the facts as they find them," *id.* at 615 (quoting *Sparf*, 156 U.S. at 102), is a far cry from holding that it is the court's duty to dismiss a juror favoring mercy over the law as charged by the judge.  The law does not countenance interference with the jury's essential function, one of which, the *Thomas* court conceded, is to "'provid[e] 'play in the joints' that imparts flexibility and avoid[] undue rigidity . . . [and] act[] as a 'safety valve' for exceptional cases, without being a wildcat or runaway institution.'"  *Id.* at 622 (quoting *United States v. Dougherty*, 473 F.2d 1113, 1134 (D.C. Cir. 1972)).

Despite *Thomas*'s current lack of a firm foundation, other appellate courts (both before and after *Booker*) have followed its conclusion.  The Court of Appeals for the Eleventh Circuit has approved the dismissal of a potentially nullifying juror under Rule 23(b)'s just cause provision, applying a "beyond reasonable doubt" standard to ensure that a juror may only be excused "when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence."  *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001) (per curiam).  And the Court of Appeals for the Third Circuit went as far as to declare that "courts *agree* that a district court has the authority to dismiss a juror—even during deliberations—if 'that juror refuses to apply the law or to follow the court's instructions.'"  *United States v. Kemp*, 500 F.3d 257, 303 (3d Cir. 2007), *cert denied*, 2008 U.S. LEXIS 1922 (U.S., Feb. 19, 2008) (quoting *Abbell*, 271 F.3d at 1302) (emphasis added).

While *Thomas* purports to protect jurors and defendants by its ruling that "if the record

evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request," *Thomas*, 116 F.3d at 621-22 (citing *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)) (emphasis omitted), other courts have facilitated juror dismissal by requiring only "any *reasonable* possibility." *See, e.g.*, *Kemp*, 500 F.3d at 303 (emphasis added); *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999). These courts appear not to be in step with current Supreme Court practice on the Sixth Amendment.

b)      *Pabon-Cruz*

Following its *Thomas* decision, the Court of Appeals for the Second Circuit again failed to fully recognize the jury's historic Sixth Amendment mercy-dispensing powers in *Pabon-Cruz*, 391 F.3d 86. Like Polizzi, the defendant, an eighteen-year-old college student majoring in computer science, had no criminal history. *Id.* at 88. He was charged with advertising to distribute or receive images of child pornography and receiving or distributing child pornography. The advertising charge carried a ten-year mandatory minimum sentence. *Id.* at 88-89.

Before trial, both parties made in limine motions. Offering to stipulate that the files found on the defendant's computer were child pornography, the defense moved to preclude showing the jury any of the pornographic images. The government moved to preclude the jury from learning of the ten-year mandatory sentence. Viewing the motions as related, the district court denied both stating:

> I must say, I find both sides a little bit inconsistent . . . . The defense seems to want the jury to make some kind of a judgment about whether the penalty is appropriate for the conduct without letting the jury see what the conduct consists of. On the other hand, the government, which had the opportunity to have a fact

> finder who would be bound to apply the law and the evidence, chose a fact finder,
> I assume, because it wanted a judgment of the community, and yet it doesn't want
> the community to know what it is actually judging about or what the
> consequences of its judgment are.

*Id.* at 90.  Indicating that it would inform the jury of the sentence to be imposed on defendant if

convicted of the advertising offense but would not allow the defense to argue nullification, *id.*,

the trial court explained its reasoning:

> But I think there is a difference between saying that the court does not and cannot
> approve of nullification, and ignoring the fact that juries have historically played
> this role. I think they are only appropriately able to play that role when they do it
> against a backdrop of stern admonitions that they are not supposed to do it. I think
> it is an act of civil disobedience if they do it. And they should not be given any
> encouragement or any condonation or any instruction that suggests to them that it
> is legally permissible for them to violate their oath as jurors. On the other hand,
> historically jurors have sometimes done that, and the judgment of history is
> sometimes that when they do that, they are in effect lawless and evil, and at other
> times the judgment of history is that they've done the right thing.
> . . . .
> I would not expect the average juror to be very tempted to civil disobedience in
> light of the seriousness of the conduct shown here and the strength of the evidence
> against the defendant.
>
> But in the unlikely event that members of the jury were so troubled that they
> decided to acquit in the face of the court's instruction, in violation of their oaths,
> and on the face of the evidence in the case, that, it seems to me, would constitute a
> significant exercise of the historic function of the jury and one that the jurors
> could never imagine if they had no notion of the seriousness of this offense in
> terms of punishment.

