FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 18 2011 ★

BROOKLYN OFFICE

October 13, 2011

06-cr-22 (JBW)

Dear Judge Weinstien,

 Please excuse my intrusion as I know you must be a very busy man. If I may just have a moment of you time please.

My son has recently gone through an unbelievable time these past few months. While I know this is not even in our state, Could you please read what I have sent the Judge that rendered the verdict upon him?

Stephen's case is similar in ways of that of C.R. .

As a parent, I am in awe of what to do next to get him released.

Could you please, when you have a free moment, offer some advice of what I can do next?

He was in Cleveland, Ohio court. Judge Carolyn Friedland, court room 20-D, Fax# 216-348-4034

My phone # is 585-590-4796
My fax # is 585-318-4184

Thank you very much for a moment of your time!

Respectively,

*signature*

Lisa A. Covert

Judge Friedland:                                              October 13, 2011

On June 30, 2011 two court appointed officers stood before you and threw non admittance to aspects in a case, let the court rule blindly.

You sentenced an 18 year old to 8 years in prison; 10 years post supervision and 25 years of monitoring for pictures on a flash drive of child pornography.

There were some things the officers did not tell you.

First, there seems to be in question of how just the witness came into the evidence. Upon reviewing the Parma Police Summary Report, it is an oblivious clear violation of the Fourth Amendment. Out of six people not one can get their story straight. The witness 'Miss Azlee Harris' swears to "she was walking by Suspect #1's apartment and observed the door to be slightly opened." Saying how she and Stephen were good friends and often never knocked entering each other's apartment the report says, "Harris knocked on the partially opened door anyways and received no response."

Adolescents and young adults are known for impulsive actions. Why now did she suddenly knock? It goes on to state, "Harris entered the apartment and began looking for Covert. Harris observed that no one was inside the apartment, and in fear that an unknown offender may steal items Harris removed Covert's X-box for safekeeping."

Mr. Covert will testify that he knows Miss Harris through work as an acquaintance and has gone to her apartment to 'drink beers and party with' on a few occasions. That she is a larger woman in stature and he would never think of entering her apartment without knocking first.

The report goes on to say, "Harris observed a Kingston flash drive in the rear of the X-box...the flash drive she had loaned to Covert at an unknown date in the past."

Miss Harris writes in her own statement that, "I went to Steven House the door was open. I knocked no answer but I went in because the door was open." "I went in no one was home but I seen his expensive X-box sitting out. I took it...I took it home."

By Miss Harris's own admission she violated Mr. Covert's Fourth Amendment. He had expectancy to his right of privacy. Most honest people see an open door and keep walking. A friend may shut the door or call. Not Miss Harris. "I went in because the door was open." Instead of verifying no one was home, leaving and shutting the door behind her...a reasonable expectation...Miss Harris takes items that do not belong to her.

Mr. Josue Galindo wrote in the report, "My friend went to get Steven's X-box and the X-box contained a memory card in it." But that is not was Miss Harris says in her report to the police.

Miss Harris says she, "noticed a memory card I loaned him so I popped it in to see the 9 movies stored." Proven fact, an average movie of 1 hour and 45 minutes can use up to 2 GB on a drive. This was a 4 GB drive.

Miss Deandra Pettaway adds, "Azlee let him borrow the flash drive a few weeks ago." This is an important key when it came to the sentencing, establishing time frame of viewing behavior.

Mr. Ezequiel Quiroz says, "Friends told me about some disturbing images." But Miss Harris stated that she had confronted Mr. Covert in front of 5 witnesses but Mr. Quiroz stated, "I walked out the room and went downstairs because I was discusted of what I seen." But goes on to say, "friends told me about some disturbing images." Which one is it?

Mr. Silas Gossett reported, "In living room heard yelling went into room and found out what was going on." Mr. Gossett wasn't even in the room as Miss Harris stated.

Mr. Jimmy Amaya stated, "they started asking him questions about the hard drive or disk...and on the disk or hard drive we seen little kids." Mr. Amaya doesn't even know what the story is or he wasn't paying attention.

Not one person had the same story other than Miss Harris went to Mr. Covert's apartment and took his X-box without his knowledge or consent. Miss Harris also reported that she currently worked at the same place of employment. Miss Harris had been let go weeks prior to this. In Aquilar V. Texas,was implied that "reliable information from a creditable witness" is needed and that an informer should be a prudent person. Miss Harris is not a "prudent witness' that would be expected or needed to base a case on. Miss Harris alone tells you she violated Mr. Covert's Fourth Amendment. She projected no prudence in her judgment.