*Id.* at 90-91.

The government promptly filed an application in the Court of Appeals for the Second

Circuit for an emergency stay and writ of mandamus.  *Id.* at 91.  The court granted the writ in an

*unpublished summary order*, which stated in its entirety:

> IT IS HEREBY ORDERED that the petition for a writ of mandamus is granted.
> Challenges to a proposed jury charge may properly be considered on a petition for
> a writ of mandamus.  The District Judge's proposed jury instruction regarding the
> penalties the defendant faces if convicted is a clear abuse of discretion in light of

binding authority.  *See Shannon v. United States*, 512 U.S. 573 (1994); *United States v. Thomas*, 116 F.3d 606 (2d Cir.1997). IT IS FURTHER ORDERED that the stay of trial proceedings is hereby lifted.

*Id.* at 91-92.

Pabon-Cruz appealed after a jury verdict of guilty.  In the published decision on the direct appeal, *United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004), the Second Circuit acknowledged that the issue posed on appeal was different from that recognized on mandamus:

> [T]he pertinent question on appeal is not whether that [mandamus] ruling was correct, but whether defendant was denied the benefit of a charge he requested to which he was legally entitled.  Accordingly, *even if we believed the earlier panel was incorrect in forbidding the District Court from instructing the jury on the sentencing* consequences, *the conviction remains sound* unless the instructions actually given by the District Court were in error or the defendant had a legal entitlement to the instruction he was denied.

*Id.* at 94 (emphasis added).  Finding no reversible error in the charge, the Court of Appeals supported its reasoning by an explanation relying on its previous opinion in *Thomas* and adopting the Supreme Court's "fully persuasive dicta" in *Shannon v. United States*, 512 U.S. 573 (1994):

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury.  The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged.  The judge, by contrast, imposes sentences on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.  Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion.

*Pabon-Cruz,* 391 F.3d at 94-95 (quoting *Shannon*, 512 U.S. at 579).

The appellate court in *Pabon-Cruz*, it is respectfully suggested, too broadly interpreted *Shannon.  Shannon* had held that a defendant had no legal right to a charge informing a jury of the consequences of a not guilty by reason of legal insanity verdict (commitment to a mental

111

asylum). *Pabon-Cruz* interpreted *Shannon*'s holding to mean that defendants have "no legal

right to a charge informing the jury of [any of] the sentencing consequences of its decisions." *Id.*

at 94. Because *Thomas* had held that jurors have "no right" to engage in nullification—although

although they do have the power to do so—trial "courts have the duty to forestall or prevent such

conduct." *Id.* at 95 (citing *Thomas*, 116 F.3d at 616). Hence, the *Pabon-Cruz* court concluded

that the defendant had no right to a jury instruction informing the jury of the ten-year mandatory

minimum sentence and strongly implied that trial courts were forbidden to so instruct or allow

juries to be so informed.

> c)    Post-*Booker*, *Pabon-Cruz*, *Thomas* and *Shannon* Require
>       Reinterpretation

*Pabon-Cruz*, *Thomas*, and *Shannon* were all issued without taking full account of *Booker*

and the sea change in Sixth Amendment and sentencing practice it required. As demonstrated in

Part IV.B, *supra*, courts must now interpret Sixth Amendment questions in light of the jury's role

in colonial times, when juries knew—or were informed at least in some cases—of the applicable

sentences and had the recognized ability to dispense mercy. *See, e.g., Agostini v. Felton*, 521

U.S. 203 (1997). *But cf. Pabon-Cruz*, 391 F.3d at 90 (criticizing the district court for deciding to

inform the jury of the ten-year mandatory minimum, after noting that "juries have historically

played this role . . . and at . . . times the judgment of history is that they've done the right thing").