Katz V. Us implies, even though he has roommates, what 'he seeks to preserve as private even in an area accessible to the public', being if someone did leave the door open, may be constitutionally protected. His capacity to claim the protection of the Amendment depends upon a property right in the invaded place, but whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.

Just as in Mancusi V. Deforte 1968, the official had a reasonable expectation of privacy in an office he shared with others, although he owned neither the premises nor the papers they seized. Mr. Covert is not entitled to the same rights? When Mr. Covert had left for work that evening he had taken normal precautions to maintain his privacy, precautions customarily taken by those seeking to exclude others by shutting the door behind him..A significant factor in that determines legitimacy of expectation. He deserved according to the Fourth Amendment, the right to have his home secure while he was away. His items were not in 'plain view' and he never gave permission to enter his residence. And with no 'inevitable discovery' in play, the police more than likely would never had known had someone, uninvited, taken said items from the residence.

When Mr. Covert went to file a robbery report due to his expectation of privacy being violated it is is noted written in the report "suspect information," and while he states he was assaulted and pictures were taken, nothing was to come out of it. Vigilantism apparently is acceptable. Miss Harris was allowed to violate Mr. Covert's Fourth Amendment right of the people to be secure in their persons, houses, papers and effects. Why didn't she just close the door and lock it? Why did she have to walk in uninvited and unknown and help herself to Mr. Covert's things?

Miss Harris also admits to videoing the confrontation of her asking Mr. Covert about the contents of the flash drive. That the officers as well left with that evening after viewing and entered into evidence later obtaining a search warrant for the said item. In Alderman V. US 1969, it states, the homeowner could object to the surveillance of conversations emanating from his home even though he was not a party to the conversations. Nobody asked Mr. Covert if he could be videoed taped; the evidence of the confrontation is inadmissible. An acquaintance not only helped herself to his items but assaulted him by her own omission, "I whooped his ass." Her behavior is acceptable?

And the behavior of and in Mr. Steven Eubanks statement of the items he 'finds' in his apartment are unaccountably bizarre. He states, "I was cleaning out his stuff because I was told he moved out." This was on 3/1/11. I didn't not arrive to town till 3:30am on 3/2/11 and did not speak to anybody in authority about moving out till well after 8:30am that morning. He claims in his statement he finds inappropriate pictures among Mr. Covert's items. That's interesting. I picked up Mr. Covert's belongings boxed, in a corner, in front of the rental manger, escorted I should say, and when going through the

items back in New York, I find paystubs that did not belong to Mr. Covert, I find clothes that weren't Mr. Covert's and I also find a stub with grades from school from a past roommate that moved out 2 months prior. So as far as the Officers and Mr. Eubanks finding items in question in an apartment where 4 boys lived, 2 beds per bedroom, nobody can say with 100% items belong to Mr. Covert. I documented going through the belongings with pictures that upon request I would be happy to supply.

As far as the contents of the flash drive Miss Harris had no right to possess, "Harris further advised that the flash drive that she observed in the X-box was the flash drive she had loaned to Covert at an unknown date." An observation that cannot be substantiated due to flash drives are massed produced, there is not a way she could be certain with a 100%, it looked similar would be a fair statement. US V. Chadwick 1977 states, "a person's expectation of privacy in personal luggage and other close containers is substantially greater than an automobile. Mr. Covert's closed container being the flash drive, he had reasonable expectations to privacy. As per Nardone V. US 1939, states, "such evidence is the 'fruit of the poisonous tree,' it is derived from the original illegality. It needs to be noted that search warrants were obtained after the officers had possession and had other officers view the material.

Weeks V. US 1914, states, The Supreme Court supplanted the long-standing common law tradition with the rule that evidence acquired in violation of the Fourth Amendment is inadmissible in criminal proceedings. The flash drive that had started the up and coming proceedings and the judgment rendered against Mr. Covert are 'fruit of a poisonous tree.'

Olmstead V. US says, "The striking outcome of the Weeks case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a violation of the Fourth Amendment."

Mapp V. Ohio 1961 ruled that the Fourteenth Amendment applied restrictions of the Fourth Amendment to the states via the Odious Doctrine of 'selective incorporation.' However, in 1961 the Federal Government foisted the exclusionary rule upon state courts as well.

Olmstead V. US, US V. Calandra, supra says, "The rule thus operates as a judicially created remedy designed to safe guard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."