> d)    *Pabon-Cruz* Applied to Polizzi

At Polizzi's first trial, the jury was not informed—despite defendant's request—of the

five-year mandatory minimum sentence consequent to a guilty verdict. This decision was based

on the trial court's acceptance of the government's argument before trial that *Pabon-Cruz*

112

controlled and required denial of the request as a matter of law.  If the trial court had indicated

that it would inform the jury or allow the defendant to inform the jury of the mandatory

minimum sentence, the government would almost certainly have sought an emergency stay and a

writ of mandamus from the Court of Appeals for the Second Circuit, which likely would have

been summarily granted following *Pabon-Cruz*.  Because of recent Sixth Amendment Supreme

Court constitutional jurisprudence, this court's finding that *Pabon-Cruz* precluded it from

exercising its discretion by issuing Polizzi's requested jury instruction on sentencing was

incorrect.  Polizzi did have a Sixth Amendment right to exercise of the court's discretion to

inform the jury of the minimum sentence.

　　　　Technically, even if *Pabon-Cruz* withstood analysis post-*Booker*, the decision would not

itself constitute binding authority on a *trial court's discretion* to inform a jury of a mandatory

minimum sentence.  The writ of mandamus granted by the Court of Appeals for the Second

Circuit in *Pabon-Cruz* was an unpublished summary order.  *United States v. Pabon-Cruz,* No.

02-3080 (2d Cir. Oct. 11, 2002); *see Pabon-Cruz*, 391 F.3d at 91-92.  Summary orders do not

have precedential value.  2d Cir. Local Rule 32.1.1(b).  The Court of Appeals' subsequent

published decision after the defendant appealed his guilty verdict only addressed the question

whether the defendant was legally entitled to a jury charge describing the mandatory minimum.

The issue was not—as it is now in the instant case—whether the trial court has the power and

discretion to inform the jury, in a charge or otherwise, of the mandatory minimum.  *See id.* at 95

n.11 ("Because the issue is not before us, we intimate no view as to whether, or in what

circumstances, a trial judge may inform the jury of the relationship between punishment and

offense.").  Despite this technical distinction, since the overall tenor of *Pabon-Cruz* was fairly

clearly opposed to Polizzi's proposed jury instruction in the instant case, this trial court declined

113

*as a matter of law* to issue the proposed instruction on sentencing impact to the jury, a decision

that this court now recognizes was in error.  Even under *Pabon-Cruzi*, however, it arguably had

discretion to grant the charge.

<ol start="2">
<li>*Gilliam*'s Language Represents Current General Role of Informed Jury as Representative of Community Mores</li>
</ol>

In comparison with *Thomas* and *Pabon-Cruz*, language of the Court of Appeals for the

Second Circuit more in keeping with the jury's traditional function is that in *United States v.*

*Gilliam*, 994 F.2d 97 (2d Cir. 1993)—putting aside the validity of its holding.  In *Gilliam*, the

defendant appealed from a guilty jury verdict on a felon-in-possession charge, protesting the trial

court's failure to force the government to accept his proposed stipulation to an entire *element* of

the offense.  Before trial, defendant had offered to stipulate that he not only had a prior felony

conviction—the facts stipulating the predicate element of the crime—as allowed by *Old Chief v.*

*United States*, 519 U.S. 172 (1997), but that he was a felon as defined under the applicable felon-

in-possession statute.  Acceptance of the proposed stipulation would have prevented the jury

from learning the nature of the statute under which Gilliam was being tried: all the jury would

have had to determine was whether the defendant possessed a gun at the time the government

alleged.  The trial court opted not to require the government to accept the defendant's proposed

stipulation, and the Court of Appeals for the Second Circuit affirmed, emphasizing the potential

harm to the traditional "role of the jury" in a reversal.  Reliance was placed on the importance to

the jury system of jurors knowing "the true import" of its findings:

> But there is harm done by his proposal, harm to the judicial process and the role
> of the jury in determining the guilt or innocence of the accused as charged.
> *Gilliam's proposal violates the very foundation of the jury system.* It removes
> from the jury's consideration an element of the crime, leaving the jury in a
> position only to make findings of fact on a particular element *without knowing the*

> *true import of those findings. . . . The jury speaks for the community in*
> *condemning such behavior, and it cannot condemn such behavior if it is unaware*
> *of the nature of the crime charged.*

*Gilliam*, 994 F.2d at 100-01 (emphasis added).