Mr. Covert qualifies for the Fourth Amendment by meeting both tests. He subjectively reasonably expected some degree of privacy in his own residence. And two, he objectively reasonably had the same expectation of privacy with his residence that society is willing to recognize. Miss Harris broke that expectation as soon as she entered that apartment without permission. A fact she admits. Mr. Covert had a very legitimate expectation of privacy in his own home. Not to mention that the officers who illegally gathered evidence are in violation of the Fifth Amendment and also after they arrested Mr. Covert violated his Sixth Amendment when Mr. Covert asked for his parents he was told no (this is not noted in the police summary, why not.) This was an adolescent from a different state with no local help nor support in Ohio. They would not even allow him to make a phone call to his parents citing it was an out of state call. Also when I arrived at the police station at 3:30am, I was told I was not allowed to see my son. It took hours of hounding and multiple phone calls till the lead detective finally called me at 11:30am saying I was allowed a half an hour if I immediately go now. Of course I was in the parking lot already.

Simply put, If an unlawful search of your property or residence is conducted without your consent which is what Miss Harris did, and evidence of a crime is found, its illegal and the judge yourself can throw out the evidence and allow Mr. Covert to go back to his home state of New York. Facts of the case you were not at all aware had happened. The evidence was botched plain and simple and the exclusionary rule applies.

Mr. Covert's attorney must be held incompetent. His actions show an individual who only wants to insure a stipend. The most critical evidence he could not be bothered to give to you till right before sentencing that morning, right before you left to go get a cup of coffee. Mr. Covert's Eight Amendment requires proportionality in the sentenced imposed...how can that be if the lack of professionalism on the attorney's part grossly affected the outcome? The Prosecutor was hoping by using fallaciousness in empirical concepts to you, it would just squeak by. Regardless of the success of some observationally based generalizations (imagery), how can anyone justify his expectation that the future will conform to the past so the knowledge built upon past experience has any relevance whatsoever to the future? On what basis can we believe that the validity of the knowledge, It's fleeting that the particularity of each experience constitutes the evidence. It is not atypical for an 18 year old to have condoms in their possession away at college. When did drawing pictures become abnormal for an adolescent? Mr. Covert has always been artistic. Wasn't US V. Dorvee that found error in sentencing over the courts "apparent assumption" about the link between possession of child pornography and the risk of acting out?

Actually this whole case has been a Paradox. The Eight Amendment challenges the length of the term-in-years sentenced given all the circumstances in a particular case. You didn't have them. And two, it forbids only extreme sentences that are 'grossly disproportionate' to the crime. Mr. Covert was handed 8 years 9 months in person, 10 years post release and 25 years of being listed as an offender tier 2. That's in all 43 years for pictures that were less than 10 weeks old at best. That the pictures you held him accountable for which were out of character for him. You were not made aware that when his parents got involved that Mr. Covert was being treated for this. All this evidence handed to you right before your coffee break, I know I was sitting right there when he went back to hand it in. A little late. You did not know that the doctor that had been seeing him said Mr. Covert was no threat to anyone. That he was responding to treatment. That this was a manifest of the juvenile side to the attention deficit of being off his daily medicine and facing the hardship of being away from home day after day. That in a sense he was regressing due to his daily life failing, he went back to a comfortable time were things made sense and were easier and his sexual level that any 18 year old was evident. He agreed that going home with parental monitoring and the appropriate program that he approved of, that this would not come about again in his life.

After Mr. Covert was sentenced and I was speaking to the doctor, he informed me he was confused as to what happened to the deal that was supposed to have been worked out. Mr. Covert's doctor visits often happened after the attorney visits or court appearance. Mr. Covert's attorney had told us he has asked for a continuance due to the fact the assistant prosecutor needed a more lenient supervisor to come on duty and that way we could plea to probation. Sentencing was a surprise. The doctor had informed me that had there been no deal he would have showed up and testified on Mr. Covert's behalf. Mr. Covert even has a session taped between him and the doctor discussing the deal and what that would mean, with total expectance of this to come about. And yes, the doctor was giving permission to speak to you. You have his medical diagnosis in the papers handed in right before sentencing.