Just as juries, according to *Gilliam*, cannot condemn behavior when they are unaware of all elements of the offense, to understand the full "nature of the crime," in our society juries must be aware of the severity of the consequences of their verdicts in cases such as the present one. Comprehending the "true import of [a jury's] findings," *id.* at 101, necessarily entails knowledge of a mandatory penalty in cases such as the one now before the court. That the jury in Polizzi should have been informed of the applicable mandatory minimum sentence before deciding the insanity defense, is driven home by other language in *Gilliam* extolling the jury's "mollifying influence":

> Our constitution guarantees the accused the right of a trial by a jury of his peers, primarily *in order to ensure that the accused is judged by prevailing community mores.* As Judge Learned Hand stated, the *institution of the jury "introduces a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions."* As representatives of the people, the jurors can rebuke the accused for violation of community standards, morals, or principles. *See, e.g., Witherspoon v. Illinois*, 391 U.S. 510, 519 n.15 (1968) ("[O]ne of the most important functions any jury can perform . . . is to maintain a link between contemporary community values and the penal system. . . ."). *The jury is the oracle of the citizenry in weighing the culpability of the accused*, and should it find him guilty it condemns him with the full legal and moral authority of the society. The public listens with rapt attention to the jury's pronouncement of guilt or innocence, for in that singular moment the convictions and conscience of the entire community are expressed.

*Id.* at 101 (citation omitted) (emphasis added).

Mandatory minimums in a case like the present one reduce the impact of local community values on our community and the penal systems. *Cf. United States v. Lucania*, 379 F. Supp. 2d 288, 293-96 (E.D.N.Y. 2005) (Sifton, J.), *aff'd in part, vacated in part sub nom*

115

*United States v. Cavera*, 505 F.3d 216 (2d Cir. 2007); Essay, *The Role of Judges in a Government Of, By, and For the People*, 30 Cardozo L. Rev. 1, 195-99 (2008); Daniel Richman, *Federal Sentencing in 2007: The Supreme Court Holds—The Center Doesn't*, 117 Yale L.J. 1374, 1414-15 (2008) (decentralization, federal enforcement with deference to local state law and practice and jury of community (citing *United States v. Brennan*, 468 F. Supp. 2d 400 (E.D.N.Y. 2007))); Rachel E. Barkow, 152 U. Penn. L. Rev. 33, 34 (2004) (characterizing mandatory minimums as "secret machination" that erode the jury's power to check government); Charles P. Sifton, *Themes and Valuations: The Relationship Between National Sentencing Standards and Local Conditions,* 5 Fed. Sent'g Rep. 303 (1993).

To ensure that the accused is judged by prevailing community mores in connection with "the penal system," a jury in some cases applies its own judgment regarding the defendant's culpability to determine whether the acts in question fit both society's definition of the crime and the socially-approved punishment.  As the *Gilliam* opinion declared, the jury is not a mere factfinder:

> *Without full knowledge of the nature of the crime, the jury cannot speak for the people or exert their authority. If an element of the crime is conceded and stripped away from the jury's consideration, the jurors become no more than factfinders.* The jury must know why it is convicting or acquitting the defendant, because that is simply how our judicial system is designed to work.

*Id.* at 101 (emphasis added).  If the jury is unaware of the severity of a sentence, as in a case such as the present one where guilt hangs on sanity with a possibly mentally disturbed defendant, they become no more than menial factfinders rather than spokespersons for the community, as *Gilliam* and the Sixth Amendment establish they must be.