Mr. Covert is a good but naive adolescent as I am most assured the doctor would agree. He is very close to his family. That the family make up is very close. Mr. Covert is 1 out of 3 brothers and his

parents have been together over 23 years. Mr. Covert has been homeschooled many times by his mother and has spent many times traveling with his father due to his occupation of an over the road truck driver. He is very close to all his Aunts and Uncles, many of them close in age. And he is adored by both grandmothers. This kid does not deserve 43 years of punishment for a flash drive illegally obtained of pictures less than 10 weeks old. This is not something that has gone on for years. This is not who the system is in place for. Even if you use all the ways of profiling for future outcome, Mr. Covert does not fit in any class. There was no justice that day in June for him, or for you, or for the public.

The public that are going to have to pay for something that the child should have been sent back home with his parents and made to see a mental health specialist to help him finish growing up the correct way. Ohio has to pay for 43 years for this child instead of someone who really needs incarceration. Ohio is willing to ruin the rest of his life for a decision that mounted to a mental breakdown of sorts. When a professional put his reputation on the line after years of working for the social service system as a victim advocate, says to you in a report, THIS CHILD IS NOT A THREAT, wouldn't he know better than anyone?

Putting Mr. Covert in prison who has an immaturity level of that of a 10 to 12 year old at best, this can be proven by people who work for the state prison systems, is the worst decision, what is he going to pick up? Who is he going to learn to be? That's even if he lives. Yes he made a mistake and was taking accountability for that mistake and was receiving treatment, effective treatment. He was a scared kid that the system bullied him and lied to him to do what they wanted him to do, are what both the attorney and prosecutor did to him.

In US V. C.R, Judge Jack B. Weinstein, a senior United States District Judge, in his Memorandum and order, discussing mandatory minimums, noting that instead of a 5 to 7 year child pornography sentence, "Many judges are imposing a probation for 1 year for the 1st offense." And Judge Weinstein set a presidency with this past May 16th ruling saying anything over 5 years was cruel and unusual punishment. C.R was a twenty-two year old that had been viewing child pornography from age 15 to 19 and 19 years old when arrested and said to have visited 'gay watering holes.' Judge Weinstein gave him a 30 month sentence and said that was too harsh in his opinion. Mr. Covert viewed his images for 10 weeks at best and he received 8 years in prison, 10 years post supervised released and 25 years of being listed as a Tier 2 sex offender. Where is the proportionate to the sentencing?

The Supreme Court accepted consideration of a defendant's age and maturity in 2 recent decisions: Roper V. Simmons & Graham V. Florida.

The Mental Health professionals in the case of US V. C.R backed up the immaturity of an adolescent "can well last into their 20's as long as the frontal lope in the brain takes to grow. Some may never receive full growth while most will." (The frontal lope is the area responsible for high executive control functions that peek later in teen years that support the ability to suppress inappropriate actions, thought, focus attention, remember things from moment to moment, work for reward, and control movement-functions often disturbed in people with ADHD.) (Circuitry in the frontal and temporal areas that integrate information from the sensory areas with the high-order functions showed the greatest maturational delay in youth with ADHD.) (One of the last areas to mature, the middle of the prefrontal cortex, lagged five years with those with the disorder.) That information can be found on the governmental website, www.nih.gov/science-news/2007. I provided a copy for you. And that's with a 'normal' ADHD. Mr. Covert when diagnosed at the age of 3, was said to have all 13 symptoms of the criteria that was used 15 years ago. The specialist who moved to Maine Mr. Covert was seeing during his early years, would go on record of telling me that Stephen would never out grow this and would always need medication to help him through life. Stephen will tell you that out of my supervision he stopped

taking his medicine and did not restart till after I had his maternal grandmother get involved. This chaos on top of his world spinning out of control is what led to his poor choices, but nothing that deserves to be punished for 43 years! Stephen is currently taking medicine for his ADHD in Madison Correctional Institution of Pamelore, generic version, Nortriptyline. He is on the highest dosage the doctor said of 100mg taken daily.

Judge Weinstein is quoted as saying, "I don't approve of child pornography obliviously," he also said he did not believe that those who merely view images, as opposed to producing or selling them, present a significant threat to children. "Were destroying innocent lives unnecessarily. At most they should be receiving treatment and supervision." This coming from a wildly regarded and one of the most respected judges in America.