116

3.    In Instant Case, Informing the Jury of the Applicable Penalty Was
Necessary Because of the Defendant's Unusual Background and the
Unknown Punishment

It must be emphasized that not all juries need to be, or should be, informed of applicable

sentences.  The discretion of the trial court will be exercised responsibly in a limited number of

cases in accordance with Colonial and British practice described in Part IV.A, *supra*.  The case at

bar is not typical, but one in which it was critical that the jurors "be aware of the moral

consequences of their decisions." *United States v. Pabon-Cruz*, 255 F. Supp. 2d 200, 214

(S.D.N.Y. 2003).  Such awareness is required, as the *Pabon-Cruz* trial court noted, in the special

circumstances,

> Where . . . . the average juror might well not remotely imagine that advertising
> child pornography not only carries a harsher penalty than actually delivering it,
> but that the penalty is a mandatory ten years in prison, even for a defendant who
> is little more than a child himself.

*Id.*  Here the special circumstances include the mandatory minimum sentence unknown to the

jury, the need for psychiatric help in view of sexual childhood abuse, the locked door behind

which viewing took place, and other factors.

**E.    Variability of Results Depending Upon Informed & Non-Informed Jurors**

Perhaps the most prejudicial aspect of a failure to be candid with the jury on the effect of

its decision in a case such as the present one, is that some juries may have a juror who knows the

sentencing implications and will accurately inform his or her co-jurors in discussions, others will

have no such informed person, and still others will have an ill-informed person with influence on

the decision.  This kind of exchange undoubtedly occurs frequently in juror deliberations, but is

almost impossible to detect or even to investigate.  *See* Fed. R. Evid. 606(b).

Disparate impact caused by different levels of juror knowledge can lead to serious equal

117

protection and due process issues.  *See generally* Milton Heumann & Lance Cassak, *Not-So-Blissful Ignorance: Informing Jurors About Punishment in Mandatory Sentencing Cases*, 20 Am. Crim. L. Rev. 343 (1983); Katherine M. Sullivan & Gerald Gunther, Constitutional Law 467 ff. (15th ed. 2004) (discussing the origins of the due process clause as incorporating federal rights against the states).  The excellent field work and analysis of Heumann and Cassak as well as the reaction of the jurors in the instant case demonstrates that the due process and equal protection dangers both to defendants and the judicial system of silence by the court in a case such as the present one are substantial.  Lack of candor and transparency here, as in so many other aspects of our democracy, creates an unnecessary hazard to justice.

The problem of the misinformed juror is reflected in the trial judge's opinion in *United States v. Buck*, 23 F. Supp. 503 (W.D. Mo. 1938), explaining why it was necessary to inform the jury of sentencing ranges because of the special situation in that case.

> In the joint motion of all of the defendants criticism is expressed of the reference in the charge of the court to the fact that in the event any defendant was found guilty by the jury he would receive neither the maximum nor the minimum punishment provided by the statute.  It is scarcely necessary, however, to refer to that matter.  The very first argument to the jury by any of the attorneys for the defendants, being the argument by Mr. Swanson, began with the reading to the jury of the statute, including that part of the statute setting out the maximum punishment which might be imposed.  Counsel then developed his argument by seeking to impress upon the jury that although the statute provided for a minimum punishment of a day in jail or a dollar fine, that no such punishment could be expected from the presiding judge in the event of a verdict of guilty.  With the possible exception of counsel representing Mrs. Ryan (who say that they made no reference to the matter of punishment) every one of the six attorneys who argued for the defendants in this case dwelt on the fact that a penitentiary sentence might be imposed upon the defendants by the presiding judge.  There was never in any case over which we have presided any such enlargement upon the subject of punishment possible under the statute.  It is inconceivable that any one can believe that under such circumstances the presiding judge should not have referred at all to that matter in the charge.  In what possible way could any defendant have been prejudiced by the fact that the jury was told that if that defendant was found guilty he would receive substantial and not a merely trifling

118

> punishment?  In what possible way was any defendant prejudiced because the
> judge told the jury (after attorneys over and over again had referred to the
> maximum punishment provided in the statute) that the maximum punishment
> would not be imposed on any defendant?