This was a kid who went to another state to try to start growing up. He made mistakes. He was lied to, he was bullied. His Amendment rights were shattered. And a senior United States District Judge said, when implying the same per case of US V. C.R, that his sentenced that ...he should be characterized for sentencing as a developmentally immature young adult with limited ability to appreciate legal limits on contacts with child pornography and to control his viewing of easily accessible internet programs, "our society views juveniles..As 'categorically less culpable than the average criminal" from Roper V. Simmons.
That the testimony from his doctor strongly supported the therapeutic value of an intensive outpatient course of treatment for Mr. Covert.
Judge Weinstein memorandum also says, "The need to avoid sentence disparities among defendants with similar records when they have been found guilty of similar conduct. Comparable sentences have been analyzed. The present sentence is slightly lower than those for adults using the internet the way the defendant did. But is somewhat higher (based upon conversations with judges in this court and surveys of the literature) than would be expected if defendant had been charged with possession only, a substantial possibility apparently seriously considered by the prosecuting authorities. C.R is a relatively immature 22 years old with no criminal history or substantial experience navigating the prison system. His youthful appearance, coupled with his diagnosed immaturity and child pornography offense would make him a target for predators in the general population.

WHAT DOES THIS MEAN FOR STEPHEN?
AGAIN, C.R was 22 this past May at sentencing. Stephen is only 18.
His Amendment rights were violated. When he tried to take accountability he was sentenced to a punishment that would equal 43 years. Evidence in US V. C.R; prove he did these actions for over 4 years. Stephen a few weeks. C.R only got 30 months.

This verdict needs to be thrown out. You did not have all the facts. Stephen needs to be sent home to his parents and allowed to finish growing up with mental health help. Please overturn this verdict due to inadmissible evidence. Stephen is not a threat per his mental health doctor Mr. Hamilton; again Mr. Hamilton worked for 25 years for social services as a victim's advocate.

Thank You for your time,

*Lisa Covert*

Lisa A. Covert

# William F. Hamilton, M.S.S.A. A.C.S.W., L.I.S.W. -S., BCD

*Academy of Certified Social Workers*
*Board Certified Clinical Social Worker*

Psychological & Behavioral Consultants

2770 S.O.M. Center Road                    2511 Country Club Blvd., Suite 290
Willoughby Hills, Ohio 44094                North Olmsted, Ohio 44070

### 216-548-2895
(216) 486-8131 Home FAX
(440) 944-7330 Office FAX

David J Ingersoll, Esq.
526 Superior Avenue E # 458
Cleveland, OH 44114-1984

July 1, 2011

RE: Covert, Stephen
DOB:    10/13/92

Dear Mr. Ingersoll:                                                  Page 1 of 2

Included in this package is my assessment of the aforementioned individual and my treatment notes up to this juncture. You will note that within his assessment is his historic records which I was able to obtain. It is my hope that you will find this information helpful.

In summary of the attached;

Diagnoses and Current Medications:
DSM IV

| Axis | Code | Description |
|---|---|---|
| Axis I: | 314.01 | Attention-Deficit / Hyperactivity Disorder, Combined Type |
|  | 302.2 | Pedophilia |
| Axis II: | 799.9 | Deferred |
| Axis III: |  | None Noted |
| Axis IV: |  | Legal Problems / Insecure Living Circumstances |
| Axis V: | 35/50 |  |

Current Medications:
Adderal 20 mg (90 daily)

This individual has been seen in my office five times, including his assessment. This individual is clearly motivated to progress in therapy. This individual is continually referencing points that were discussed in previous sessions and makes a point of discussing his follow through with various assignments. Prior to his charges, this individual had not been medically compliant. since coming into counseling this individual has demonstrated medical compliance. Given his diagnosis, both counseling recommendations and medical compliance are necessary for his recovery. This individual states during each session that he never wants to be in this position again and he wants to get better.

During the period that this individual has been in counseling it has become clear to me that there is a significant difference between his chronological age and his emotional development. I have investigated through interviews with his mother and he what the causal factors for this disconnect might be. It appears that due to his severe AD/HD his mother has been very protective of him and has been vigilant in supervising his behaviors in and out of school. As a result, this young man has been able to progress

academically and stay out of trouble legally and socially while he was under her supervision. The only thing that was problematic is that due to this close supervision, he has not progressed through the developmental stages consistent with his chronological age. This individual claimed that he had two girlfriends while in high school. Through discussion it became clear that one was only a friend who thought of him as a "brother" and the other was just a girl who he would talk to on occasion. This was verified by his mother. Additionally, this individual had few age mate friends due to his levels of social immaturity.