*Id.* at 505.

Post-verdict polling evidence suggests that informing juries could cause them to acquit more often, but that any such effect will be relatively slight and will not throw the federal courts into disarray.  There are at least two reasons to conclude that informing juries of mandatory minimums will cause them to nullify in a few cases.  First, polls that ask generalized questions about jury nullification sometimes show that most Americans are willing to exercise some mercy if they believe it is morally right to do so.  *See* Leonard W. Levy, The Palladium of Justice: Origins of Trial by Jury 55 (1999).  Second, some polling data suggests that while jurors are generally supportive of mandatory minimums in the abstract, when forced to analyze how the mandatory minimum statutes apply to the individual defendants before them, they become less willing to see doled out the harsh sentences required by such laws.  *See* Brandon K. Applegate, et al., *Assessing Public Support for Three-Strikes-and-You're-Out Laws: Global Views Versus Specific Attitudes*, 42 Crime & Delinquency 517 (1996) (finding that when respondents are given descriptions of a crime that would require life terms under three-strikes laws, most would not sentence defendant to life term, and that most favored exceptions to three-strikes laws in many situations, despite fact that eighty-eight percent of respondents said that they wanted the state to adopt a three-strikes law).

If juries use information on mandatory minimum sentences to nullify, they are likely to do so judiciously.  Notable is Heumann and Cassak's interesting study of the Michigan Felony Firearm Statute.  Heumann & Cassak, *supra*; *see* Mich. Comp. Laws § 750.227b.  In 1977,

Michigan passed a statute, known colloquially as the "Gun Law," which required that any defendant who possessed a firearm while committing a felony receive a two-year sentence in addition to whatever sentence he otherwise would have received. Heumann & Cassak, *supra*, at 346. At the same time, the state launched a publicity campaign—replete with billboards and bumper stickers announcing that "one with gun gets you two"—to ensure that the public was aware of the new mandatory minimum. *Id.* at 347 & n.15.

Heumann and Cassak hypothesized that juries would find the mandatory minimum to be unjust in many cases, and that many Michigan juries would be aware of the law even if it was never mentioned at trial due to the widespread publicity that accompanied its enactment. *See id.* at 346-47. They gathered information on how frequently juries acquitted defendants in Gun Law cases before and after the law was enacted. *See id.* at 349-52. Their hypothesis of increased nullification was not strongly supported by the data. *See id.* Prior to 1977, eight of the eleven felonious assault cases that went to the jury resulted in acquittals. *Id.* at 352 n.27. After 1977, thirty-two of the forty-three cases that went to juries resulted in acquittals. *Id.* In percentage terms, 72.7% of the cases resulted in acquittals before the Gun Law, while after the Gun Law 74.7% resulted in acquittals. *Id.* This increase is not statistically significant.

But Heumann and Cassak argued that despite this insignificant change in the acquittal rate, the Gun Law did cause some increase in nullification: they noted that their interviews with prosecutors, judges, and defense attorneys suggested that the strict Gun Law sentence caused juries to nullify. *Id.* They also pointed out that even if the acquittal rate did not increase significantly, juries did acquit more defendants, in absolute terms, after the passage of the law than before. Whatever one makes of these arguments, Michigan post-Gun Law juries which were likely to have been aware of the mandatory minimum did not substantially increase

120

nullification.  There is no reason to suspect that informing juries of mandatory minimums in the small number of cases where the defendant requests such a charge, and the court exercises its discretion to give it, will create any crisis in law enforcement.