After this individual was stabilized medically he has been able to be very honest and forthright in his conversations during session about the internet pornography. I have sensed no attempt to be deceptive during the therapeutic interventions. With this in mind, I was able to explore with him any past sexualized behaviors with children. This individual not only denied this but was annamite that this would be. "disgusting" to him. There is no evidence to suggest that this individual has acted on any attraction towards children physically even though he has had continual access to them prior to coming to Ohio. However, when it was brought to his attention that viewing images of children in a pictorially sexualized environment, he was in fact an active participant in child sexual abuse, he was shocked and genuinely remorseful. Work was done with this individual to help him recognize that women his own age are the only appropriate relationship focus. This individual understood and appears to have accepted that fact. But clearly, much more work needs to be done. This individual has come a long way in a short period of time towards recovery. I have no reason to believe that this progress will not continue if he were to remain in treatment.

It is important to note that this individual did not begin the behaviors which brought him to the courts attention until he came to Ohio. Prior to beginning school in Ohio he was under the continual supervision of his mother. His mother has committed to this individual returning to her home if the Court allows him. His mother has spoken with the probation department in his home county of Orleans in the state of New York. They informed her that transfer of probation would only be a matter of paperwork. This individual's mother has also made contact with Orleans County Mental Health Services. After explaining the circumstances and his diagnosis she learned that he could be enrolled in an intensive therapeutic intervention. It is my opinion that public safety, this individual's recovery, and this individuals ability to contribute to the community would be best served if the aforementioned components were in place. I would strongly recommend against his being incarcerated for fear that the elements that he would come in contact with along with his other mental health issue may reinforce his previous behaviors and reduce his chances of recovery. It is my hope that he receive close, structured probation in his home County which will focus not only on the anti-social behavior but on age appropriate socialization, vocational development, and medical compliance.

If you have any questions or if I could be of further assistance, please do not hesitate in contacting me.

Respectfully,


William F. Hamilton, M.S.S.A., A.C.S.W., L.I.S.W.-S, BCD
WFH/wfh
Encl.

# What Is Pamelor Used For? (Cont.)

## How Does Pamelor Work?
**Pamelor** is a tricyclic antidepressant. **Tricyclic antidepressants** are an older group of medications that have been used to treat **depression** for many years. Even though Pamelor has been around for a long time, it is not entirely clear how the medication works. It is known that Pamelor affects several chemicals in the brain, including serotonin and norepinephrine.

## Can Children and Teens Use It?
How Does Pamelor Work?Pam children or teens. **Antidepressants** have been shown to increase the risk of suicidal thoughts and behavior in short-term research studies involving children and teenagers (see **Nortriptyline and Suicide** for more information on the risks of suicide with Pamelor). Talk to your healthcare provider about treatment options for childhood or **teen depression**.

## Is Pamelor Used for Off-Label Reasons?
On occasion, your healthcare provider may recommend Pamelor for something other than depression. This is called an **"off-label"** use. At this time, there are several off-label Pamelor uses, such as:

- Chronic pain. Pamelor works best for chronic pain that is nerve-related, such as nerve pain from having **shingles** (including **postherpetic neuralgia**).

- **Anxiety disorder**: Many antidepressants (including Pamelor) are used to treat **anxiety disorders**.

- **Bedwetting**: Pamelor has been used to help people stop bedwetting.

- Attention deficit hyperactivity disorder (**ADHD**): Pamelor can be used to treat ADHD, especially if other ADHD medications have not been effective or cause side effects.

- **Fibromyalgia**: Pamelor has been used to treat pain and other symptoms of fibromyalgia.

- Prevention of **migraine headaches**: Pamelor can be used on a daily basis to prevent **migraine headaches**. Pamelor is not effective for treating a **migraine headache** once it starts.

- **Treatment for bulimia**: Pamelor has been found to improve **bulimia symptoms**, including **binge eating** and vomiting.

- Smoking cessation: Pamelor is sometimes used to help people quit smoking.

Stay up-to-date on this topic

Written by/reviewed by: Kristi Monson, PharmD; Arthur Schoenstadt, MD
Last reviewed by: Kristi Monson, PharmD

Last updated/reviewed: January 21, 2011
List of references (click here)

Date: October 13, 2011

To: Judge Jack B. Weinstein
    United States District Court
    Fax: 718-613-2527

CR ob-22 (JBW)

From: Lisa Covert
    Medina, NY
    585-590-4796

RE: Stephen Covert

URGENT ATTENTION NEEDED

Please find: Letter for Judge -1 page
    Letter for the Judge -6 pages
    Medical diagnosis letter -2 pages
    NIMH Press release – 2 pages
    Medication information – 1 page