The Supreme Court's fears of a slippery slope expressed in *Shannon* in giving juries sentencing information are unwarranted:

> Moreover, Shannon offers us no principled way to limit the availability of instructions detailing the consequences of a verdict to cases in which an NGI [not guilty by reason of insanity] defense is raised.  Jurors may be as unfamiliar with other aspects of the criminal sentencing process as they are with NGI verdicts. But, as a general matter, jurors are not informed of mandatory minimum or maximum sentences, nor are they instructed regarding probation, parole, or the sentencing range accompanying a lesser included offense.  *See United States v. Thigpen*, 4 F.3d 1573, 1578 ([11th Cir.] 1993) (en banc), *cert. pending*, No. 93-6747; *United States v. Frank*, 956 F.2d 872, 879 ([9th Cir.] 1991), *cert. denied*, 506 U.S. 932 (1992).  Because it is conceivable that some jurors might harbor misunderstandings with regard to these sentencing options, a district court, under Shannon's reasoning, might be obligated to give juries information regarding these possibilities as well.  In short, if we pursue the logic of Shannon's position, the rule against informing jurors of the consequences of their verdicts would soon be swallowed by the exceptions.

*Shannon v. United States*, 512 U.S. 573, 586-87 (1994).

Our jurors are intelligent and responsible.  They can understand complex legal and factual issues that are adequately explained to them with the aid of effective advocates and judges.  Given the general antipathy to such criminals, there is no reason to expect that jurors will be soft on child pornographers, drug traffickers, repeat offenders, or others subject to mandatory minimums.

### F.    Summary: Informing Jury in Present Case

Perhaps the issue is as well summed up as it need be by quoting briefly from Professor Roscoe Pound and Judge Learned Hand.  Pound referred to jury nullification as "the great corrective of law in its actual administration."  Roscoe Pound, *Law in Books and Law in Action*,

44 Am. L. Rev. 12, 18 (1910).  And Learned Hand declared that nullification introduces the necessary "slack into the enforcement of law."  *United States ex rel. McCann v. Adams*, 126 F.2d 774, 776 (2d Cir. 1942).  It allows the jury to temper the law's rigor "by the mollifying influence of current ethical conventions."  *Id.*; *see, e.g.*, Andrew J. Parmenter, *Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification*, 46 Washburn L. J. 379, 426 (2007) (providing other supporting citations).  *See Polouizzi I*, 549 F. Supp. 2d at 450-54 (providing selected bibliography on powers of jurors when Sixth Amendment was adopted).

In Harry Kalven, Jr.'s and Hans Zeisel's comprehensive and still valid study, The American Jury (1966), the authors concluded that in the relatively rare cases where the jury reaches a "different conclusion from the judge on the same evidence, it does so not because it is a sloppy or inaccurate finder of the facts, but because it gives recognition to values which fall outside the official rules."  *Id.* at 495.  "It . . . will move where the equities are.  And where the equities are at any given time will depend on both the state of the law and the climate of public opinion."  *Id.*; *see also, e.g.*, Valerie P. Hans, *Judges, Juries, and Scientific Evidence*, 16 J.L. & Pol'y 19, 23 (2007) ("[M]any disagreements [between judges and juries] are explained by the fact that compared to judges, juries appear to require a stronger case by the prosecution to convict the defendant; or by the fact that juries infuse community notions of justice into their verdicts." (citing, *inter alia*, Kalven and Zeisel, *supra*)).

The experience of trial judges is that the jury is among our most conservative institutions. When in doubt we should trust its judgment, as did those who adopted the Sixth Amendment.

### G.    Special Circumstances

The Supreme Court has recognized that the jury has a significant role in determining punishment.  *See United States v. Booker*, 543 U.S. 220 (2005); *Crawford v. Washington*, 542

U.S. 360 (2004); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  The Court of Appeals for the Second Circuit has conceded the appropriateness of instructing the jury about punishment in some cases.  *See Polouizzi II*, 564 F.3d at 159.  Courts recognize the limits of their new rulings to the special situation before them.  As one commentator put it, in "predicting the administrative feasibility of a proposed remedy" on instructing the jury, the courts must move gingerly, limiting themselves to special situations—as this court now does in the present case.  Note, *Judicial Intervention and Organization Theory: Changing Bureaucratic Behavior and Policy*, 89 Yale L. J. 513 (1980).

In those decisions reducing the constitutional role of the jury and arrogating to courts themselves greater control of jurors than the Constitution permits, modern federal judges have assigned the ugly name "nullification" to the jury's exercise of discretion—a word having negative connotations dating back to some juries' post-Civil War harsh treatment of minorities.  A more apt word for modern juries' exercise of their constitutional power to soften the application of overly harsh laws in specific cases would be "rectification."  Exercise of this corrective power relies on the jury's historic role, going back to Colonial times, of bringing the law as applied into better accord with current community human considerations.

The argument that the jury will abuse its rectification powers, as it has in some instances in the past to enforce racist local social prejudice, is no longer persuasive in our more tolerant America.  Unjustified verdicts of conviction based upon racism can and should be set aside by the court.  The fact that a few juries may refuse to convict for racist or other disreputable reasons does not justify denying the jury its historic constitutional role in exercising clemency in appropriate cases.  This slippery slope argument is not, in any event, persuasive in the Eastern District of New York where our heterogeneous juries discharge their duties without prejudice.

Federal judges who deal with these cases and diverse defendants are increasingly disenchanted with strict and unnecessarily punitive minimum sentencing requirements in child pornography cases that treat with the same harshness those requiring control and medical help outside of prison and those requiring long incarcerations to incapacitate. *See, e.g.*, Amir Ffrati, *Judges Trim Jail Time for Child Porn*, Wall St. J., Jan. 20, 2010, *available at* http://online.wsj.com; Alan Gomez, *Judges Seek Flexibility in Child Porn Cases*, USA Today, Dec. 23, 2009, at A3; United States Sentencing Commission, The History of Child Pornography Guidelines 8, n.33 (2009); *cf. America's Unjust Sex Laws; Illiberal Politics*, Economist, Aug. 6, 2009; *Unjust and Ineffective; Sex Laws*, Economist, Aug. 6, 2009. This view reflects the same dynamics as the increased flexibility in Guideline Sentencing ultimately approved by the Supreme Court following strong judicial opposition to the harsh rigidity originally required. *See, e.g.*, *United States v. Gall*, 552 U.S. 38 (2007), *United States v. Booker*, 543 U.S. 220 (2005), *Crawford v. Washington*, 542 U.S. 36 (2004), *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Compare too, the reduction of death sentences in response to increased opposition, through its elimination in the states, refusals of prosecutors to seek its imposition, opposition of judges, and denial by juries, based upon community sentiment. *See, e.g.*, John Swartz, "Death Sentences Dropped, but Executions Rose in 09," *N.Y. Times*, Dec. 17, 2009, at A22. Judges as well as juries are not immune to the views and influence of an informed community.

Each Article III judge is granted the responsibility to interpret the Constitution as he or she understands it. History confirms—what the Supreme Court has now held of sentencing generally—that the jury's power to ameliorate the harshness of the law is built into our system of justice. The Sixth Amendment's right to a jury trial was designed to confirm the opportunity and

124

power of the community (speaking through its cross-section of the petty jury) to forgive, condone or mediate punishment under special circumstances warranting that grace.

## V. Conclusion

Following the Court of Appeals' conclusion in *Polouzzi II*, that "the mere fact that jurors advised of the harsh sentencing law might have voted to acquit in an effort to nullify its application did not furnish adequate justification for vacating the jury's verdict and ordering a new trial," 564 F.3d at 163, this court specifically refuses to grant a new trial on that ground.

For the reasons stated above, *see* Part III.C, *supra*, it grants a new trial on all counts. Rejected is the government's contention, *see* Govt.'s Letter, July 27, 2009, that this result is precluded by the terms of the remand. If the case had been remanded solely for resentencing, the Court of Appeals panel would have stated in terms or substance: "with instructions to resentence the defendant." Instead, it stated: "[W]e VACATE the April 9, 2008 order granting defendant's motion for a new trial and REMAND this case . . . *for further proceedings consistent with this opinion." Polouizzi II*, 564 F.3d at 163 (emphasis added).

In accordance with the mandate of the Court of Appeals: the judgment of conviction is vacated and the jury verdict is set aside on all counts. A new trial is granted on Counts Two, Three, Six and Nine (Receipt of Child Pornography) and Fourteen (Possession of Child Pornography).

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   January 20, 2010
        Brooklyn, New York

125